Lynn L. Sarko *(Pro Hac Vice)*
lsarko@kellerrohrback.com
Michael D. Woerner *(Pro Hac Vice)*
mwoerner@kellerrohrback.com
Derek W. Loeser *(Pro Hac Vice)*
dloeser@kellerrohrback.com
Gretchen S. Obrist *(Pro Hac Vice)*
gobrist@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384

Sharon T. Hritz (S.B. #265105)
shritz@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101-6760
Tel: (805) 456-1496
Fax: (805) 456-1497

Robert L. Lakind *(Pro Hac Vice)*
rlakind@szaferman.com
Arnold C. Lakind *(Pro Hac Vice)*
alakind@szaferman.com
Mark A. Fischer *(Pro Hac Vice)*
mfisher@szaferman.com
Robert E. Lytle *(Pro Hac Vice)*
rlytle@szaferman.com
Robert G. Stevens, Jr. *(Pro Hac Vice)*
rstevens@szaferman.com
SZAFERMAN, LAKIND, BLUMSTEIN &
BLADER, P.C.
101 Grovers Mill Road
Lawerenceville, NJ 08648
Tel: (609) 275-0400
Fax: (609) 275-4511

**Counsel for Plaintiffs Jaclyn Santomenno,
Karen Poley and Barbara Poley**

Danielle Disporto *(Pro Hac Vice)*
ddisporto@lpklaw.com
Theresa Vitello *(Pro Hac Vice)*
tvitello@lpklaw.com
LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 11th Floor
New York, NY 10022
Tel: (212) 605-6205
Fax: (212) 605-6290

***Additional Counsel for Plaintiffs Jaclyn Santomenno,
Karen Poley and Barbara Poley***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACLYN SANTOMENNO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TRANSAMERICA LIFE INSURANCE COMPANY, et al.; <br><br> Defendants. | **No. 2:12-cv-02782-DDP (MANx)** <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> **BEFORE THE HON. DEAN D. PREGERSON** |

# **Table of Contents**

I.  INTRODUCTION ................................................................1

II.  FACTUAL BACKGROUND.............................................2

    A.  TLIC Acknowledges It Is a Fiduciary.................4

    B.  TLIC Exercises Fiduciary Functions. ................5

    C.  TLIC's Investment Options and Fees. ...............7

    D.  Overview of Plaintiffs' Claims. ........................9

        1.  The Mutual Fund Excessive Fee Claims. .................9

        2.  The Revenue Sharing Claim. .................9

        3.  The Affiliate Claims.................10

        4.  The Mutual Fund Share Class Claim. .................10

        5.  The Collective Trust / Separate Account Excessive Fee Claim. .................10

        6.  The IAA Claim.................10

III.  ARGUMENT.................11

    A.  Applicable Legal Standard. .................11

    B.  Plaintiffs Have Plausibly Alleged that TLIC Is an ERISA Fiduciary With Respect to the Conduct Underpinning Each ERISA Claim.................12

        1.  Overview of Fiduciary Status Law. .................12

        2.  Assessment of Fiduciary Status Cannot Be Made on the Pleadings. .................13

        3.  The Complaint Plausibly Alleges TLIC Is a Fiduciary With Respect to the Specific Actions on Which the Complaint Is Based. .................14

            a.  TLIC Is a Fiduciary for Purposes of All ERISA Claims Because Plan Assets Are Held in Separate Accounts. .................15

b.   By Retaining the Authority to Amend Its
Compensation and Controlling Investment
Options, TLIC Is a Fiduciary........................................17

    (i)   TLIC Retained Both Authority and
Control Over Plan Assets and
Discretionary Authority and Control
Over Plan Administration and
Management By Controlling Its
Compensation.....................................................18

    (ii)   TLIC Retained Both Authority and
Control Over Plan Assets and
Discretionary Authority and Control
Over Plan Administration and
Management By Controlling the
Selection of Investment Options. ......................20

c.   TLIC Is a Fiduciary Because It Retains
Authority Over Revenue Sharing Payments. ...............25

d.   TLIC Acts as a Fiduciary When It Provides
Investment Advice For a Fee.......................................26

    (i)   Advice to the Plans............................................26

    (ii)   Advice to Participants. ......................................29

4.   The Existence of Other Plan Fiduciaries Is a Red
Herring. ................................................................................30

5.   TLIC's Challenges to the ERISA Claims Against
TLIC Fail..............................................................................33

a.   TLIC Violated Its ERISA Duties of
Prudence and Loyalty. .................................................34

b.   TLIC Violated ERISA Through Prohibited
Transactions.................................................................35

c.   The Mutual Fund Excessive Fee Claims Are
Well-Pled. ....................................................................35

d.   The Mutual Fund Share Class Claim Is
Well-Pled. ....................................................................38

e.   The Revenue Sharing Claim Is Well-Pled...................39

|   |   |   | f. | The Collective Trust / Separate Account Excessive Fee Claim Is Well-Pled. .............................40 |
|---|---|---|---|

g. The Affiliate Claims Against TLIC Are Well-Pled. .............................................................40

C. TIM and TAM Knowingly Participated in TLIC's Prohibited Transactions. .......................................42

D. Plaintiffs' IAA Claim Is Well-Pled. ...............................45

1. There Is a Contract Between TLIC and Plaintiffs. ...............47

a. There Is a Contract Under Federal Securities Law. .......................................47

b. There Is a Contract Under the Common Law. ...............................48

2. TLIC's Arguments Lack Merit. ...........................49

3. Plaintiffs May Seek Restitution. ...........................49

IV. CONCLUSION...........................................................50

## <u>Table of Authorities</u>

### <u>Cases</u>

*Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977) ...............................45, 46

*Adkins v. John Hancock Mut. Life Ins. Co.*, 957 F. Supp. 211 (M.D. Fl. 1997) .............................................................................................16

*AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631 (9th Cir. 2012)...............11

*Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715 (9th Cir. 1997).....................................................................................12

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)...............................................................................................11

*Baker v. Chin & Hensolt, Inc.*, No. 09-4168, 2010 WL 1222783 (N.D. Cal. Mar. 24, 2010)...................................................................44

*Bd. of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270 (3d Cir. 2001) ............................16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)...........................................................................11

*Blatt v. Marshall & Lassman*, 812 F.2d 810 (2d Cir. 1987)................................32

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009)................... passim

*Briscoe v. Fine*, 444 F.3d 478 (6th Cir. 2006) ......................................................17

*Calhoon v. TWA, Inc.*, 400 F.3d 593 (8th Cir. 2005)............................................44

*CGI Techs and Soln's v. Rose*, --- F.3d ----, 2012 WL 2334230 (9th Cir. June 20, 2012)............................................................................43, 44

*Charters v. John Hancock Life Ins. Co.*, 534 F. Supp. 2d 168 (D. Mass. 2007) ("*Charters I*").......................................................................21

*Charters v. John Hancock Life Ins. Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008) ("*Charters II*")................................................................ passim

*Chi. Bd. Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254 (7th Cir. 1983) ......................................................................................18, 20

*CIGNA Corp. v. Amara*, --- U.S. ----, 131 S. Ct. 1866, 179 L. Ed. 2d 843 (2010).................................................................................43

*Clark v. Nevis Capital Mgmt., LLC*, No. 04-2702, 2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ...................................................................49

*Columbia Air Servs., Inc., v. Fidelity Mgmt. Trust Co.*, No. 07-11344, 2008 WL 4457861 (D. Mass. Sept. 30, 2008)..................................20

*Concha v. London*, 62 F.3d 1493 (9th Cir. 1995)............................. 12, 32, 34, 43

*Decker v. Independence Shares Corp.*, 311 U.S. 282, 61 S. Ct. 229, 85 L. Ed. 189 (1940) ...................................................................50

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982)..............................33

*Donovan v. Mazzola*, 716 F.2d 1226 (9th Cir. 1983) ...........................34

*Donovan v. Mercer*, 747 F.2d 304 (5th Cir. 1984) ........................13, 37

*Eaton v. D'Amato*, 581 F. Supp. 743 (D.D.C. 1980)...........................13

*Ed Miniat, Inc. v. Globe Life Ins. Grp.*, 805 F.2d 732 (7th Cir. 1986)............19, 20

*Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694 (W.D. Mich. 2007)........29, 41

*Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ...................................................................11

*F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250 (2d Cir. 1987) ...................................................................19

*First Pac. Bancorp Inc. v. Helfer*, 224 F.3d 1117 (9th Cir. 2000) .......................49

*George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011) ("*George II*")...................................................................39

*George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031 (N.D. Ill. 2009) ("*George I*")...................................................................14

*Gilliam v. Edwards*, 492 F. Supp. 1255 (D.N.J. 1980).........................35

*Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618 (D.N.J. 2010).................29, 35, 39

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) ...................................................................42, 43

*Haddock v. Nationwide Fin. Servs. Inc.*, 262 F.R.D. 97 (D. Conn. 2009) ("*Haddock II*"), *vacated on other grounds*, 460 Fed. App'x 26 (2012) ................................................................... 21, 23, 24, 25

*Haddock v. Nationwide Fin. Servs. Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006) ("*Haddock I*") ................................................... passim

v

*Hamilton Sec. Advisory Servs. v. United States*, 60 Fed. Cl. 144 (Fed. Cl. 2004) ................................................................50

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000)........................................42, 44

*Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) ...................... 19, 24, 34, 36

*Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989 (3d. Cir. 1987) ................................................................50

*In re ADC Telecomms., Inc. ERISA Litig.*, No. 03-2989, 2004 WL 1683144 (D. Minn. July 26, 2004) ................................14

*In re Beacon Assocs. Litig.*, No. 09-777, 745 F. Supp. 2d 386 (S.D.N.Y. Oct. 5, 2010) ................................................29

*In re Regions Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944 (W.D. Tenn. 2010)................................................35, 43

*In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220 (3d Cir. 2009) ................................................13

*IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415 (9th Cir. 1997).............. passim

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 114 S. Ct. 517, 126 L. Ed. 2d 524 (1993)....................................12, 17

*Kayes v. Pac. Lumber Co.*, 51 F.3d 1449 (9th Cir. 1995) ...............................13, 45

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, No. 11-5127, 2012 WL 701397 (S.D.N.Y. Mar. 6, 2012)................................34

*Landwehr v. DuPree*, 72 F.3d 726 (9th Cir. 1995)................................................44

*Lowen v. Tower Asset Mgmt.*, 829 F.2d 1209 (2d Cir. 1987)..............................35

*Mack Boring & Parts v. Meeker*, 930 F.2d 267 (3d Cir. 1991)...........................16

*Marks v. Independence Blue Cross*, 71 F. Supp. 2d 432 (E.D. Pa. 1999) ................................................................20

*Martin v. Schwab*, No. 91-5059, 1992 WL 296531 (W.D. Mo. Aug. 11, 1992) ................................................23

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985) ................................................2, 34

*Mertens v. Hewitt Assocs.*, 508 U.S. 248, 113 S. Ct. 2063,  124 L. Ed. 2d 161 (1993)................................................13, 42

vi

*Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co.*, 255 F.3d 375 (7th Cir. 2001) ..................................................................................16, 20

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970) ........................................................................................47

*Moreland v. Behl*, No. 92-1238, 1996 WL 193843 (N.D. Cal. Apr. 17, 1996) ................................................................................................21

*Palmeri v. LG Elecs. USA, Inc.*, No. 07-5706, 2008 WL 2945985 (D.N.J. July 30, 2008) ..............................................................................50

*Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001) ....................... passim

*Paul S. Mullin & Assocs., Inc. v. Bassett*, 632 F. Supp. 532 (D. Del. 1986) ................................................................................................49

*Paulsen v. CNF Inc.*, 559 F.3d 1061 (2009) ..............................................43

*Pegram v. Herdrich*, 530 U.S. 211, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000) ................................................................................................34

*Pension Fund—Mid Jersey Trucking Indus.—Local 701 v. Omni Funding Grp.*, 731 F. Supp. 161 (D.N.J. 1990) ..................................28

*Pepsi Bottling Grp., Inc. v. Thomas*, No. 10-54, 2010 WL 2650560 (W.D. Wash. July 1, 2010) ........................................................................44

*Phones Plus, Inc. v. Hartford Fin. Servs. Grp., Inc.*, No. 06-1835, 2007 WL 3124733 (D. Conn. Oct. 23, 2007) .......................................... passim

*Procacci v. Drexel Burnham Lambert, Inc.*, No. 89-0555, 1989 WL 121984 (E.D. Pa. 1989) .................................................................28

*Prudential Life Ins. Co. v. SEC*, 326 F.2d 383 (3d Cir. 1964).........................41, 46

*Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003) ......................................14

*Reich v. Compton*, 57 F.3d 270 (3d Cir. 1995)........................................35

*Renfro v. Unisys Corp.*, 671 F.3d 314 (3rd Cir. 2011) ...................... 24, 25, 36, 40

*Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F. Supp. 278 (D.N.J. 1994) .........................................................28

*Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) ............................19

*Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610 (6th Cir. 2003) ................................................................................................19

vii

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963) ................................................................46

*SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010)................43

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946) ................................................................................................47

*SEC v. Wash. Inv. Network*, 475 F.3d 392 (D.C. Cir. 2007) ...........................45

*Shirk v. Fifth Third Bancorp*, No. 05-049, 2008 WL 4449024 (S.D. Ohio Sept. 26, 2008) ................................................................45

*Stanton v. Shearson Lehman/Am. Express, Inc.*, 631 F. Supp. 100 (N.D. Ga. 1986) ................................................................28

*Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904 (9th Cir. 1997) ................................................................................................13

*Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114 (9th Cir. 1994) ................................................................13, 29

*Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010) ("*Tibble II*") ................................................................39

*Tibble v. Edison*, 639 F. Supp. 2d 1122 (C.D. Cal. 2009) ("*Tibble I*") ................41

*Tool v. Nat'l Emp. Benefit Servs., Inc.*, 957 F. Supp. 1114 (N.D. Cal. 1996) ................................................................................................16

*Tr. of Laborers Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*, 783 F. Supp. 899 (D.N.J. 1992) ................................................................16

*Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979) ................................................................46, 50

*Tussey v. ABB, Inc.*, No. 06-4305, 2008 WL 379666 (W.D. Mo. Feb. 11, 2008) ("*Tussey I*") ................................................................ 14, 20, 32, 44

*Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012) ("*Tussey II*") ................................................................39

*United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603 (8th Cir. 1999) ................................................................50

*United States v. Glick*, 142 F.3d 520 (2d Cir. 1998) ................................32

*Will v. Gen. Dynamics Corp.*, No. 06-698, 2009 WL 3835883 (S.D. Ill. Nov. 14, 2009) ................................................................14, 43

*Woods v. Sullivan Co.*, 396 F. Supp. 2d 1351 (N.D. Ga. 2005) ............................14

*Wright v Or. Metallurgical Corp.*, 360 F.3d 1099 (9th Cir. 2004)........................41

*Yeseta v. Baima*, 837 F.2d 380 (9th Cir. 1988).................................................23, 32

*Zang v. Paychex Inc.*, 728 F. Supp 2d 261 (W.D.N.Y. 2010) ..............................24

**State Cases**

*Cont'l Bank of Pa. v. Barclay Riding Academy, Inc.*, 93 N.J. 153, 459
    A.2d 1163 (N.J. 1983) ...................................................................................49

*In re Marriage of Brown*, 15 Cal. 3d 838, 126 Cal. Rptr. 633 (Cal.
    1976) .............................................................................................................48

**Federal Statutes**

ERISA § 3(17), 29 U.S.C. § 1002(17).................................................................15

ERISA § 3(21), 29 U.S.C. § 1002(21)........................................................... passim

ERISA § 401(c), 29 U.S.C. § 1101(c) .................................................................16

ERISA § 404(a), 29 U.S.C. § 1104(a) .................................................................34

ERISA § 406(b), 29 U.S.C. § 1106(b).......................................................10, 35, 41

ERISA § 410(a), 29 U.S.C. § 1110(a) .................................................................18

ERISA § 502(a), 29 U.S.C. § 1132(a) .......................................................10, 42, 43

ERISA § 503(a), 29 U.S.C. § 1132(a) .................................................................45

IAA § 203(a), 15 U.S.C. § 80b-3(a) ...................................................................11

IAA § 203, 15 U.S.C. § 80b-3 ...........................................................................45

IAA § 205(d), 15 U.S.C. § 80b-5(d) ...................................................................48

IAA § 215(b), 15 U.S.C. § 80b-15(b) .................................................................46

**State Statutes**

Cal. Civ. Code § 1550.......................................................................................49

**Federal Regulations**

29 C.F.R. § 2509.96-1.......................................................................................27

29 C.F.R. § 2509.96-1(d) ..................................................................................29

29 C.F.R. § 2510.3-101(h) ................................................................15

29 C.F.R. § 2510.3-21 ......................................................................26

29 C.F.R. § 2550.401c-1(d) .......................................................15, 16

29 C.F.R. § 2550.401c-1(g) ............................................................15

29 C.F.R. § 2550.408b-2(c) ............................................................41

Definition of the Term "Fiduciary", 75 Fed. Reg. 65263 (Oct. 22, 2010) ................................................................................26, 29

Investment Advice—Participants and Beneficiaries, 74 Fed. Reg. 3822 (Jan. 21, 2009) .............................................................29

Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 Fed. Reg. 41600 (July 16, 2010) ..............................19

## **Other Authorities**

Brief of the Secretary of Labor as Amicus Curiae in Support of Plaintiffs, *In re Beacon Sec. Litig.*, No. 09-777 (S.D.N.Y. Oct. 1, 2010) (Dkt. 179-1) ................................................................27

Definition of the Term "Fiduciary", 40 Fed. Reg. 50842 (Oct. 31, 1975) ........................................................................................27

DOL Op. 05-22A, 2005 WL 3751637 (Dec. 7, 2005)............................15

DOL Op. 97-15A, 1997 WL 277980 (May 22, 1997) ("Frost DOL Op.")........................................................................................21

DOL Op. 97-16A, 1997 WL 277979 (May 22, 1997)............................22

H.R. Conf. Rep. 93-1280 ....................................................................15

x

# I.   INTRODUCTION

Plaintiffs submit this consolidated memorandum in opposition to the two motions to dismiss filed by Defendant Transamerica Life Insurance Company ("TLIC") (Dkt. 103) ("TLIC MTD") and by Defendants Transamerica Investment Management, LLC ("TIM") and Transamerica Asset Management, Inc ("TAM") (Dkt. 104) ("TIM/TAM MTD").  *See* Order (July 24, 2012) (Dkt. No. 115).

Plaintiffs' Complaint ("Compl.") advances claims under the Employee Retirement Income Security Act of 1974 ("ERISA") and alleges that Defendants extracted impermissible fees from group annuity contracts ("GACs") issued by TLIC to 401(k) plans created for small- and mid-sized businesses (Counts I-VII); and alleges claims arising under the Investment Advisers Act of 1940 ("IAA"), which relate to TLIC's practice of rendering investment advice to the public without registering with the Securities and Exchange Commission ("SEC") (Count VIII).

Prior to this litigation, TLIC presented itself as a veritable fiduciary—a one-stop shop for retirement plan fiduciary functions that provided, among other assurances, a "Fiduciary Warranty" and a "Fiduciary Management Program." However, TLIC fails to inform Plaintiffs that it will utilize its fiduciary powers to make available only investment products that produce compensation for TLIC—which significantly exceeds what Plaintiffs would otherwise pay for these same products, Compl. ¶¶ 246-258.  TLIC now abandons its fiduciary representations, and, instead, claims it has no relevant fiduciary duties.  Rather, its clients—retirement plan sponsors (the "Plans") to which it provided its "Fiduciary Warranty"—are supposedly solely responsible for the excessive fees TLIC charges to the Plans.  TLIC attempts to refocus attention everywhere but itself.  Yet, the existence of plan sponsors with duties to the Plans does not absolve TLIC of responsibility for the actions it undertook as the fiduciary *warrantor* to the Plans.

It is TLIC's conduct that is at issue in this case, and its conduct that runs afoul

of the "crucible of congressional concern"—the "misuse and mismanagement of Plan assets." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985).  Despite its duties and responsibilities as a fiduciary, TLIC levies excessive fees that have a devastating effect on the retirement savings of the Plan participants whose best interests TLIC is required to serve.  This is not mere hyperbole, as demonstrated by the following chart:



Assuming an investment management fee of 18 bps in the underlying mutual fund and a wrapper of 75 basis points ("bps") charged by TLIC (such as with TLIC's Vanguard Total Stock Market Index Ret Opt), the excessive fees charged by TLIC will reduce retirement savings by $34,014.00 for an investor in this investment option over a 40-year period.  Thus, *more than 23%* of what the investor otherwise would have earned in returns over 40 years ($145,494.00) is paid instead to TLIC.[1]

## II.    FACTUAL BACKGROUND

TLIC operates 401(k) plans through its GACs for small- and mid-sized employers (the "Plaintiff Plans" or "Plans").  Compl. ¶¶ 2, 94.  Plaintiffs Karen and Barbara Poley are participants in the QualCare Alliance Networks Inc., Retirement

---

[1] This hypothetical assumes a $1,000 per year investment increased by 2% inflation rate per year, as well as a 6% return in the underlying mutual fund.

Plan ("Qualcare Plan"), a Plaintiff Plan.  Compl. ¶¶ 4, 56.  Prior to December 2010, Plaintiff Santomenno was a participant in the Gain Capital Group, LLC 401(k) Plan ("Gain Plan"), also a Plaintiff Plan.  Compl. ¶¶ 5, 57.  Through their Plans, Plaintiffs acquired interests in "investment options" offered and administered by TLIC.

TLIC makes a number of relevant promises to its retirement plan clients.  It claims that, as part of its services to the Plans, it acts as a "fiduciary"; provides a "Fiduciary Warranty"; implements its "Fiduciary Management Program"; and provides investment advice to the Plans and their participants.  Compl. ¶¶ 155, 181, 189-199, 303.  In TLIC's words, "[o]ur expertise allows you to focus on your business . . . ."  Compl. ¶ 96.  What TLIC fails to tell its retirement plan clients, such as the Plaintiffs' Plans, is that it will utilize its position as a fiduciary to narrow available investment options, presenting only those options that allow TLIC to add substantial fees to their cost.  Remarkably, many of the options are mutual funds that the client plans could obtain directly at a fraction of the cost.  Compl. ¶¶ 246-258.

TLIC refers to options it offers to Plaintiffs for the investment of their retirement savings, as "separate account" investment options.  Some of the investment options are collective investment trusts; others are investments into the separate account.  Most, however, are simply pass-through vehicles that invest in an underlying mutual fund which is available to the general public.  As TLIC acknowledges, the performance of the mutual fund-based separate accounts mimic that of the underlying funds.  Compl. ¶ 253.  Despite that Plaintiffs only receive an investment in a mutual fund, TLIC charges a minimum 75 bp fee in addition to the fees of the "underlying mutual fund."  TLIC MTD at 6.  Thus, for example, one separate account—the "Vanguard Total Stock Market Index Ret Opt"—overlaying the Vanguard Total Stock Market Index Fund (Investor Class) charged 93 bps, while the underlying mutual fund charges 18 bps.  Compl. ¶¶ 246-247, 270-280.  That means TLIC increases the cost over ***400 percent*** (75 bps) purportedly for "managing" an index fund, which, by design, is not actively managed.

All of the investment options TLIC selects include significant add-on fees, causing substantial losses to the Plans. *See* Dep't of Labor ("DOL"), "A Look at 401(k) Plan Fees"[2]; *see also* Compl. ¶¶ 262-265. The Plan participants' loss is TLIC's gain. With over $19.5 billion in assets under management, over *a one year period*, an additional 75 bps charge results in the transfer of over *$146 million* from participant retirement savings to TLIC.

## A. TLIC Acknowledges It Is a Fiduciary.

TLIC tells its retirement plan clients that it is a fiduciary. As stated in materials TLIC provides to its clients:

> Would you like someone to help you handle the fiduciary requirements concerning your 401(k) plan? . . .
>
> If you're confused about your fiduciary responsibilities, *don't worry*. Transamerica . . . a top plan provider with more than 70 years of experience in the retirement services business—can help provide you with the support you need to satisfy those responsibilities.

Compl. ¶ 100; Ex. A (Cover Letter from Financial Adviser) (emphasis added).[3] TLIC claims it will provide these services through its "Fiduciary Management Program"—which TLIC says "provides the best of both worlds to plan sponsors— the protection of a fiduciary warranty along with a proactive *turn-key fiduciary program*." Ex. B (Feb. 11, 2008 Press Release) (emphasis added). Via its "turn-key fiduciary program," TLIC will unilaterally add and delete investment options and monitor the investments, including their fees. "[TLIC] examines six different criteria to determine if an investment choice is appropriate for our line-up: . . . Fees and Expenses." Compl. ¶ 181. TLIC also offers the "Transamerica Fiduciary

---

[2] *Available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf.
[3] Unless otherwise noted, all Exhibits ("Ex.") referenced herein are attached to the Declaration of Gretchen S. Obrist ("Obrist Decl."). With respect to Defendants' exhibits or documents already in the record, page numbers refer to Page ID numbers on the ECF filing.

1   Warranty" and promises to secure investment options with "lower than average"

2   fees, Compl. ¶¶ 155, 181; Ex. C (Transamerica Investment Monitor); Ex. D

3   (Transamerica Fiduciary Management Program Warranty).

4        In addition to marketing its fiduciary programs with a warranty, TLIC

5   proclaims: "For every new investment choice we are offering in 2009, [TLIC] *is a*

6   *fiduciary* as to the monitoring and management of its investments underlying each

7   investment choice."  Ex. E (TRS 5436-1280) (emphasis added); Compl. ¶ 204.

8   **B.     TLIC Exercises Fiduciary Functions.**

9        TLIC acknowledges that it performs fiduciary functions and then performs

10   them, beginning with the construction of a menu of investment options for all

11   Plaintiff Plans.  Compl. ¶¶ 11-13.  First, TLIC selects an investment menu with 170

12   separate account investment options, which it calls its "Partner Series III Menu."

13   Compl. ¶¶ 12-13; 240-242.  Second, from this "Partner Series III Menu," each plan

14   sponsor is allowed to "select" a smaller menu of investment options for each Plan,

15   within the constraints imposed by TLIC—with a limit of 50 to 80 investment

16   options.  Compl. ¶¶ 14, 157, 242; Ex. F (Extra Assurance for Plan Fiduciaries).

17        TLIC advises the sponsor how to construct the smaller menu by providing its

18   "Transamerica Investment Monitor," which is part of its "Fiduciary Management

19   Program."  TLIC describes this program as "our proprietary comprehensive due

20   diligence process for selecting and monitoring the investment choices offered for

21   your retirement plan."  Compl. ¶ 181; Ex. E (TRS 5436-1280).

22        TLIC encourages employers to select certain portfolio options, known as

23   "Transamerica models."  Compl. ¶ 157; Ex. E.  Those who select a "model"

24   portfolio receive the "Transamerica Fiduciary Warranty," which provides:

25        Transamerica . . . warrants, and covenants that the Transamerica

26        investment line-up . . . :

27        •     Will satisfy the requirements set forth in … [ERISA §] 404(c)….

28

- Will meet the prudence requirement of section 404(a)(1)(B) of ERISA, . . . (prudence requirement); . . . .

Ex. C.  Through an "Indemnification" provision, TLIC makes clear that the warranty will not apply if the plan's other fiduciaries fail to select investments "from Transamerica's models" or, in the event of a "customized line-up," if the plan sponsor fails to include "at a minimum and at all times" at least one "investment choice" from a list of seven TLIC-defined "categories." *Id.*  Further, TLIC retains the right to *change* its models and categories and requires that the other fiduciaries bring their line-ups "into conformity with any changes by Transamerica" within 120 days of notice.  *Id.*; *see also* Compl. ¶¶ 157-163.

Once a Plan's investment menu is established, TLIC gives investment advice regarding the options and the fees charged by them, retains the right to add and delete investment options, change the share class of underlying mutual funds, and modify the fees of the investment options.  Compl. ¶¶ 152-153, 169, 181-183.  TLIC also implements its "Fiduciary Management Program," *see* Ex. G, through which it monitors and scores investments using the "Transamerica Investment Monitor" and TLIC's "Investment Monitor Scorecard."  This includes a "watch list," deselection analysis, and services provided by TLIC's "investment committee."  *Id.* at 2-3, 15.  The "score card" says that if an investment manager does not meet TLIC's standards, it will "hire a different sub-advisor to manage existing assets."  Ex. H (The Transamerica Investment Monitor "How-to" Guide).

Through both the Fiduciary Warranty and Fiduciary Management programs, TLIC retains the discretion to unilaterally replace investment options.  TLIC may also unilaterally delete investment options "[f]or other reasons at the discretion of the [TLIC] investment committee."  *See* Declaration of Darcy Hatton in Support of Defendant Transamerica Life Insurance Company's Motion to Dismiss Ex. D. at 3338-3341 (Dkt. 103) ("Hatton Decl.") (listing for many separate accounts in Gain Plan investment options that money "may, however, be invested in *any securities* in

6

which TLIC is permitted to invest according to applicable law") (emphasis added); *id*. Ex. E at 3436-3439 (same for Qualcare Plan).  For example, the Vanguard Total Stock Market Index Ret Opt separate account *might* be invested in the Vanguard Total Stock Market Index Fund.  But it might not, if TLIC decides to invest plan participant funds in something else.  *Id.* Ex. D. at 3340.

Finally, in addition to providing investment advice to the Plans, TLIC gives investment advice directly to participants through its "AdviceSolutions" program.  Compl. ¶¶ 185-202.  AdviceSolutions provides "Instant and Personalized Assistance" to participants in the Plans who must input information to receive TLIC's *personalized* recommendations on investing.  Compl. ¶¶ 190-198.

**C.    TLIC's Investment Options and Fees.**

As noted above, TLIC refers to each investment option as a "separate account," Compl. ¶ 19, which takes one of three forms—a mutual fund (or discretionary equivalent), a collective trust, or a "traditional" separate account.  Compl. ¶¶ 110; *see also id.* ¶¶ 112-118, 214 (mutual funds), 119-123, 215 (collective trusts), 124-134, 216 (separate accounts).  Most separate accounts are invested in mutual funds (or equivalents that TLIC chooses).  Compl. ¶¶ 21, 214; Hatton Decl. Exs. D, E.  Regardless of the ultimate investment, a TLIC separate account is always involved.  Compl. ¶¶ 138-140.

TLIC uses its control over Plaintiffs' retirement assets to charge excessive fees in three ways.[4]  First, each separate account has an "expense ratio," which is used to compute the fees that participants pay for investing in the associated investment option.  Compl. ¶ 229.  For separate accounts "that invest in another underlying fund to make up your investment," Compl. ¶ 253, the expense ratio equals the fees charged by the "underlying mutual fund" plus an additional fee of

---

[4] Specifically, TLIC and its affiliates collect the following "add-on" fees: "Investment Management and Administrative Charges," fund distribution and service fees (*i.e.*, 12b-1 fees), and revenue sharing that benefits TLIC.  Compl. ¶ 147.  TLIC also utilizes high expense structures to its own benefit.  *Id.*

"approximately 75 basis points . . . of Plan assets invested in those options." TLIC MTD at 6. TLIC generally justifies the receipt of its (at least) 75 bps[5] on the grounds that these fees are needed for "Investment Management and Administrative" services to the separate account. *See* Hatton Decl. Ex. H at 3473, for an example of how TLIC discloses this fee (bottom left). Yet, as TLIC explains, a separate account invests "in an another underlying mutual fund to make up your investment," so "the units of the separate account function and perform in the same way shares of a mutual fund would." Compl. ¶ 253. Thus, to invest in a mutual fund, TLIC is charging Plaintiffs a fee that often is many times the cost of the underlying mutual fund. Compl. ¶ 140.[6] The additional "Investment Management" fees, *see* Compl. ¶¶ 171-173, are particularly unjustified for index funds, which by design are not actively managed and charge a low fee *for precisely this reason*.

Second, TLIC receives revenue sharing payments from the underlying mutual funds. The revenue sharing payments are based directly on the amount participants invest in each option, hence, are derived from Plan assets, and are the *quid pro quo* for TLIC's decision to include the particular funds on its investment menu. Compl. ¶¶ 147, 178-179. TLIC tells its clients that these revenue sharing payments offset certain "Investment Management and Administrative" fees—yet, participants already are paying for associated services via other charges that TLIC levies against Plan assets (such as the 75 bps add-on fee). Compl. ¶¶ 281-295. Revenue sharing payments to TLIC based on Plan assets range from 5 to 60 bps. Compl. ¶ 287.

Third, the mutual funds have various share classes, each of which "invests in

---

[5] Between 79 bps and 150 bps are charged on assets invested in collective trusts or "traditional" separate accounts. TLIC MTD at 7. *See* Compl. ¶¶ 320-342.

[6] Although Plaintiffs are charged a variety of other fees, including an annual contract asset charge, as well as recordkeeping, distribution, enrollment, consulting, de-conversion (*i.e.*, termination), and contract discontinuation fees, *see* Hatton Decl. Ex. A at 3276-77, 3281-82, 3337; *id*. Ex. D at 3336, 3417; *id*. Ex. E at 3434; *id*. Ex. A at 3280-3282. Plaintiffs' claims are limited to the fees for investing in TLIC's separate accounts and the impact of those fees on investments.

the same diversified pool of securities; however, each share class differs as a function of annual fees and expenses paid by" Plaintiffs.  Compl. ¶ 303.  TLIC fails to use its leverage, which comes with managing $19.5 billion in retirement assets, Ex. K, to access to lower-fee share classes on Plaintiffs' behalf.  Compl. ¶¶ 302-319.

**D.     Overview of Plaintiffs' Claims.**

     **1.     The Mutual Fund Excessive Fee Claims.**

Counts I and II concern the first type of separate account investment option, which is simply a pass-through vehicle that invests in an underlying mutual fund. Compl. ¶ 21.  The expense ratio for this pass-through category equals the sum of the fees of the "underlying mutual fund" plus an additional fee of "approximately 75 basis points"—"or .75% of Plan assets invested in those options."  TLIC MTD at 6; Compl. ¶¶ 247, 272.  Because an investor only receives an investment in the underlying mutual fund, which already charges for investment management, Compl. ¶ 260, and because TLIC receives *separate* recordkeeping and administrative fees, Plaintiffs contend that the add-on fees are excessive.  ¶ 258.  Count I concerns separate accounts for which the fees are in excess of the fees charged by the underlying mutual fund with no justification for these excess fees—sometimes described as "Investment Management and Administrative" fees—while Count II concerns the subset of separate accounts for which the fees are described solely as "Investment Management."  *See* Compl. ¶¶ 245-280.  TLIC's excess fees are thus a breach of ERISA fiduciary duties and constitute prohibited transactions.

     **2.     The Revenue Sharing Claim.**

Count III alleges ERISA fiduciary breaches and prohibited transactions through TLIC's collection of revenue sharing from the mutual funds that underlie certain separate accounts.  TLIC used its authority and control over Plan assets to select funds based on the payment of revenue sharing to TLIC.  Revenue sharing did not legitimately offset costs of administration (which was separately paid by the

Plans via other fees), but, instead, was merely another fee levied against Plan assets by TLIC. TLIC's "Investment Management and Administrative Charge" is an illusory fee, against which revenue sharing is "credited." *See* Compl. ¶¶ 281-295.[7]

### 3. The Affiliate Claims.

Several of the funds underlying the separate accounts are affiliated with TLIC and employ TIM or TAM as their adviser (TLIC affiliates). Compl. ¶¶ 296-297. By paying advisory fees to these affiliates, TLIC committed prohibited transactions under ERISA § 406(b), 29 U.S.C. § 1106(b). Counts IV and VII seek relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), against TIM and TAM for participating therein. *See* Compl. ¶¶ 296-301; 338-342.

### 4. The Mutual Fund Share Class Claim.

In Count V, Plaintiffs allege that TLIC breached its ERISA fiduciary duties by failing to invest in the lowest cost share class of the mutual funds underlying separate account investment options, even though TLIC had the leverage to do so. Thus, TLIC facilitated its own receipt of revenue sharing. *See* Compl. ¶¶ 302-319.

### 5. The Collective Trust / Separate Account Excessive Fee Claim.

In Count VI, Plaintiffs allege that TLIC either failed to use its economic leverage to obtain lower fees available for the collective trust and traditional separate account investment options—or that it did do so, but kept the savings for itself. *See* Compl. ¶¶ 320-337.

### 6. The IAA Claim.

TLIC entered into a contract with Plaintiffs pursuant to which it provided investment advice to Plaintiffs and charged them an "Investment Management Charge" for these advisory services. Compl. ¶¶ 343-365, 369. Count VIII alleges

---

[7] TLIC mischaracterizes Plaintiffs' complaint when it says that Plaintiffs "admit" that revenue sharing payments were "used to reduce the total fees under the Group Annuity Contracts." TLIC MTD at 6-7. Rather, the Complaint states that TLIC claims that revenue sharing was used "to reduce the Investment Management and Administrative Charges." Compl. ¶ 288; *see also id.* ¶ 294.

that TLIC provided investment advice to Plaintiffs for a fee without registering with the SEC, thereby violating IAA § 203(a), 15 U.S.C. § 80b-3(a)—the predicate violation for Plaintiffs' IAA § 215(b) claim.  Plaintiffs voluntarily dismiss their derivative IAA claim (Count IX).  *See infra* note 30 and accompanying text.

### III.   ARGUMENT

**A.     Applicable Legal Standard.**

A motion to dismiss should be denied if the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  *Iqbal* and *Twombly* do not impose a "probability requirement."  *Iqbal*, 556 U.S. at 678.  Rather, a complaint states a plausible claim for relief if the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  Moreover, all inferences are to be drawn in the plaintiff's—not the defendant's—favor on a motion to dismiss.  *Id.*; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009); *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) ("[W]e accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff.").  Further, a plaintiff is not required to plead "'specific facts' explaining precisely how the defendant's conduct was unlawful."  *Braden*, 588 F.3d at 595 (quoting *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)).  A complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Braden*, 588 F.3d at 594.

This approach is particularly important in ERISA cases, where a plaintiff's allegations concern the fiduciary process.  *Id.* at 597-98.  Because ERISA's remedial purpose is to prevent "misuse and mismanagement of plan assets," an ERISA

11

plaintiff's "limited access to crucial information" regarding facts that "tend systemically to be in the sole possession of defendants" mandates a "holistic evaluation of an ERISA complaint's factual allegations." *Id.* (quotation omitted). *See also Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("[T]he circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage.").

**B.  Plaintiffs Have Plausibly Alleged that TLIC Is an ERISA Fiduciary With Respect to the Conduct Underpinning Each ERISA Claim.**

TLIC dedicates most of its brief to disputing its fiduciary status.  However, in addition to misconstruing the law, TLIC's arguments raise factual disputes that cannot be decided at this stage of the case.  Thus, TLIC's motion should be denied.

**1.  Overview of Fiduciary Status Law.**

Under ERISA, a person or entity is a fiduciary:

to the extent (i) he exercises any discretionary authority *or* discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) (emphasis added).  Fiduciary status is to be "construed liberally, consistent with ERISA's policies and objectives." *Ariz. State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 720 (9th Cir. 1997) (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 96, 114 S. Ct. 517, 126 L. Ed. 2d 524 (1993)).  In addition, ERISA employs a *functional* test that depends on the activities and powers of persons or entities and measures whether those activities and powers rise to the level of fiduciary conduct.

*IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S. Ct. 2063,  124 L. Ed. 2d 161 (1993)); *see also In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 228 (3d Cir. 2009); *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1461 (9th Cir. 1995) (ERISA embodies a "broadly based liability policy" that works in tandem with "its functional definition of 'fiduciary.'").  In *Kayes*, the Ninth Circuit explained: "'The legislative history is replete with indications of congressional concern to assure adequate protection for the interests of plan participants and beneficiaries beyond that available under conventional trust law.'"  *Id.* (quoting *Eaton v. D'Amato*, 581 F. Supp. 743, 746 (D.D.C. 1980) (rejecting application of "restrictive judicial gloss to the term 'fiduciary'")); *see also Donovan v. Mercer*, 747 F.2d 304, 308-09 (5th Cir. 1984) (noting as to fiduciary status, if it "Talks Like a Duck" and "Walks Like a Duck," "It's a Duck.").  A defendants' own opinion or belief about its fiduciary status is "of no consequence" to the inquiry.  *Thomas, Head & Greisen Emps. Trust v. Buster*, 24 F.3d 1114, 1119 (9th Cir. 1994).

Here, taking into consideration the multifaceted nature of TLIC's activities, TLIC is a fiduciary under not just one, but all four of the subsections and clauses of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

### 2.    Assessment of Fiduciary Status Cannot Be Made on the Pleadings.

As a preliminary matter—and Plaintiffs' ample allegations of fiduciary status notwithstanding—resolving fiduciary status is inappropriate on the pleadings.  This is particularly true in light of the inherently factual nature of *de facto* fiduciary status.  A conclusion regarding fiduciary status "is essentially a factual conclusion." *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 913-14 (9th Cir. 1997) (citing *Buster*, 24 F.3d at 1116 (holding that court's finding after trial that an individual was an ERISA fiduciary was "essentially" a factual issue, which could not be set aside unless clearly erroneous)).  *See also Tussey v. ABB, Inc.*, No. 06-

4305, 2008 WL 379666, at *9 (W.D. Mo. Feb. 11, 2008) ("*Tussey I*") ("further discovery will be needed to untangle the relationship" between parties); *Woods v. Sullivan Co.*, 396 F. Supp. 2d 1351, 1365 (N.D. Ga. 2005) (collecting cases holding fiduciary status should not be decided on a motion to dismiss).

Resolution of fiduciary status should not be made prior to discovery because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598; *see also Tussey I*, 2008 WL 379666, at *7 (noting fiduciary roles remain "'something of a black box'" before discovery completion) (quoting *Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003)); *In re ADC Telecomms., Inc. ERISA Litig.*, No. 03-2989, 2004 WL 1683144, at *5 (D. Minn. July 26, 2004) (absent discovery, "Plaintiffs cannot fairly be expected to ascertain all the factual details of Defendants' precise responsibilities and actions."); *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1049-50 (N.D. Ill. 2009) ("*George I*") (same, in excessive fee case); *Will v. Gen. Dynamics Corp.*, No. 06-698, 2009 WL 3835883, at *2 (S.D. Ill. Nov. 14, 2009) (same, citing cases); *Phones Plus, Inc. v. Hartford Fin. Servs. Grp., Inc.*, No. 06-1835, 2007 WL 3124733, at *4 (D. Conn. Oct. 23, 2007). Thus, at this stage of the case, determining fiduciary status is premature.

### 3. The Complaint Plausibly Alleges TLIC Is a Fiduciary With Respect to the Specific Actions on Which the Complaint Is Based.

TLIC claims that there is not a sufficient nexus between Plaintiffs' allegations of fiduciary status and their theories of liability. TLIC MTD at 10. This is incorrect. The Complaint challenges the fees—*i.e.*, compensation—TLIC pays itself from the Plans' assets, and details precisely how and why TLIC is a fiduciary with regard to the challenged conduct. Specifically: (1) TLIC placed Plan assets in its separate accounts and assumed fiduciary status with regard to those assets; (2) TLIC retained and exercised discretion to increase and decrease the compensation it earned on Plan assets; (3) TLIC used its control over Plan assets to secure revenue

sharing payments; and (4) TLIC provided investment advice to Plaintiffs.

### a.    TLIC Is a Fiduciary for Purposes of All ERISA Claims Because Plan Assets Are Held in Separate Accounts.

TLIC is a fiduciary with respect to the fees it charges Plaintiffs and the fee structures it controls, because TLIC holds Plaintiffs' Plan assets in separate accounts. Compl. ¶¶ 149-151.  *See* ERISA § 401(c)(5), 29 U.S.C. 1101(c)(5); 29 C.F.R. § 2550.401c-1(d)(2)(c); *see also* ERISA § 3(17), 29 U.S.C. § 1002(17) (separate account defined).  TLIC's separate accounts are indisputably *plan assets*. 29 C.F.R. § 2510.3-101(h)(iii) (assets in insurer's separate account are plan assets.); *see also* H.R. Conf. Rep. 93-1280, 5077 (Aug. 12, 1974) (same); DOL Advisory Opinion ("DOL Op.") 05-22A, 2005 WL 3751637 (Dec. 7, 2005) (same).  Thus, as the DOL and Congress have stated, and the courts have held, once Plaintiffs' funds were deposited into TLIC's separate accounts, TLIC became a fiduciary with regard to those funds and was responsible for ensuring that the fees paid from those funds did not violate ERISA §§ 404 or 406.  This is Black Letter Law under ERISA.

According to the DOL:

[A]n insurer is subject to ERISA's fiduciary responsibility provisions with respect to the assets of a separate account . . . .  ERISA requires insurers, in administering separate account assets, to act solely in the interest of the plan's participants and beneficiaries; prohibits self-dealing and conflicts of interest; and requires insurers to adhere to a prudent standard of care.

29 C.F.R. § 2550.401c-1(d)(2)(c); *see also* H.R. Conf. Rep. 93-1280, 5077 ("[I]nsurance companies are to be responsible under the general fiduciary rules with respect to assets held under separate account[s] . . . and the assets of these contracts are to be considered as plan assets."); 29 C.F.R. § 2550.401c-1(g) ("The more stringent standard of prudence set forth in section 404(a)(1)(B) of [ERISA] continues to apply to . . . insurers' management of plan assets maintained in separate

accounts."). Courts agree. *See, e.g.*, *Mack Boring & Parts v. Meeker*, 930 F.2d 267, 275 (3d Cir. 1991) (quoting 29 C.F.R. § 2550.401c-1(d)(2)(c)); *Tr. of Laborers Local No. 72 Pension Fund v. Nationwide Life Ins. Co.*, 783 F. Supp. 899, 905 (D.N.J. 1992) (Plan funds in separate account are subject to ERISA fiduciary duty.). *See also Midwest Cmty. Health Serv., Inc. v. Am. United Life Ins. Co.*, 255 F.3d 375, 378-79 (7th Cir. 2001) (describing history of ERISA § 401(c)(5)); *Tool v. Nat'l Emp. Benefit Servs., Inc.*, 957 F. Supp. 1114, 1119 (N.D. Cal. 1996) (noting allegations that plan assets are held in "separate accounts" would subject insurer to ERISA liability after *John Hancock v. Harris Trust* and subsequent amendment to ERISA); *Adkins v. John Hancock Mut. Life Ins. Co.*, 957 F. Supp. 211, 214-15 (M.D. Fl. 1997) (insurer is fiduciary for assets in separate accounts).

By virtue of holding Plan assets in separate accounts, TLIC is a fiduciary for those assets. For this reason alone, TLIC's motion should be denied. In its capacity as a fiduciary for Plan assets in separate accounts, it is incumbent upon TLIC to use its control and authority to manage those assets for the sole benefit of Plan participants. This duty has nothing whatsoever to do with TLIC's negotiation of its fees. Rather, with the additional step of holding Plan assets in separate accounts, TLIC assumed the responsibility of a fiduciary for those funds to act solely in the best interest of Plan participants, avoid self-dealing and conflicts of interest, and adhere to a prudent standard of care. 29 C.F.R. § 2550.401c-1(d)(2)(c).

Furthermore, TLIC's specific actions with regard to the separate accounts indicate that it indeed had and exercised authority and control over Plan assets within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). While TLIC argues (inaccurately) that it lacks discretion over these assets, discretion is not a requirement for fiduciary status under this prong of ERISA. *Bd. of Trs. of Bricklayers & Allied Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 273 (3d Cir. 2001) (reversing dismissal because facts could establish authority and control under second clause of ERISA § 3(21)(A)(i); noting

that "word 'discretionary' is conspicuously absent" from ERISA § 3(21)(A)(i)'s rule regarding control of assets); *IT Corp.*, 107 F.3d at 1421 ("'Any' control over disposition of plan money makes the person who has the control a fiduciary."); *Briscoe v. Fine*, 444 F.3d 478, 490-91 (6th Cir. 2006) ("The plain language of the [second clause of ERISA § 3(21)(A)(i)] imposes fiduciary duties not only on those entities that exercise discretionary control over the disposition of plan assets, but also imposes such duties on entities or companies that exercise 'any authority or control' over the covered assets"); *John Hancock v. Harris Trust*, 510 U.S. at 96 ("Congress commodiously imposed fiduciary standards on persons whose actions affect the amount of benefits retirement plan participants will receive."); *id.* at 106 (finding under ERISA § 3(21)(A)(i) that insurer is fiduciary for funds in group annuity contracts due to retention of authority to set prices and because participant bore risk of fluctuations in value, thus establishing control over plan assets).

The Complaint amply describes TLIC's "exercise" of both authority and control over Plan assets in numerous ways, including amending its separate account fees and maintaining control over the investment options, Compl. ¶¶ 152-153, 164-168, 180-184; extracting revenue sharing payments from mutual funds that would not be available to TLIC but for its control over Plan assets, *id.* ¶¶ 178-179, 281-295; channeling fees to its affiliates that advised the funds underlying TLIC's separate accounts, *id.* ¶¶ 296-301, 338-342; and controlling which share class of the particular funds will be offered via the separate accounts, *id.* ¶¶ 302-319.

Moreover, TLIC's authority and control over Plan assets in its separate accounts—as well as its significant discretion—is further demonstrated by the TLIC "Fiduciary Management Program," "Fiduciary Warranty," and "Investment Monitor Scorecard," through which TLIC exercises authority to change how the separate accounts are invested, including though unilateral substitution authority.

**b.    By Retaining the Authority to Amend Its Compensation and Controlling Investment Options, TLIC Is a Fiduciary.**

17

1    The Complaint alleges not only TLIC's exercise of authority or control over

2    Plan assets (for which discretion is not required), but also alleges *discretionary*

3    authority in spades.  TLIC retained the authority and/or discretion to: (1) adjust its

4    own fees; (2) alter the investment menus available to the Plans; (3) channel money

5    to its affiliates; and (4) invest in other than the lowest cost share classes of mutual

6    funds or obtain lower fees.  TLIC's "warranty" reinforces these controls by

7    penalizing plan sponsors who stray from TLIC's models even within the lineup that

8    TLIC unilaterally chooses.[8]

9                    **(i)    TLIC Retained Both Authority and Control Over Plan
                             Assets and Discretionary Authority and Control Over
10                           Plan Administration and Management By Controlling
                             Its Compensation.**
11

12    In an ERISA excessive fee case, *de facto* fiduciary status typically arises out

13    of the type of interconnected fee-setting and fund selection activities alleged here.

14    For example, in *Charters v. John Hancock Life Ins. Co.*, the court held:

15            [I]t is undisputed that Hancock retained sole discretion to change the

16            maximum administrative maintenance charge at any time upon three-

17            months prior written notice to Charters.  That discretion was sufficient

18            to make Hancock an ERISA fiduciary.

19    583 F. Supp. 2d 189, 198 (D. Mass. 2008) ("*Charters II*").  In *Charters II*, Hancock

20

21    _____

      [8] Notably, TLIC relegates discussion of the Fiduciary Warranty to a footnote in its

22    brief—claiming it is "not an admission of fiduciary status" and it excludes claims

23    that "any expenses paid directly or indirectly by the plan are reasonable."  TLIC
      MTD at 12 n.18.  This purported exclusion—which is itself in a footnote to the

24    warranty—is inconsequential when evaluating TLIC's fiduciary status.  A contract
      between a plan and a service provider may not eviscerate with words fiduciary

25    status that exists due to conduct.  *IT Corp.*, 107 F.3d at 1418-19 (contract with
      purported exoneration clause held void as a matter of law); *see also Chi. Bd.*

26    *Options Exch. v. Conn. Gen. Life Ins. Co.*, 713 F.2d 254, 259 (7th Cir. 1983)
      (noting that ERISA § 410(a), 29 U.S.C. § 1110(a) renders exculpatory provisions

27    void and citing legislative history).  For the same reasons, TLIC's "Disclaimer of
      Responsibility," *see* Hatton Decl. Ex. A at 3271, in its contract is ineffective.

28    What matters is the *de facto* fiduciary status inquiry.  And TLIC's enthusiastic
      adoption of the "fiduciary" rubric cuts in favor of, not against, fiduciary status.

exercised discretion over its own compensation "by unilaterally setting the administrative maintenance charge."  *Id.* at 199.  Here too, it is undisputed that TLIC has the authority to alter fees on investment options.  *See* Hatton Decl. Ex. D at 3381, Ex. E at 3431 ("We reserve the right to change the Investment Management Charge or the Administrative Charge, upon . . . at least 30 days [notice]."); *see also id.* Ex. D at 3393 ("Transamerica reserves the right to: . . . Assess[] a transfer fee or redemption fee for a particular Contract Account [*i.e.*, investment option].").

TLIC says it cannot be a fiduciary for purposes of negotiating the terms of its "retention."  TLIC MTD at 2, 11-19 (citing, *e.g., Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009); *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983)).  But even if TLIC was not a fiduciary *prior* to its retention by the Plans, it became one by virtue of *retaining* the authority to adjust and influence its own compensation.  *Ed Miniat, Inc. v. Globe Life Ins. Grp.*, 805 F.2d 732, 737 (7th Cir. 1986) ("when a contract . . . grants an insurer discretionary authority, even though the contract itself is the product an arms length bargain,[9] the insurer may be a fiduciary"); *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987) (after entry into "an agreement with an ERISA-covered plan, the agreement may give [an entity] such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation"); *Seaway Food Town, Inc. v. Med. Mut. of Ohio*, 347 F.3d 610, 619 (6th Cir. 2003) (quoting *F.H. Krear*, 810 F.2d at 1259).  *See also* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 Fed. Reg. 41600, 41610 (July 16, 2010) (noting in disclosure regulations that a service provider's "ability to affect its own compensation" "likely would constitute a fiduciary act resulting in a separate prohibited transaction.").

---

[9] The facts here do not suggest the GACs were the products of arms-length bargaining.  TLIC represented to its clients the quality of its investment options when it knew, or should have known, it charged excessive fees.

19

1    None of TLIC's cases involve service providers or other entities that retained

2  the ability—much less the unilateral ability—to change fees levied against

3  participants' accounts.  This is dispositive.  Moreover, the Seventh Circuit, which

4  decided *Schulist* and *Hecker*, concurs with the view that the retention of authority

5  over a GAC confers fiduciary status.  *See, e.g.*, *Midwest Cmty. Health*, 255 F.3d at

6  376-78 (ability to amend value of insurance contract subjected insurer to fiduciary

7  duties under ERISA because it exercised discretionary control over plan assets,

8  noting "[w]e have twice held" as much); *Chi. Bd. Options Exch., Inc. v. Conn. Gen.*

9  *Life Ins. Co.*, 713 F.2d 254, 259-60 (7th Cir. 1983) (insurer's ability to amend

10  contract and thereby affect value established control over plan assets and fiduciary

11  status); *Ed Miniat*, 805 F.2d at 738 (distinguishing *Schulist* and noting that *Chicago*

12  *Board* is more on point in finding that insurer's retention of authority to "amend the

13  contract and thereby alter its value" did not "appear to be qualitatively different

14  from the ability to choose investments" and therefore suggested fiduciary status).

15  *See also Charters II*, 583 F. Supp. 2d at 197 (*Schulist* inapplicable due to power to

16  amend fee); *Tussey I*, 2008 WL 379666, at *6-7 (noting limitations of *Schulist* and

17  its inapplicability to "the fiduciary's future conduct which may violate ERISA.").[10]

18    *Columbia Air Servs., Inc., v. Fidelity Mgmt. Trust Co.*, No. 07-11344, 2008

19  WL 4457861, at *5 (D. Mass. Sept. 30, 2008), cited by TLIC, *see* TLIC MTD at 14,

20  in fact undermines TLIC's position.  *Columbia* concludes that the ability to remove

21  from the "list of permissible investments" all funds that refuse to share revenue and

22  "substitute only funds agreeing to share revenue" is "sufficient discretionary

23  authority over its own compensation" to make it an ERISA fiduciary.  *Id.*

24    **(ii)   TLIC Retained Both Authority and Control Over Plan**
25    **Assets and Discretionary Authority and Control Over**
    **Plan Administration and Management By Controlling**
26    **the Selection of Investment Options.**

27  _____

   [10] *Marks* is distinguishable.  There the plan "shifted the risk from itself to [the
28  insurance company]," *Marks v. Independence Blue Cross*, 71 F. Supp. 2d 432, 435
   (E.D. Pa. 1999).  Here, Plaintiffs bore all investment risk and TLIC bore none.

As with a service provider's power to set and alter its own fees, an entity is a fiduciary under ERISA if it "exercises authority or control over plan assets by determining and altering which mutual funds are available for the Plans' and the participants' investment." *Haddock v. Nationwide Fin. Servs. Inc.*, 419 F. Supp. 2d 156, 166 (D. Conn. 2006) ("*Haddock I*"); *Haddock v. Nationwide Fin. Servs. Inc.*, 262 F.R.D. 97, 106-09 (D. Conn. 2009) ("*Haddock II*"), *vacated on other grounds*, 460 Fed. App'x 26 (2012)[11]; *Charters v. John Hancock Life Ins. Co.*, 534 F. Supp. 2d 168, 171-73 (D. Mass. 2007) ("*Charters I*"); *Charters II*, 583 F. Supp. 2d at 196-200; *Phones Plus*, 2007 WL 3124733, at *2-6. *See also Moreland v. Behl*, No. 92-1238, 1996 WL 193843, at *5 (N.D. Cal. Apr. 17, 1996) (finding fiduciary status under ERISA § 3(21)(A)(i) where insurance company made "significant investment decisions"). Thus, TLIC is a fiduciary because it retains the authority to add/delete investment options, and select fund share classes after a plan's menu is established, thereby altering its compensation. Compl. ¶¶ 152-154. These deletions may occur in the context of TLIC's Fiduciary Management Program (*i.e.*, the option fails TLIC's "stringent criteria") or "[f]or other reasons at its discretion." Ex. G.

The Department of Labor has opined that a service provider may have discretionary authority or control over plan assets if it has the right to add or remove "families" of mutual funds that it makes available to plans. DOL Op. 97-15A, 1997 WL 277980, at *3 (May 22, 1997) ("Frost DOL Op."). The Frost DOL Opinion supports Plaintiffs' allegations of fiduciary status insofar as TLIC caused the Plans to invest in separate accounts with underlying mutual funds that paid fees to TLIC,

---

[11] As noted in *Haddock I*, "courts have glossed over the distinction" between the discretionary and nondiscretionary clauses of ERISA § 3(21)(A)(i) in discussing control over plan assets. 419 F. Supp. 2d at 167. As demonstrated herein, with respect to both fee-setting, *see supra* subsection III.B.3.b(i), and investment option selection, *see* herein subsection III.B.3.b(ii), the same facts support findings of *both* discretionary and nondiscretionary authority and control by TLIC. Accordingly, Plaintiffs' authorities discuss both discretionary and nondiscretionary fiduciary status, because TLIC's fiduciary status may arise under either clause of ERISA § 3(21)(A)(i) or under ERISA § 3(21)(A)(iii).

1 who retained the right to *unilaterally* add or remove the underlying mutual funds.[12]

2     TLIC argues that sponsors and plan members retained the ability to reject

3 TLIC's changes by terminating their participation, and thus, TLIC was not a

4 fiduciary in this regard.  TLIC MTD at 13-16.  But this specific argument has been

5 squarely rejected.  In *Charters II*, the court concluded that built-in fee penalties for

6 termination meant that the plans "did not have a meaningful opportunity to reject

7 substitutions."  583 F. Supp. 2d at 199.  As the court further explained:

8     Charters' ability to reject Hancock's substitutions was, however, more

9     limited than the arrangement considered by the DOL in the Aetna letter

10     [DOL Op. 97-16A, 1997 WL 277979 (May 22, 1997)].  If Charters

11     sought to reject a substitution and maintain his investment in the

12     replaced fund, his only option was to terminate the Contract and select

13     a different service provider offering that fund.  In exercising that right,

14     *Charters would be subject to a termination fee* of up to 2% of the assets

15     invested with Hancock by the Plan.  *Cf.* DOL Op. 97-16A, 1997 WL

16     277979, at *2, 5 (May 22, 1997) (plan fiduciaries could terminate the

17     arrangement without penalty).  Charters would also be subject to

18     administrative charges for transferring assets to another sub-account.

19 583 F. Supp. 2d at 198-99 (emphasis added).  TLIC similarly imposes penalties on

20 participants and the Plan who seek investment options other than those presented by

21 TLIC, including contract termination and participant level redemption fees.  Hatton

22 Decl. Ex. D at 3337, 3344, 3393, 3408; *see also id*. Ex. A at 3280-3282.[13]  As in

23

---

24 [12] As to the substantive question of whether TLIC's conduct is permissible under

25 ERISA, Plaintiffs note that while Frost suggests that an entity may select funds that
pay fees to itself if the fees merely offset appropriate other fees owed to the entity,

26 the Complaint alleges that the fees that TLIC claims to be offsetting with revenue
sharing are not, in fact, appropriate fees, but excessive add-on fees.  *See* Compl. ¶¶

27 281-295; *see also Haddock I*, 419 F. Supp. 2d 166 at n.6.

28 [13] An additional document produced in discovery and designated as confidential
shows the applicable contract termination charges, and can be provided on request.

*Charters II*, the Plans' or participants' ability to pay their way out of TLIC's fund line-up does not negate TLIC's fiduciary status.

TLIC also claims that, because it provides thirty days notice of changes to its Investment Management and Administrative Charges, it is not a fiduciary.  TLIC MTD at 13-14.  *Charters II* involved a contract with a three-month advance notice provision, and the Court still found the insurer to be a fiduciary.  583 F. Supp. 2d at 198.  Here, the facts are even stronger.  TLIC is free to replace the underlying mutual fund *without* advance notice to the Plans.  Hatton Decl. Ex. D at 3402; *id.* Ex. E at 3436 ("[s]uch funds may . . . be invested in any securities . . .").  A change in the underlying mutual fund is tantamount to replacing the investment option.  For the same reason that the *Charters II* court found Hancock's ability to substitute investment options "rendered it a fiduciary of the Plan," TLIC's ability to control substitution of investment options renders it a fiduciary.

Apparently acknowledging its unilateral authority to modify the available investment options and adjust its own compensation, TLIC argues that it can only be found to be a fiduciary for purposes of the occasions where it *exercises* such discretion.  TLIC MTD at 13, 17-18.  TLIC is wrong for three reasons.

First, as a matter of law in the Ninth Circuit and elsewhere, TLIC can be a fiduciary even if it *never* exercised its power over plan assets.  *Yeseta v. Baima*, 837 F.2d 380, 384-85 (9th Cir. 1988) (failure to exercise discretionary authority or responsibility does not negate fiduciary status).[14]  Because TLIC had the authority to alter fees and change the investment menu, it is a fiduciary with regard to fees and its conduct should be measured by what it did or *failed* to do.  A fiduciary has

---

[14] *See also Haddock II*, 262 F.R.D. at 108 (finding it "irrelevant whether Nationwide actually exercised its authority to remove or replace mutual funds"); *Martin v. Schwab*, No. 91-5059, 1992 WL 296531, at *4 (W.D. Mo. Aug. 11, 1992) ("[T]hat Defendants did not choose to exercise their authority did not in any way diminish the authority bestowed on them by the Plan document. . . . [F]ailure to . . . comply with the terms of the Plan document" was an "exercise" of authority.).

23

affirmative obligations to conduct itself prudently.  Fiduciary duties are not constrained to merely refraining from initiating misconduct.  On the contrary, they entail obligations to end conduct that may be self dealing or imprudent.  These duties are especially pertinent here because, as described *supra*, TLIC held Plaintiffs' assets in its separate accounts, represented it would act as a fiduciary and "look for investment choices with lower than average management expenses," Compl. ¶¶ 148-151, 181, 204, operated the Plaintiff Plans under its Fiduciary Warranty, and agreed to monitor and advise on fees.  *See, e.g.*, Ex. G at 2, 15, 19.[15]

Second, determining whether TLIC exercised discretion is a factual matter that is inappropriate for resolution on a motion to dismiss.

Third, TLIC *did* exercise such authority.  Even at this early stage, Plaintiffs have uncovered evidence that TLIC altered its fees.  Ex. I.  Discovery will likely reveal other similar instances.  *See Braden*, 588 F.3d at 598.

TLIC repeatedly claims that *Hecker* and *Renfro*, absolve it of liability.  However, *Hecker* distinguished its holding from *Haddock I*, because, as here, the service provider had the "authority to delete and substitute mutual funds from the plan without seeking approval."  *Hecker*, 556 F.3d at 584.  Subsequently, the *Haddock* court reiterated this very distinction from *Hecker*.  *See Haddock II*, 262 F.R.D. at 108 n.6.  Nor does *Renfro* help TLIC.  *Renfro* rejected a claim of ERISA fiduciary status, alleged only under ERISA § 3(21)(A)(iii), and based upon an assertion that Fidelity could veto proposed changes to the investment lineup.  The Court held that "veto power" was meaningless because Fidelity could only refuse to

---

[15] Relying on *Zang v. Paychex Inc.*, 728 F. Supp 2d 261, 269 (W.D.N.Y. 2010), TLIC argues that mere possession of discretion (regardless of exercise) only pertains to § 3(21)(A)(iii), TLIC MTD at 17-18, but this ignores that Plaintiffs have pled their claims under both § 3(21)(A)(i) and (iii).  Moreover, *Zang* misinterpreted *Hecker* and has not been widely adopted, much less acknowledged in this circuit.  Further, *Haddock II* expressly analyzed fiduciary status under § 3(21)(A)(i).  262 F.R.D. at 106.  The conduct alleged here does not require "exercise" of discretion, and, in any event, Plaintiffs have alleged that very fact.

provide administrative services on any proposed additions to the investment menu and "Fidelity had no contractual authority to control the mix . . . of investment options." *Renfro v. Unisys Corp.*, 671 F.3d 314 at 323 (3rd Cir. 2011).  Plaintiffs' fiduciary allegations here are not based on TLIC's veto power, but on other factors, including TLIC's authority to "control the mix" of investment options—decisions made in the course of TLIC's provision of investment advice to Plaintiffs.

In short, TLIC is a fiduciary because it both had and exercised authority and control (including discretionary authority and control) over the fees it levied against Plan assets and the selection of investment options.

### c.    TLIC Is a Fiduciary Because It Retains Authority Over Revenue Sharing Payments.

TLIC is a fiduciary for the additional and independent reason that it affected its own compensation by retaining revenue sharing payments on the pretext that these payments defrayed Investment Management and Administrative fees—charges that were trumped-up and excessive.  Compl. ¶¶ 266-278; 284-294.  In *Haddock I*, the court found Nationwide's control, though constrained to "deleting and substituting mutual funds from a list of funds approved by the Plans," sufficient to allege fiduciary status.  419 F. Supp. 2d at 166 n.6.  Removing from the list of options "all mutual funds that refused to share revenue with it" would mean that "only those mutual funds that had agreed to make revenue-sharing payments" would be offered, thus creating a genuine issue regarding the exercise of control or authority.  *Id.*  Thus, the control over the list of funds from which the Plans' investment options were selected and the authority to change the underlying mutual funds discussed *supra* confers fiduciary status insofar as the selected funds provide revenue sharing to TLIC.  *See Haddock II*, 262 F.R.D. at 107 (finding that insurance company that "pool[s] . . . billions of dollars of retirement assets" and "leverages its position as . . . gatekeeper to those funds to extract revenue sharing payments . . . in exchange for giving the mutual funds the opportunity to be investment choices" is a

25

1    fiduciary); *see also IT Corp.*, 107 F.3d at 1421.

2    **d.    TLIC Acts as a Fiduciary When It Provides Investment Advice For a Fee.**

3

4        TLIC ignores the significance of its investment advice, relegating discussion

5    thereof to a single footnote.  TLIC MTD at 10-11 n.16.  Under ERISA §3(21)(A)(ii),

6    29 U.S.C. § 1002(21)(A)(ii), an entity is a fiduciary if it "renders investment advice

7    for a fee or other compensation, direct or indirect," regarding any plan assets "or has

8    any authority or responsibility to do so."  TLIC satisfies this test.[16]

9        **(i)    Advice to the Plans.**

10        At the fund selection stage, TLIC advises on the choice of investment options

11    using its "Transamerica Investment Monitor," which it describes as its "proprietary,

12    comprehensive due diligence process" for investment selection and monitoring.  *See*

13    *supra* Sections II.A-C; Compl. ¶ 181.  TLIC promises to "seek to identify managers

14    . . . that have the resources, processes and potential to deliver consistent

15    performance over time."  Compl. ¶ 181.  Additionally, a TLIC "financial advisor"

16    will help the Plans "select the investments . . . that meet the client's specific needs."

17    Ex. J.  TLIC represents that it "maintains the highest standards in selecting and

18    continually monitoring the investment choices offered for your retirement plan line-

19    up."  Compl. ¶ 181.  This is investment advice.  Brief of the Secretary of Labor as

20    Amicus Curiae in Support of Plaintiffs at 8, *In re Beacon Sec. Litig.*, No. 09-777

21

22    [16] While TLIC may argue that Plaintiffs must satisfy the 5-part test set forth in 29
      C.F.R. § 2510.3-21 in order to establish that TLIC provided investment advice for
23    a fee, this is incorrect.  The express terms of the regulation indicate an entity is a
      fiduciary/investment adviser *either* because it has discretionary authority or control
24    with respect to the purchase or sale of securities *or* if it meets the 5-part test
      articulated by the DOL governing the first clause of ERISA § 3(21)(A)(ii).
25    Furthermore, the regulation is inconsistent with the plain meaning of the statute,
      and the DOL itself has indicated that the 5-part test is too "restrictive"—and for
26    this very reason has proposed a new regulation.  *See* Definition of the Term
      "Fiduciary", 75 Fed. Reg. 65263, 65264 (Oct. 22, 2010) (setting forth current
27    regulation in Proposed Rule to modify same).  Finally, and at any rate, the
      Complaint alleges sufficient facts to satisfy the test, as discussed below.
28

(S.D.N.Y. Oct. 1, 2010) (Dkt. 179-1) (Appendix ("App.") A) ("[M]aking recommendations that a plan employ particular investment mangers is tantamount to making recommendations as to the advisability of particular investments.").

TLIC's Fiduciary Warranty confirms its role as investment adviser. To receive the "Fiduciary Warranty," a plan sponsor must "select from TLIC's models" or the "investment choices" are required to "at a minimum and at all times include at least one investment choice" from each of several TLIC-defined "categories." Compl. ¶¶ 14, 157, 242; Ex. F (Extra Assurance for Plan Fiduciaries). If a TLIC model is selected, TLIC "warrants" that the investment line-up will satisfy ERISA's "prudence" requirements and agrees to "indemnify and make the plan whole for any loss resulting from breach of . . . warranties."[17] *See also* Compl. ¶ 155-163.

TLIC's investment advice does not stop once the menu of funds is established. Rather, TLIC continues to provide investment advice via its "Fiduciary Management Program." *See* Ex. G (Investment Scorecard). For a fee,[18] TLIC monitors the investment options, and advises plans with regard to, among other things, the performance of the funds, and the fees and expenses associated with the funds, rating them with "Quantitative Analysis Scores" of 1 to 5. *See* Compl. ¶ 181; Ex. G at 2. One of the six attributes evaluated by TLIC is the separate account investment option's "Fees & Expenses." *Id.* This evaluation entails comparing the investment option's fees to the "total operating expenses of the separate account and respective peer group." *Id.* at 19. Thus, TLIC renders investment advice on its *own* fees. TLIC performs this service quarterly and for every investment option on the Plans' menus. TLIC then communicates its results to each plan in an "Investment

---

[17] As discussed *supra* note 8, TLIC's purported disclaimer of fiduciary responsibility in a footnote to the warranty is void under ERISA § 410.

[18] *See* 29 C.F.R. § 2509.96-1, Interpretive Bulletin at n.3 ([F]ees "should . . . include all fees or other compensation incident to the transaction . . . ."); *see also* Definition of the Term "Fiduciary", 40 Fed. Reg. 50842 (Oct. 31, 1975) (App. B) (fees may include "brokerage commissions, mutual fund sales commissions, and insurance sales commissions").

Scorecard." *Id.* at 1. This service commences *after* TLIC is retained by a Plan.[19]

As explained by TLIC's Fiduciary Management Program, if TLIC determined an investment was failing to meet its "stringent criteria," it would perform additional review and eventually recommend elimination of a fund after a time on its "Watch List." *Id.* at 15. *See supra* Section II.B; Ex. G. Thus, in all aspects of its Fiduciary Management Program, TLIC interpreted information and made recommendations to plan sponsors regarding the funds it offered. *See IT Corp.*, 107 F.3d at 1420 (decisions involving "interpretation and judgment" confer fiduciary status). TLIC plausibly provides investment advice for a fee under ERISA.

These allegations are more than sufficient to establish that TLIC had discretionary authority or control with respect to the purchase or sale of securities, and, thus, functioned as fiduciary investment adviser to the Plans. Abundant case law supports this conclusion. *See, e.g., Procacci v. Drexel Burnham Lambert, Inc.*, No. 89-0555, 1989 WL 121984, at *5 (E.D. Pa. 1989) (recognizing that a broker's fiduciary status is clear where he "is *effectively* and *realistically* in control of the assets") (emphasis in original); *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 869 F. Supp. 278, 287 (D.N.J. 1994) (ratification of trades by plan trustees did not preclude finding that firm was also a fiduciary); *Pension Fund—Mid Jersey Trucking Indus.—Local 701 v. Omni Funding Grp.*, 731 F. Supp. 161, 167-68 (D.N.J. 1990); *Stanton v. Shearson Lehman/Am. Express, Inc.*, 631 F. Supp. 100, 103-04 (N.D. Ga. 1986); *Phones Plus*, 2007 WL 3124733, at *1, *6 (review and evaluation of investment options sufficed). Indeed, "[i]t has long been the view of the Department [of Labor] that the act of making individualized recommendations of particular investment managers to plan fiduciaries may constitute the provision of investment advice within the meaning of [ERISA] section 3(21)(A)." Investment

---

[19] TLIC's investment advice produces results that are dubious at best. For example, TLIC gave the Vanguard Total Stock Market Index Ret Opt separate account investment option a top score of "5" for fees and expenses, *id.* at 7, even though TLIC's add-on fees *increased* this fund's cost by over **400 percent.** Compl. ¶ 246.

Advice—Participants and Beneficiaries, 74 Fed. Reg. 3822, 3824 (Jan. 21, 2009). This is precisely what TLIC has done here.[20]

### (ii)    Advice to Participants.

As described *supra* Sections II.A-C, TLIC renders investment advice directly to the Plan's participants through its "AdviceSolutions" program.  Compl. ¶¶ 185-202.  Once logged into this website, a participant inputs specific data, including expected retirement age and salary.  Compl. ¶¶ 186-91.  The program processes the data and advises the participant which TLIC investment options to choose and the amount that should be invested in each.  Compl. ¶¶ 195-98.

TLIC does not dispute that this program constitutes the rendering of investment advice for a fee, which makes it a fiduciary under ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii).  Rather it claims in a footnote that the program is exempt under 29 C.F.R. § 2509.96-1(d)(3).  TLIC MTD at 10-11 n.16.  TLIC is wrong.  That regulation excludes from "investment advice" the following:

> *Asset Allocation Models.*  Information and materials (e.g., pie charts, graphs) that provide a participant . . . asset allocation portfolios of *hypothetical individuals*.

---

[20] Moreover, while not necessary to state a claim, Plaintiffs also satisfy the alternative 5-part test set forth in the now discredited regulation.  *See supra* note 16.  TLIC provided (1) "purchasing recommendations" and assessment of the prudence of particular investments; (2) did so on a regular basis; (3) pursuant to its contractual agreement with its client plans; (4) which, given the significant disincentives to plans to deviate from TLIC's recommendations, serves as a primary basis for investment decisions; and (5) according to TLIC's marketing materials,  pertained to the "particular needs of the plan."  *See* Definition of the Term "Fiduciary", 75 Fed. Reg. at 65264, 65270; *see also Buster*, 24 F.3d at 1117 (applying 5-part test prior to DOL criticism of test, and affirming finding of fiduciary status under 5-part test); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 703-09 (W.D. Mich. 2007) (granting summary judgment to plaintiffs and rejecting defendants' contention that they must have "discretionary" control under the 5-part test).  *See also In re Beacon Assocs. Litig.*, No. 09-777, 745 F. Supp. 2d 386, 423-26 (S.D.N.Y. Oct. 5, 2010) (applying 5-part test and analyzing elements); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 627 (D.N.J. 2010) (investment advice to trustees satisfied § 3(21)(A)(ii).

*Id.* (emphasis added).  TLIC is not providing charts of asset models of hypothetical individuals.  Far from being just a set of models, TLIC's interactive program advises on the *specific* investments an individual participant should make, in light of his or her particularized needs.  The regulatory exclusion lists other requirements that implicate factual inquiries, none of which TLIC claims to have satisfied.

Finally, TLIC's assertion that its provision of investment advice through "AdviceSolutions" is "not relevant to any specific claim," TLIC MTD at 10-11 n.16, is not true.  TLIC is a fiduciary through the panoply of investment advice programs it operates, including the "Fiduciary Warranty," "Fiduciary Management Program," and "AdviceSolutions."  Once TLIC set up a fund structure that benefitted itself and maintained the authority to make changes within that structure, it then advised both the Plans and participants that these investments were prudent.  Additionally, separate from these programs and their fees, TLIC charges Plaintiffs an "Investment Management" fee, Compl. ¶¶ 266-280, a fee which must, by its very title, entail compensation for investment management.  Investment Managers are fiduciaries under ERISA 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii).  Therefore TLIC is a fiduciary for the precise conduct that is challenged in this case.

Similarly, TLIC argues throughout its brief that Plaintiffs do not allege that TLIC steered them into *particular* investments within TLIC's platform.  *See* TLIC MTD at 2, 10-11.  First, that is incorrect—AdviceSolutions did just that as to participants and TLIC's Fiduciary Monitoring program did the same to the Plans.  Second, the argument is simply disingenuous.  The only options participants could select (and the sponsors could select without losing the Fiduciary Warranty) were those made available by TLIC.  TLIC levied excessive add-on fees on all of the options it selected; hence, it is entirely beside the point whether TLIC pushed one option or another.  It pushed them all.

### 4.   The Existence of Other Plan Fiduciaries Is a Red Herring.

TLIC appears to argue that it cannot be a fiduciary because the plans have other fiduciaries—who, according to TLIC, are to blame for the misconduct alleged by Plaintiffs. TLIC MTD at 1-4, 10-19. Neither point is correct. The presence of other fiduciaries is irrelevant. Plans typically have several different fiduciaries who perform different functions. The fiduciary functions at issue in this case are precisely those functions that TLIC performed, as made abundantly clear by the Fiduciary Warranty, investment monitoring, and AdviceSolutions programs. TLIC has little of substance to say about the Complaint's detailed fiduciary status allegations—other than to repeat the irrelevant observation that Plaintiffs do not attribute harm to any one particular investment option.[21]

TLIC's effort to blame the Plans other fiduciaries for its misconduct has nothing to do with its status as a fiduciary, and, moreover, is without merit as a matter of law. First, TLIC's arguments regarding negotiating the terms of its "retention" and the fact that other fiduciaries hired TLIC, TLIC MTD at 1-2, 11, 19, are unavailing. TLIC retained (and used) the authority to adjust its own fees and to change the investments underlying its separate accounts, and failed to bargain on behalf of the Plans for better share classes and fees which its control of over $19.5 billion in Plan assets enabled.

Second, TLIC's claim that it cannot be held liable because different fiduciaries—the Plan sponsors—were *wholly* responsible for selecting TLIC's products, and therefore *wholly* responsible for any losses described in this case simply is wrong. The Complaint plausibly alleges that TLIC was responsible for selecting and monitoring Plan investment options, and determining the fees charged to Plan participants. These allegations are supported by abundant factual detail. TLIC may wish to prove that Plaintiffs are wrong—but this is a factual dispute that

---

[21] As noted above, TLIC levied excessive add-on fees on all the options in its fund menu, and breached its duty of prudence and committed prohibited transactions in the same manner for all of the plans in the proposed Class.

1    cannot be decided at this stage of the case.[22]

2            Third, well-settled law undermines TLIC's form-over-substance argument.

3    *See, e.g., Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987) ("An

4    entity need not have *absolute* discretion . . . in order to be considered a fiduciary."

5    (emphasis added)); *Tussey I*, 2008 WL 379666, at *7 ("Even if . . . not the final

6    arbiter of Plan decisions, [the defendant] may still be a fiduciary with respect to

7    choosing funds."); *see also United States v. Glick*, 142 F.3d 520, 527-28 (2d Cir.

8    1998) (finding "sufficient control over at least part of the [plan] assets to create a

9    fiduciary relationship" due to "full discretion" in setting commissions).  Thus,

10   authority or control by one fiduciary does not preclude a finding of fiduciary status

11   with respect to another—multiple fiduciaries can and often do co-exist with

12   overlapping functions.  *Phones Plus*, 2007 WL 3124733, at *4 (holding that a "plan

13   sponsor's power over the ultimate decision is only one factor . . . it is not by itself

14   dispositive of the question of a service provider's fiduciary status" and that "a

15   reasonable fact finder could still conclude . . . that the change notification

16   procedures are inadequate or that the time provided in which to make such a

17   decision is unreasonably short, and that as a result Hartford is an ERISA

18   fiduciary."); *Yeseta*, 837 F.2d at 386-88 (finding as fiduciaries those who had, but

19   did not exercise, discretionary authority, as well as those who exercised control over

20   assets of the plan); *Concha*, 62 F.3d at 1501-02 (finding allegations that defendants

21   were "given and accepted discretion" over plan management "more than sufficient

22   to state a claim for breach of fiduciary duty"; holding there "need not be an express

23   delegation of fiduciary duty in the Plan instrument itself" to find fiduciary status).

24   

25   _____

26   [22] TLIC's effort to deflect blame to other fiduciaries misses the mark for another
     reason.  In the Ninth Circuit, breaching fiduciaries are not allowed to seek
     contribution or indemnity from co-fiduciaries.  *Kim v. Fuzikawa*, 871 F.2d 1427 (9th

27   Cir. 1989); *Call v. Sumitano Bank of Cal.*, 881 F.2d 626 (9th Cir. 1989).  Thus,
     whatever slings and arrows TLIC may have in mind for its client plan fiduciaries,

28   they cannot affect TLIC's liability in this case.

TLIC's contention that Plaintiffs "challenge the decisions by thousands of different plan sponsors" with a "broad-brush attack on TLIC," TLIC MTD at 2 n.2, is wrong. The decisions of other Plan fiduciaries are precisely what this case is *not* about. Rather, Plaintiffs challenge TLIC's self-dealing and abusive conduct that affects all of the Plans in exactly the same manner. They are subjected to excessive fees entirely of TLIC's making. Moreover, whether TLIC fully and fairly disclosed its fees to its clients—a factual issue—has nothing to do with TLIC's fiduciary status, the excessiveness of TLIC's fees, and its self-dealing. Disclosing an ERISA violation does not nullify the breaches or prohibited transactions at issue here. *See Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001) (affirming finding that a fiduciary cannot disclose its way out of an ERISA violation).

Finally, whatever the responsibilities of the plans' other fiduciaries, the Complaint alleges that TLIC (1) selects the investment menu that includes funds advised by its affiliates; (2) retains authority to unilaterally change the investment options available; (3) retains the authority to adjust its own compensation by imposing fees and/or swapping out investments underlying separate accounts; (4) provides monitoring of investments that includes the authority to hire and fire investment managers, put funds on a watch list, and ultimately terminate and replace them; (5) provides a fiduciary "warranty" with indemnification; (6) provides investment advice to plan sponsors regarding the quality of the separate accounts it offers; and (7) provides investment advice to individual participants in an interactive format. These allegations are supported by factual averments that go far beyond what is necessary to establish plausible fiduciary status of TLIC at the pleading stage of this case. Accordingly, TLIC fiduciary status arguments should be rejected.

### 5.    TLIC's Challenges to the ERISA Claims Against TLIC Fail.

ERISA's fiduciary obligations are the "highest known to the law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (citation omitted), enforced

through ERISA's "carefully integrated" remedial provisions, *Mass. Mut. Life Ins.*, 473 U.S. at 146.  Plaintiffs' ERISA claims are well pled.

### a.  TLIC Violated Its ERISA Duties of Prudence and Loyalty.

Counts I, II, III, V, and VI allege prudence and loyalty violations pursuant to ERISA §§ 404(a)(1)(A)-(B), 29 U.S.C. §§ 1104(a)(1)(A)-(B), resulting from TLIC charging excessive fees and collecting revenue sharing from the investment options.  To state an ERISA claim for breach of fiduciary duty, Plaintiff must allege that (1) the defendant was a fiduciary with respect to the Plan; (2) the defendant's acts or omissions constituted a breach of duty; and (3) the breach caused harm.  *Pegram v. Herdrich*, 530 U.S. 211, 225-26, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000).  The duty of prudence requires a fiduciary to act with such "care, skill, prudence, and diligence" as would a "prudent man acting in a like capacity and familiar with such matters."  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).  Under the prudence standard, courts consider whether fiduciaries have "employed the appropriate methods to investigate the merits of the investment and to structure the investment."  *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983).  The closely related duty of loyalty requires that a fiduciary act "solely in the interest of the participants and beneficiaries" of a plan and for the "exclusive purpose" of providing benefits and paying expenses.  ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).  Evaluating breach of fiduciary duty claims, like the determination of fiduciary status, involves factual questions that are inappropriate to resolve on a motion to dismiss.  *See Concha*, 62 F.3d at 1503.

As recently noted by one district court in the excessive fee context, "allegations of self-dealing are what set apart" claims that fail and claims that go forward.  *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, No. 11-5127, 2012 WL 701397 (S.D.N.Y. Mar. 6, 2012) (contrasting failed claims in *Hecker*, 556 F.3d at 586, with successful pleading in *Braden*, 588 F.3d 585).  Self-dealing is the core of

1  Plaintiffs' ERISA claims here, and each of Plaintiffs' prudence/loyalty claims is

2  well pled, as discussed *infra*.

3        **b.    TLIC Violated ERISA Through Prohibited Transactions.**

4        Counts I, II, III, IV, VI, and VII allege that TLIC committed prohibited

5  transactions under ERISA §§ 406(b)(1) & (3), 29 U.S.C. §§ 1106(b)(1) & (3), by

6  charging fees to separate account investment options over which TLIC exercised

7  control.  ERISA § 406(b) prohibits fiduciary self-dealing, providing in relevant part:

8        A fiduciary with respect to a plan shall not --

9        (1) deal with the assets of the plan in his own interest or for his own

10       account, . . . or

11       (3) receive any consideration for his own personal account from any

12       party dealing with such plan in connection with a transaction involving

13       the assets of the plan.

14  29 U.S.C. § 1106(b).  As explained by the Ninth Circuit Court of Appeals, section

15  406(b) "creates a per se ERISA violation; even in the absence of bad faith, or in the

16  presence of a fair and reasonable transaction," *Patelco*, 262 F.3d at 911 (quoting

17  *Gilliam v. Edwards*, 492 F. Supp. 1255, 1263 (D.N.J. 1980)).  This is a "blanket

18  prohibition of certain acts."  *Id.  See also Reich v. Compton*, 57 F.3d 270, 288 (3d

19  Cir. 1995) (ERISA § 406 to be broadly construed).

20       In the excessive fee context, successful § 406(b) claims rest on fiduciary acts

21  that enrich the fiduciary at the expense of plan participants.  *See, e.g.*, *In re Regions

22  Morgan Keegan ERISA Litig.*, 692 F. Supp. 2d 944, 959-60 (W.D. Tenn. 2010);

23  *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 633 (D.N.J. 2010); *see also Lowen

24  v. Tower Asset Mgmt.*, 829 F.2d 1209, 1212 (2d Cir. 1987) (investments in

25  affiliates).  As described *infra*, the prohibited transaction claims are well-pled.[23]

26       **c.    The Mutual Fund Excessive Fee Claims Are Well-Pled.**

27  _____

28  [23] TLIC's challenge to Plaintiffs' prohibited transaction claims are limited to Counts III, IV and VII.  TLIC ignores these aspects of Counts I and II, as noted below.

1    TLIC's challenges to Counts I and II—which arise from TLIC's conduct with

2    respect to the separate account investment options that invest in an underlying

3    mutual fund, Compl. ¶ 253, are meritless.  First, as explained *supra* Sections II.A-C,

4    TLIC levies grossly excessive add-on investment management fees for underlying

5    mutual funds—funds that participants could obtain directly at a fraction of the

6    cost.[24]  Index funds need no managers and managed funds already have managers.

7    Plaintiffs therefore plausibly allege that the addition of investment management fees

8    that *exceed* the underlying investment management fees of the mutual funds (by as

9    much as ***900 percent or more,*** *see supra* note 24) are excessive and a breach of

10   fiduciary duty for the reasons set forth in the Complaint.  *See* Compl. ¶¶ 245-280,

11   291-294.  *See Braden*, 588 F.3d at 595 (allegations of kickback scheme plausibly

12   pled breaches *and* prohibited transactions).

---

13   [24] Once in TLIC's separate accounts, encased in TLIC's fee wrapper, these
14   investment options provide nothing close to "market rates"—setting this case apart
     from those where a broad-based market selection of investment options with a
15   range of fees was offered to participants and excessive fee claims did not fare well
     for that reason.  *See Hecker*, 556 F.3d at 585-86; *Renfro*, 671 F.3d at 326-27
16   (relying on *Hecker*) (cases where the *only* charges were those of the underlying
     mutual funds).  To be precise, the separate accounts at issue here charged total
17   expense ratios ranging from .65% (65 bps) to 1.97% (197 bps), and 108 (out of
     170) of the investment options had fees in excess of 1.21% (121 bps).  These
18   investments are much more expensive than what is available on the open market,
     because an investment in one of TLIC's separate accounts results in nothing more
19   than investment in the underlying mutual fund, but with much higher fees.  *See*
     Declaration of Robert L. Lakind ¶¶ 9-11 & Exs. H, I, & J (Dkt. 46) ("Lakind
20   Decl.") (previously filed in *Santomenno v. Transamerica Life Ins. Co.*, No. 11-
21   0736 (D.N.J. filed Sept. 1, 2011)); Compl. ¶¶ 249, 253.  Based on a review of SEC
     filings, of the 140 TLIC separate account investment options that invest in a
22   mutual fund, 110 of them charges fees that exceed those of the underlying mutual
     funds' fees.  Lakind Decl. ¶¶ 10-11, Ex. I & J.  With respect to 48 of these
23   investment options that invest in the retail share class of a mutual fund, TLIC
24   charged Plaintiffs fees in excess of the fees charged by that share class of the
     mutual fund.  Lakind Decl. ¶ 10 & Ex. I.  This excess was as high as 9 times the
25   fees charged by the underlying retail mutual fund.  *Id*.  The remaining 62
     investment options that charged fees in excess of the underlying mutual fund invest
26   in either the mutual fund's institutional share class, or a similar type of share class.
27   Lakind Decl. ¶ 11 & Ex. J.  Here the excess was more than 2.5 times the fees
     charged by the underlying fund.  *Id*.

28

1      In defense of its allegedly excessive fees, TLIC complains that Plaintiffs

2  "ignore[] the myriad services that TLIC provides to the Plans, including

3  recordkeeping and administrative services."  TLIC MTD at 13.  However, the nature

4  and extent of the services provided by TLIC and the reasonableness of the charges

5  for them are factual questions that cannot be decided now.  The Complaint plausibly

6  alleges that adding investment management fees that double, triple, and increase

7  even more the total expense ratio of the underlying mutual funds violates ERISA.

8      At any rate, documents submitted by TLIC with its motion show that it

9  assesses a variety of additional fees purportedly for specific services (including

10  recordkeeping and administrative services).  *See supra* note 4.  The Complaint

11  plausibly alleges that the sum of all the fees is excessive, particularly in light of the

12  fact that many appear to have been for services of little to no benefit to participants.

13      Third, TLIC argues that Plaintiffs' allegations in sections V.A, D, F, and J are

14  irrelevant to the Mutual Fund Excessive Fee Claims because the fees on the separate

15  accounts are "set by contract."  TLIC MTD at 14-15 & n.24.  This, however, has

16  nothing to do with whether the Complaint plausibly alleges that the fees were

17  excessive.  Moreover, TLIC ignores that once the "contract" was entered, TLIC

18  retained the ability to change its fees, rendering it a fiduciary with regard to them.

19  The same is true of TLIC's unilateral authority to change the share class of the

20  underlying investment.  The question, therefore, is whether the Complaint plausibly

21  alleges that TLIC breached its fiduciary duties by levying excessive fees and failing

22  to ensure that the Plans paid no more than reasonable fees—obligations that TLIC

23  cannot avoid by claiming, despite its authority and discretion, that while it walks

24  like a fiduciary, and talks like a fiduciary, it's just a service provider operating under

25  a contract.  *Mercer*, 747 F.2d at 308-09.

26      TLIC's other arguments fare no better.  That other plan fiduciaries made the

27  decision to invest in TLIC's separate accounts—or had the "final" say—is a red

28  herring given TLIC's authority, control and discretion with regard to the selection

37

and monitoring of investment options.  *See supra* subsection III.B.4 and Section II.A-C.  Likewise, TLIC's assertion that "disclosure" of its excessive fees somehow absolves it of liability is specious.  Disclosure of an ERISA violation does not undo the violation.  *Patelco*, 262 F.3d at 911.  *Renfro*, *Hecker*, *Marks*, and *Schulist* are not to the contrary.  *See supra* subsection III.B.3.

Despite TLIC's abundant efforts to challenge the Complaints' factual averments, the Complaint plausibly alleges that TLIC breached its fiduciary duties and engaged in prohibited transactions by assessing and collecting excessive fees, which it could not collect but for the fact that TLIC had and exercised authority, control, and discretion over Plan assets invested in TLIC separate accounts.[25]

### d.   The Mutual Fund Share Class Claim Is Well-Pled.

Count V alleges that TLIC breached its fiduciary duties by not using its economic leverage (examples of which are listed in the Complaint, ¶ 318) to gain access to the less expensive institutional share class of the underlying mutual funds.  Compl. ¶¶ 302-319.  Rather than using the leverage that comes with TLIC's control of over $19.5 billion in retirement assets, *see* Ex. K, and the attendant heft to demand lower fee share classes, Compl. ¶ 318, TLIC failed to invest in the institutional share classes of the mutual funds underlying its separate accounts or gain access, for Plaintiffs *and the well over 10,000 plans in which they participate*, to the institutional share class of the underlying mutual funds.  Excessive fee claims of this type are well-recognized.  *See Braden*, 588 F.3d at 595 (choice of retail funds by massive plan with access to institutional funds plausibly pled breach); *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *26 (C.D. Cal. July 8, 2010)

---

[25] TLIC does not challenge the Mutual Fund Excessive Fee Claims on the basis that there is no "transaction," *cf.* TLIC MTD at 16-17 (challenge to Affiliate Claims, discussed *infra* subsection III.B.5.g)—perhaps because to do so would be futile.  As just one example, as described in the "Commission Disclosure," TLIC assesses Investment Management Charges *daily*.  Hatton Decl. Ex. F at 3455; Ex. G at 3460.  It is difficult to imagine how the fees challenged by these claims could be collected by anything but a "transaction."

("*Tibble II*") (findings of fact and conclusions of law holding that fiduciaries should have asked for fee waivers and failure to do so caused participants to pay "wholly unnecessary fees"); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796-97, 800 (7th Cir. 2011) ("*George II*") (reversing summary judgment on two fiduciary breach claims because of issues of fact regarding timing of fiduciary decisionmaking and because "a trier of fact could reasonably conclude that defendants did not satisfy their duty to ensure that Hewitt's fees were reasonable"), *see also Tussey v. ABB, Inc.*, No. 06-4305, 2012 WL 1113291, at *28 (W.D. Mo. Mar. 31, 2012) ("*Tussey II*") (bench trial finding of prudence violation when fiduciary failed to choose lower-cost share classes and negotiate for available fee rebates); *Goldenberg*, 741 F. Supp. 2d at 635 (no justification for use of "inferior fund"). Thus, Count V is well pled, and amply supported by case law. And TLIC's refrain that it cannot be liable because plan sponsors made the "final" decision to invest in the share classes TLIC chose once again is wrong. *See supra* subsection III.B.4.

### e. The Revenue Sharing Claim Is Well-Pled.

Plaintiffs have alleged that TLIC chose many funds for the Plans' menus *because* they paid revenue sharing to TLIC, and that, but for its authority and control over Plan assets, TLIC would not have been able to extract these payments. Compl. ¶¶ 178-179, 281-295. TLIC then disguised these excess payments by "crediting" them against excessive Investment Management and Administrative Charges to make it appear to Plaintiffs that they were receiving a benefit from the revenue sharing payments. Compl. ¶¶ 245, 250-260, 266-277, 291-294. Offsetting an illegitimate charge does not create a legitimate one.

TLIC's challenge to Count III is premised on its assertion that TLIC's "Investment Management and Administrative" charges are legitimate and "redounded to the benefit of the Plans." TLIC MTD at 15-16. TLIC is of course free to pursue this argument on the merits, but cannot do so on its motion to dismiss.

Plaintiffs' allegations plead ERISA violations.  *Braden*, 288 F.3d at 595 (kickback scheme allegations).  *Cf. Renfro*, 671 F.3d at 327 ("[P]laintiffs have not contended there was any sort of concealed kickback scheme").  As one court explained:

> Although Nationwide contends that it contracted with the mutual funds to provide services to the funds, a fact finder . . . could conclude . . . the contracts, were a guise for making payments to Nationwide or that Nationwide provided only nominal services.

*Haddock I*, 419 F. Supp. 2d. at 162; *See also Phones Plus*, 2007 WL 3124733, at *5.

Not only is TLIC's receipt of revenue sharing in this manner a fiduciary breach, it is a prohibited transaction.  *Haddock I*, 419 F. Supp. 2d at 171; *Phones Plus*, 2007 WL 3124733, at *2-5.  *See also Patelco*, 262 F.3d at 911 (prohibited transactions, *inter alia*, where defendants determined their own administrative fees and collected them from plan assets).  And as before, TLIC's blame of the plan sponsors' "decisions" misses the mark.  *See supra* subsection III.B.4.

### f.   The Collective Trust / Separate Account Excessive Fee Claim Is Well-Pled.

Plaintiffs have alleged in Count VI that the 30 TLIC investment options that did not invest in mutual funds, but rather in collective investment trusts or were simply traditional separate accounts, carried excessive fees paid to TLIC.   These investment vehicles, which have none of the reporting, marketing, and administrative costs incurred by mutual funds, should charge lower fees than a comparable mutual fund.  However, in this case, their fees exceeded those of a comparable mutual fund.  Compl. ¶¶ 326-333.  Here too, TLIC unsuccessfully tries to shirk its liability by pointing to other fiduciaries who "made the fiduciary decisions" to include these investments in the Plans.  *See supra* subsection III.B.4.  Disclosure of a breach is not a valid defense.  *Patelco*, 262 F.3d at 911.

### g.   The Affiliate Claims Against TLIC Are Well-Pled.

Plaintiffs' Affiliate Claims plausibly plead prohibited transactions.  TLIC's

challenge that Counts IV and VII do not allege any specific "transaction," TLIC
MTD at 16, fails for a number of reasons.  First, every time TLIC collects fees from
its separate accounts—after having provided a fiduciary warranty, investment
monitoring, and investment advice to the Plans and participants, having designed an
investment lineup where it maintains authority to swap out underlying investments
with whatever TLIC chooses and increase its fees—it is a "transaction."  But for
TLIC's decision to maintain investments underlying its separate accounts that
benefit its affiliates, TIM and TAM would not receive fees—further transactions.

Second, since the investment options offered by TLIC are considered
independent of TLIC, *see Prudential Life Ins. Co. v. SEC*, 326 F.2d 383, 387 (3d
Cir. 1964) ("the fund is separable from the insurance company"), a prohibited
transaction occurs when TLIC charges fees on the investment options.  *Wright v Or.
Metallurgical Corp.*, 360 F.3d 1099 (9th Cir. 2004), on which TLIC relies, is
distinguishable.  There, plaintiffs alleged a prohibited transaction based on the
fiduciary's failure to sell lawfully-owned company stock.  *Id.* at 1101.  There was no
transaction—only an omission.  *Tibble v. Edison*, 639 F. Supp. 2d 1122, 1127 (C.D.
Cal. 2009) ("*Tibble I*"), is similarly distinguishable and was an order on summary
judgment. Here, countless transactions occurred in which TLIC actively charged
fees to Plaintiffs that benefited its affiliates.  *Cf. Ellis*, 484 F. Supp. 2d at 710-11.

Third, relying on 29 C.F.R. § 2550.408b-2(c)(2), TLIC claims it did not
commit a prohibited act under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), because
it did not "use" any of the authority or responsibility which made it a fiduciary to
commit a prohibited transaction.  TLIC MTD at 17.  This statement cannot be
reconciled with the inclusion of the TIM and TAM managed funds in the investment
lineup and TLIC's provision of investment advice.  TLIC's argument that it did not
"exercise" discretion to change underlying investments or alter its fees is also
meritless for the reasons discussed *supra* subsection III.B.3.b(ii).

Last, TLIC's repetitive argument that it was the plan sponsors, not TLIC,

41

who made it so TLIC's affiliates would receive compensation ignores its authority and control over Plan assets, as discussed *supra* subsection III.B.3.

## C.   TIM and TAM Knowingly Participated in TLIC's Prohibited Transactions.

TIM and TAM served as investment advisers, for a fee, to certain separate accounts that invested in an underlying mutual fund, Compl. ¶¶ 296-297, or underlying collective investment trust, Compl. ¶ 338, as well as traditional separate accounts, *i.e.*, those that were not pass through vehicles, Compl. ¶ 339.  In Counts IV and VII, Plaintiffs allege non-fiduciary participation by TIM and TAM, through their receipt/charging of impermissible fees, in certain prohibited transactions committed by TLIC.  In their separately filed motion to dismiss, TIM and TAM claim that they cannot be liable for the equitable relief sought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), because the restitution Plaintiffs seek is actually "legal" instead of "equitable" in nature and that, in any event, the funds Plaintiffs seek are not "particular funds" that are "traceable" "plan assets."  These arguments are meritless.  Additionally, because Plaintiffs have plausibly alleged TLIC's fiduciary status, as well as the prohibited transactions in which TIM and TAM participated and from which they profited, their motion should be denied.

Plaintiffs are entitled to equitable relief, in the form of reimbursement of the impermissible fees, that TIM and TAM charged them.  *See Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 254, 120 S. Ct. 2180, 147 L. Ed. 2d 187 (2000) (holding equitable action for restitution against a non-fiduciary transferee of tainted plan assets is available under § 502(a)(3)); *see also Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 215-16, 122 S. Ct. 708, 151 L. Ed. 2d 635 (2002) (acknowledging availability of equitable restitution under the *Harris Trust* doctrine; distinguishing such from legal restitution sought in *Great-West*); *Mertens*, 508 U.S. at 262 (non-fiduciary service providers "must disgorge assets and profits obtained through participation as parties-in-interest in transactions

prohibited by § 406"); *Concha*, 62 F.3d at 1503-04 (upholding claim for participation in prohibited transactions by non-fiduciaries who profited from those transactions); *Phones Plus*, 2007 WL 3124733, at *5 (upholding claim for knowing participation in a fiduciary breach); *Gen. Dynamics*, 2009 WL 3835883, at *3-5 (same); *Regions*, 692 F. Supp. 2d at 967.

The Ninth Circuit reaffirmed the validity of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) claims against non-fiduciaries just last month. *CGI Techs and Soln's v. Rose*, --- F.3d ----, 2012 WL 2334230 (9th Cir. June 20, 2012). Moreover, *CGI* held that "appropriate equitable relief" under ERISA should be granted according to the court's "broad" powers in administering traditional equitable relief. *Id.* at *8 (citing *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010), for the proposition that "district court has broad equity powers to order the disgorgement of ill-gotten gains")). Under *CGI*, "the parties may not by contract deprive the district court of its power to act as a court in equity in a § 502(a)(3) action." 2012 WL 2334230, at *9.[26]

TIM and TAM argue that Plaintiffs' claims fail because *Great West* imposes a tracing requirement that Plaintiffs cannot meet. Plaintiffs' ERISA § 502(a)(3) claim is for equitable restitution. Compl. ¶¶ 85; Counts IV and VII.[27] Assuming traceability applies here, as noted by the Ninth Circuit, "[t]he transfer of Plan funds into [the non-fiduciary's] account creates a presumption that funds remaining in this account belong to the Plan." *Landwehr v. DuPree*, 72 F.3d 726, 736 (9th Cir.

---

[26] TIM's and TAM's reliance on *Paulsen v. CNF Inc.*, 559 F.3d 1061 (2009), TIM/TAM MTD at 3, for the proposition that "make-whole relief" falls outside the scope of "appropriate equitable relief" is irrelevant in light of *CGI*'s holdings.

[27] Defendants refer to the distinction drawn in *CIGNA Corp. v. Amara*, --- U.S. ----, 131 S. Ct. 1866, 1878-79, 179 L. Ed. 2d 843 (2010) (discussing *Great-West*, 534 U.S. at 213), between remedies available against fiduciaries and non-fiduciaries. This distinction, however, does not impact Plaintiffs' claims, because they are seeking a form of relief that the Supreme Court has indicated is available against non-fiduciaries, as set forth *supra*.

1    1995).[28]  Regardless, the funds at issue are traceable to monies received by TIM and

2    TAM pursuant to their roles as advisers to investments underlying TLIC's separate

3    accounts, *see* Compl. ¶¶ 338-341, as well as through records—that Plaintiff has yet

4    to fully receive in discovery—in TIM's and TAM's possession.  TAM is still in

5    existence, and while TIM elected to cease operations after this case was filed, the

6    assets of its bank account were presumably transferred within the Transamerica

7    family and can be located.  If tracing is required, Plaintiffs should be entitled to

8    discovery.  *Braden*, 588 F.3d at 602.  At a minimum, there exists a factual dispute

9    about whether the funds are traceable, which precludes dismissal of this claim at the

10   pleading stage.  *Tussey I*, 2008 WL 379666, at *6.

11        TIM's and TAM's "res" authorities, *see* TIM/TAM MTD at 6 & n.7, are

12   distinguishable.  For example, in *Baker v. Chin & Hensolt, Inc.*, No. 09-4168, 2010

13   WL 1222783 (N.D. Cal. Mar. 24, 2010), the plaintiffs sought *reimbursement* of

14   attorneys' fees and costs incurred to obtain plan records from the defendants.

15   Unlike here—where Plaintiffs seek restitution of TIM's and TAM's ill-gotten gains

16   *from TIM and TAM*—the *Baker* plaintiffs sought reimbursement to offset payments

17   they made to third parties, not to the defendants.  *Pepsi Bottling Grp., Inc. v.*

18   *Thomas*, No. 10-54, 2010 WL 2650560 (W.D. Wash. July 1, 2010), involved a

19   claim for money that had not yet changed hands and therefore was not in the

20   defendant's possession—unlike here, where TIM and TAM already collected their

21   fees.  TIM's and TAM's reliance on *Calhoon v. TWA, Inc.*, 400 F.3d 593, 597 (8th

22   Cir. 2005), is similarly misplaced.  There, the plaintiffs sought damages measured

23   by losses to themselves, not ill-gotten gains amassed by the defendants.  *Id.* at 598.

24   Moreover, the Ninth Circuit has rejected the Eighth Circuit's narrower approach to

25   equitable relief in the ERISA context.  *CGI*, --- F.3d ----, 2012 WL 2334230, at *7.

26   TIM's and TAM's argument that they can avoid liability because Plaintiffs'

27

28   [28] *Landwehr* suggests that equitable relief under ERISA 502(a)(3) is limited to
     "parties in interest," but this was overruled by *Harris Trust*, 530 U.S. at 246.

44

investments were comingled with other investment money is beside the point, because TIM and TAM no doubt kept records of the funds they collected—another issue that can be sorted out in discovery that is inappropriate to resolve here.

TIM and TAM argue that the unjust compensation received by them is not subject to ERISA § 503(a)(3) because, in their view, the funds are not "plan assets." TIM/TAM MTD at 4-5.  The Complaint, however, sufficiently alleges otherwise. The funds were misappropriated through prohibited transactions by TLIC from TLIC's separate accounts, which are unquestionably plan assets.  *See supra* subsection III.B.3.a.  Furthermore, this is a question of fact that cannot be resolved on a motion to dismiss.  *See generally Patelco*, 262 F.3d at 908-09 (evaluating undisputed facts on summary judgment); *Kayes*, 51 F.3d at 1466-68 (same).  In any event, the term "plan asset" "should be construed broadly in order to effectuate Congress's overriding concern with the protection of plan participants and beneficiaries." *Patelco*, 262 F.3d at 908; *Kayes*, 51 F.3d at 1467 ("[I]n this circuit there is a twofold functional test as to whether an item in question constitutes an 'asset of the plan': (1) whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary, and (2) whether such use is at the expense of the plan participants or beneficiaries.").  *See also Shirk v. Fifth Third Bancorp*, No. 05-049, 2008 WL 4449024, at *16 (S.D. Ohio Sept. 26, 2008) (discussing *Patelco* functional approach); *Haddock I*, 419 F. Supp. 2d at 170 (plan assets held upon "exercise of fiduciary discretion or authority" and "at the expense of plan participants or beneficiaries").

**D.    Plaintiffs' IAA Claim Is Well-Pled.**

IAA § 203, 15 U.S.C. § 80b-3, requires investment advisers to register with the Securities and Exchange Commission ("SEC").[29]  IAA § 215(b), 15 U.S.C.

---

[29] Entities that select and monitor investments are investment advisers and must register with the SEC.  *Abrahamson v. Fleschner*, 568 F.2d 862, 870-71 (2d Cir. 1977); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 399-400 (D.C. Cir. 2007).

45

§ 80b-15(b), voids investment advisory contracts entered into by unregistered investment advisors and permits investors to bring actions for equitable relief. *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18-19, 100 S. Ct. 242, 62 L. Ed. 2d 146 (1979).  This statute was designed for the "benefit of persons relying upon . . . investment advisers for advice."  *Abrahamson v. Fleschner*, 568 F.2d 862, 873 (2d Cir. 1977), and should "be construed . . . not . . . restrictively, but flexibly to effectuate its remedial purposes."  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963).  *See also Prudential*, 326 F.2d at 386 ("[S]ecurities legislation must be broadly construed.").

Count VIII of Plaintiffs' Complaint alleges that TLIC entered into contracts with Plaintiffs pursuant to which TLIC rendered investment advice to them, without registering with the SEC.  Count VIII ¶ 10; *see also* Compl. ¶ 38.  TLIC charged Plaintiffs an "Investment Management" fee for its services.  Invoking IAA § 215(b), Count VIII seeks to void these advisory contracts and recover the "Investment Management" fees Plaintiffs paid.

The contract that is the subject of Plaintiffs' IAA claim is one between TLIC and the individual Plaintiffs-investors to whom TLIC provides investment advice. On investors' behalf, TLIC operates a "separate account" in which, TLIC admits, "you [Plaintiff] are purchasing 'units.'" Ex. L (Separate Accounts 101) at 2.  The "units" Plaintiffs' purchase from TLIC "perform in the same way shares in a mutual fund would," but for TLIC's "Investment Management" and other fees.  Ex. L at 2-4.  For this "Investment Management" fee, which is in addition to the investment management fee Plaintiffs pay to the managers of the underlying mutual funds, Compl. ¶ 275, TLIC selects and monitors the underlying investments, offers units in the separate account to Plaintiffs, and provides advisory fact sheets to Plaintiffs.

TLIC does not deny that it rendered investment advice; nor does it deny that it

---

Further, the IAA imposes fiduciary obligations on registered advisers. *Transamerica*, 444 U.S. at 17.

did not register with the SEC.  Rather, TLIC asserts that Count VIII fails because the relevant advisory contract is one between it and the "trustee" (*i.e.*, GAC, *see* TLIC MTD at 20), not the contract it entered into with Plaintiffs.  Although discussed in TLIC's brief, the former contract is not the basis of Plaintiffs' IAA claim.  Plaintiffs who paid the "Investment Management" fee; who purchased units; who received the investment fact sheet; and who bore the investment risk—not the "trustee"—contract with TLIC.

### 1.     There Is a Contract Between TLIC and Plaintiffs.

Whether measured by Federal Securities Law or state common law, Plaintiffs are parties to an investment advisory contract with TLIC.

### a.     There Is a Contract Under Federal Securities Law.

While the IAA contains a definition of "investment advisory contract," it contains no definition of "contract."  However, the related term of "investment contract" has been defined by the Supreme Court in construing cognate securities laws.  A contract's existence is measured by the functional reality of the transaction:

> Form was disregarded for substance and emphasis was placed upon economic reality.  An investment contract thus came to mean a contract or scheme for "the placing of capital or laying out of money in a way intended to secure income or profit from its employment."

*SEC v. W.J. Howey Co.*, 328 U.S. 293, 298, 66 S. Ct. 1100, 90 L. Ed. 1244 (1946) (citation omitted).  Given that the Securities Act and the IAA are addressed to similar goals, they should be similarly construed.  *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 386-88, n.10, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970).  Plaintiffs' investment in separate accounts, intended to "secure income or profit" and accompanied by the payment of a management fee to TLIC, creates a contract.  This interpretation is consistent with the IAA's definition of "investment advisory contract," which is "any contract or agreement whereby a person agrees to act as

investment adviser to or to manage any investment . . . of another person."  IAA
§ 205(d), 15 U.S.C. § 80b-5(d).  Because TLIC did not register to give investment
advice pursuant to these contracts with the Plaintiffs, who paid TLIC's "Investment
Management" fee, they can be rescinded by Plaintiffs.

### b.     There Is a Contract Under the Common Law.

The same result obtains when measured by state common law, under which a
contract requires "offer, acceptance and consideration."  *In re Marriage of Brown*,
15 Cal. 3d 838, 846, 126 Cal. Rptr. 633 (Cal. 1976).  TLIC does so by providing
each Plaintiff with a personal electronic account and a menu of pre-selected
investment options which a Plaintiff may accept.  The website informs each Plaintiff
that "[o]nce you log in, you will be able to: . . . Change your investment choice
selections."  Ex. M.  In addition, through each investor's personalized website,
TLIC provides Plaintiffs with a separate Fact Sheet containing investment advice for
each investment option and discloses the investment's "Investment Management"
fee (lower left corner).  Hatton Decl. Ex. H at 3473.  Plaintiffs accept TLIC's offer
through their personal online account by "[c]hang[ing] your investment choice" or
by mailing a selection to TLIC.  The effect of this transaction is, as stated by TLIC
to Plaintiffs, "purchasing 'units' of that separate account."  Ex. M at 2.  TLIC then
sends Plaintiffs, not the trustee, a confirmation notice of their purchase, and
notification of any fee changes.  Ex. I, N.  Further, thereafter, on a quarterly basis,
TLIC sends Plaintiffs a statement listing the investments they may purchase.  Ex. O.

Therefore, TLIC (1) selects and monitors the underlying mutual funds in
which Plaintiffs' invest; (2) offers Plaintiffs "units" which generally mimic the
underlying mutual fund's performance. Ex. L at 4; and (3) advises Plaintiffs about
investments through "Fact Sheets."  Plaintiffs receive consideration in the form of
TLIC's culling and analysis of available investments, as well as by receipt from
TLIC of "units" of investment.  TLIC, in turn, receives consideration from Plaintiffs

48

in the form of payment of "Investment Management" fees.  *See also* Ex. L at 2, 4.

## 2.    TLIC's Arguments Lack Merit.

While all of the required elements for a contact between Plaintiffs and TLIC exist, TLIC claims the relevant contract for Count VIII is the GAC between it and the "trustee."  This argument is contradicted by the terms of the GAC, which only obligate TLIC to make separate accounts available to Plan participants.  *E.g.*, Hatton Decl. Ex. E at 3436 ("the following Separate Accounts are included under the Contract.").  TLIC has a separate obligation to, and contract with, Plaintiffs to provide them with units of a separate account and investment advice in exchange for Plaintiffs paying an "Investment Management" fee.  It was Plaintiffs, not the "trustee," who paid the "Investment Management" fee and bore the risk of TLIC's advice.  As an "investment advisory contract" exists when a person agrees to "manage any investment," IAA § 215, and Plaintiffs paid TLIC's "Investment Management" fee, Plaintiffs have an investment advisory contract with TLIC. Further, because the "trustee" did not pay the "Investment Management" fee and Plaintiffs did, the latter, not the former, had an investment contract.  Cal. Civ. Code § 1550 (consideration is an essential element of a contract); *Cont'l Bank of Pa. v. Barclay Riding Academy, Inc.*, 93 N.J. 153, 170, 459 A.2d 1163 (N.J. 1983).

TLIC's cases are distinguishable.  In *Clark v. Nevis Capital Mgmt., LLC*, No. 04-2702, 2005 WL 488641, at *13 (S.D.N.Y. Mar. 2, 2005), no consideration was paid to the putative advisor.  *Paul S. Mullin & Assocs., Inc. v. Bassett*, 632 F. Supp. 532 (D. Del. 1986), was an action by an advisor, not the recipient of advice.

## 3.    Plaintiffs May Seek Restitution.

Even if the Court finds that Plaintiffs are not plausibly a party to an investment management contract with TLIC, Plaintiffs, who pay the Investment Management fee, are still entitled to "restitution."  Count VIII ¶ 18.  *See First Pac. Bancorp Inc. v. Helfer*, 224 F.3d 1117, 1124 (9th Cir. 2000) ("[T]he Court held that

equitable remedies of rescission, injunction or restitution, are available under § 215 of the [IAA].  *See Transamerica*, 444 U.S. at 19, 100 S. Ct. 242.").

Federal common law does not require that plaintiff have an express contract with a defendant from whom unjust enrichment is sought.  *Decker v. Independence Shares Corp.*, 311 U.S. 282, 289, 61 S. Ct. 229, 85 L. Ed. 189 (1940) (Securities Act action against third party).

> [U]nder a theory of unjust enrichment[,] the contract is one that is implied in law, and not an actual contract at all. . . . [T]o sustain a claim of unjust enrichment, the claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit . . . .

*Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 998-99 (3d. Cir. 1987) (internal citations and quotation marks omitted).  Thus, "[c]laims for unjust enrichment are therefore always non-contractual," *Palmeri v. LG Elecs. USA, Inc.*, No. 07-5706, 2008 WL 2945985, at *7 (D.N.J. July 30, 2008), and actionable irrespective of whether a contract exists.  *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606-09 (8th Cir. 1999); *Hamilton Sec. Advisory Servs. v. United States*, 60 Fed. Cl. 144, 159-60 (Fed. Cl. 2004).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the motions to dismiss filed by TLIC, TIM, and TAM be denied in their entireties.[30]

DATED this 30th day of July, 2012.

Respectfully submitted,

/s/ Gretchen S. Obrist

---

[30] The sole exception is as to Count IX, which Plaintiffs withdraw.  To the extent that any portion of Defendants' motions to dismiss is granted, Plaintiffs respectfully request leave to amend their complaint pursuant to Rule 15.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lynn L. Sarko *(Pro Hac Vice)*
lsarko@kellerrohrback.com
Michael D. Woerner *(Pro Hac Vice)*
mwoerner@kellerrohrback.com
Derek W. Loeser *(Pro Hac Vice)*
dloeser@kellerrohrback.com
Gretchen S. Obrist *(Pro Hac Vice)*
gobrist@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384

Sharon T. Hritz
shritz@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA  93101-6760
Tel: (805) 456-1496
Fax: (805) 456-1497

Robert L. Lakind *(Pro Hac Vice)*
rlakind@szaferman.com
Arnold C. Lakind *(Pro Hac Vice)*
alakind@szaferman.com
Mark A. Fischer *(Pro Hac Vice)*
mfischer@szaferman.com
Robert E. Lytle *(Pro Hac Vice)*
rlytle@szaferman.com
Robert G. Stevens, Jr. *(Pro Hac Vice)*
rstevens@szaferman.com
SZAFERMAN, LAKIND, BLUMSTEIN &
BLADER, P.C.
101 Grovers Mill Road
Lawerenceville, NJ 08648
Tel: (609) 275-0400
Fax: (609) 275-4511

Danielle Disporto *(Pro Hac Vice)*
ddisporto@lpklaw.com
Theresa Vitello *(Pro Hac Vice)*
tvitello@lpklaw.com
LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 11th Floor
New York, NY 10022
Tel: (212) 605-6205
Fax: (212) 605-6290

***Counsel for Plaintiffs Jaclyn Santomenno, Karen Poley and Barbara Poley***