O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JACLYN SANTOMENNO; KAREN       )   Case No. CV 12-02782 DDP (MANx)
POLEY; BARBARA POLEY,          )
                               )   **ORDER GRANTING IN PART AND**
            Plaintiffs,        )   **DENYING IN PART DEFENDANTS'**
                               )   **MOTIONS TO DISMISS**
     v.                        )
                               )   [Dkt. Nos. 103 & 104]
TRANSAMERICA LIFE INSURANCE    )
COMPANY; TRANSAMERICA          )
INVESTMENT MANAGEMENT, LLC;    )
TRANSAMERICA ASSET             )
MANAGEMENT INC.,               )
                               )
            Defendants.        )
_____)

     Presently before the court are Defendants Transamerica Life
Insurance Company ("TLIC"), Transamerica Asset Management, Inc.
("TAM"), and Transamerica Investment Management, LLC ("TIM")'s
Motions to Dismiss.  Having considered the parties' submissions and
heard oral argument, the court adopts the following order.

**I. BACKGROUND**

     **A. The Transamerica System**

     Transamerica Life Insurance Company ("TLIC") sells a 401(k)
plan product targeted at small and mid-size employers.  (Compl. ¶¶

1  62, 94.)  The product consists of a bundle of investment options
2  and administrative services that an employer can purchase.  (Id. ¶
3  7.)  As of December 31, 2010, TLIC was operating approximately
4  15,500 401(k) plans through its group annuity product and was
5  managing approximately $19.5 billion in employee assets.  (Id. ¶
6  8.)

7      Employers who purchase the 401(k) plan product enter into two
8  separate agreements with TLIC. First, they enter into an
9  "Application and Agreement for Services" ("Services Agreement"),
10  which sets out the various services TLIC agrees to provide for the
11  employer's plan, including recordkeeping services, enrollment
12  services, and website hosting.  (See, e.g., Decl. Darcy Hatton in
13  Support of Defendant Transamerica Life Insurance Company's Motion
14  to Dismiss Class Action Complaint ("Hatton Decl."), Exh. A.)  The
15  Services Agreements for the Plaintiffs' Plans contain fee schedules
16  that are based on the number of participants or, for some services,
17  an hourly rate.  (Id., Exhs. A and C.) Plaintiffs are not
18  challenging these fees.  (See Joint Statement in Response to
19  Court's October 19, 2012 Order for Supplemental Briefing ("Joint
20  Statement") at 11.)

21      Additionally, and more relevant to this action, employers and
22  TLIC enter into a group annuity contract ("GAC" or "the contract")
23  which governs TLIC's provision of investment options to the Plans.
24  (See Hatton Decl., Exhs. D-1 and D-2.) Through the GAC, TLIC
25  provides a set of investment options to the employer.  Both of
26  Plaintiffs' employers selected the "Partner Series III" retirement
27  package.  (Compl. ¶ 243.) This package gives employers 170
28  investment options from which they may select 50 or 80 to offer to

2

their employees.  (<u>Id.</u> ¶¶ 241-42.)  The 401(k) plan sponsored by the former employer of Plaintiff Santomenno, the Gain Capital Group, LLC 401(k) Plan (the "Gain Plan"), selected 46 of 170 investment options.  (<u>Id.</u> ¶¶ 17, 206-08.)  The plan sponsored by the employer of Plaintiffs Karen and Barbara Poley, QualCare Alliance Networks, Inc. Retirement Plan (the "QualCare Plan"), selected 36 of 170 investment options.  (<u>Id.</u> ¶¶ 16, 206-08.)

One of the benefits TLIC provides to client employers is the "Fiduciary Warranty."  (<u>Id.</u> ¶ 155.)  Having entered into a GAC, an employer may pick and choose from the investment options <u>à la carte</u>, or it may choose one of TLIC's pre-selected "model" line-ups.  (<u>Id.</u> ¶ 157.)  If an employer chooses a model line-up, the employer qualifies for TLIC's Fiduciary Warranty, which "provides specific assurances" that the line-up will satisfy ERISA's "broad range of investments" requirement and its "prudent man standards."  (<u>Id.</u>)  TLIC warrants that if employees assert a claim for breach of those fiduciary duties against the employer, TLIC will indemnify the employer and make the plan whole.  (<u>Id.</u> ¶ 159.)  TLIC's Fiduciary Warranty applies if an employer constructs its own line-up only if the employer selects investments from specified categories.  (<u>Id.</u> ¶ 157.)

TLIC structures its investment product under the GAC such that each investment option is considered a separate account.  (<u>Id.</u> ¶ 132.)  Each separate account corresponds to an underlying investment: a mutual fund, a collective trust, or a traditional separate account.  (<u>Id.</u> ¶ 130.)  Many of the mutual funds are publicly traded and managed by investment managers unaffiliated with TLIC such as Fidelity or Vanguard. (<u>See e.g.</u>, <u>id.</u> ¶ 214.) Some

of the mutual funds and collective trusts are managed by
Transamerica Investment Management, LLC ("TIM") or Transamerica
Asset Management, Inc. ("TAM"), affiliates of TLIC.  (<u>Id.</u> ¶ 340.)

In each separate account, TLIC pools together the retirement
assets of all employees who choose a certain investment option,
regardless of their employer.  (<u>Id.</u> at 130.)  For example, if
Plaintiff Santomenno and Plaintiffs Karen and Barbara Polley each
selected the Vanguard Total Stock Market Index Ret Opt as one of
their investment options, the funds that they choose to invest in
that option would be channeled to and pooled in the same account,
despite the fact that Santomenno and the Polleys have different
employers.  (<u>Id.</u> ¶ 133.)

**B. Fees**

TLIC assesses fees for most separate accounts.  The GAC
specifies that Investment Management Charges and Administrative
Management Charges associated with each separate account "may be
withdrawn daily and will belong to [TLIC]."  (Hatton Decl., Exh.
D-1.) These fees are a percentage of the assets in the separate
account, and the rate varies depending on which separate account is
in question.  (Hatton Decl., Exhs. D-1 and D-2.)  The GAC provides
a schedule of fees for each of the separate accounts but reserves
the "right to change the Investment Management Charge or the
Administrative Charge upon advance written notice to the
Contractholder of at least 30 days."  (Hatton Decl., Exh. D-1.)

The TLIC fees are not the only fees withdrawn from employees'
retirement assets.  As discussed above, many of the separate
accounts overlie mutual funds that are administered by third
parties such as Vanguard or Fidelity.  (Compl. ¶¶ 214-15.)  These

1  mutual funds charge their own management fees, also calculated as a
2  percentage of the assets in the account.  (<u>See e.g.</u> <u>id.</u> ¶¶ 229,
3  245.)  Any fees charged by the underlying investments are also
4  withdrawn from the retirement assets.

5      TLIC's fees are frequently higher than the fees of the
6  underlying mutual fund.  (<u>Id.</u> ¶ 245.)  For separate account
7  investment options invested in mutual funds, TLIC's fees are
8  approximately 75 basis points, or 0.75% of the Plan assets invested
9  in each option.  (<u>Id.</u> ¶ 271.)  For at least 28 of the mutual fund
10 options, plan participants pay the fee charged by the mutual fund
11 in addition to a higher fee charged by TLIC.  (<u>Id.</u> ¶¶ 245, 248.)
12 For instance, for the separate account that invests in the Vanguard
13 Total Stock Market Index Ret Opt, the underlying mutual fund
14 charged a fee of 18 basis points and TLIC charged an additional
15 account fee of 93 basis points, for a total fee of 111 basis points
16 or 1.11% of the separate account assets.  (<u>Id.</u> ¶ 246.)  For
17 separate account investment options invested in collective trusts,
18 TLIC charged a fee ranging from 79 basis points to 150 basis
19 points.  (<u>Id.</u> ¶¶ 331, 333-34.)

20      **C. Plaintiffs' Allegations**

21      Plaintiffs allege that Defendants' fees are excessive and are
22 a breach of their fiduciary duty to Plaintiffs under ERISA.  More
23 specifically, Plaintiffs allege that TLIC's fees on separate
24 accounts that invest in publicly available mutual funds are
25 excessive because TLIC provides no services on such accounts: the
26 underlying mutual funds' investment management fees covered "all of
27 the necessary investment management/advisory services needed for
28 the mutual fund," and thus "the alleged management services

performed by TLIC were unnecessary or simply not performed."

(Compl. ¶ 276.)  As a result, Plaintiffs argue, the fees they paid

to TLIC were "excessive and unnecessary."  (Id.)  "The charging of

any fees by TLIC to Plaintiffs that are in excess of the fees

charged by each of the mutual funds that underlie the overlaying

separate account is impermissible."  (Id. ¶ 293.)  As a corollary

to this claim, Plaintiffs allege that revenue sharing payments paid

by mutual funds to TLIC benefitted only TLIC and not Plaintiffs,

even when they were used to offset TLIC's fees.  This is because

TLIC's fees did not correlate to any benefits or services to

Plaintiffs, such that any offset of such fees was not a benefit to

Plaintiffs but a diversion to TLIC of funds that should have gone

to Plaintiffs.  (Id., Count III, ¶ 3.)

Another set of Plaintiffs' allegations concern TLIC's failure

to use its leverage to provide them with low-fee investments.  With

respect to collective trust separate accounts, Plaintiffs allege

that the fees are excessive because collective investment trusts

"generally charge less in fees" than comparable mutual funds with

the same investment strategy, but the fees TLIC charged were higher

than a comparable mutual fund. (Id. ¶¶ 328, 330-33.)  Similarly,

Plaintiffs allege that Defendants failed to invest in the lowest

price share class of mutual funds despite their leverage to do so.

(Id. ¶ 314.)

Plaintiffs also make allegations against affiliates TIM and

TAM for committing prohibited transactions under ERISA and for

knowingly participating in TLIC's fiduciary violations.  (Id.,

Count IV.)

1  Finally, Plaintiffs allege violations of the Investment
2  Advisers Act ("IAA"). (Id., Counts VIII & IX.)

3  Defendant TLIC moves to dismiss the ERISA claims on the
4  grounds that TLIC does not have a fiduciary duty to Plaintiffs with
5  respect to the fees charged.  Without a fiduciary duty, none of the
6  ERISA claims survive. Defendants TIM and TAM separately move to
7  dismiss on the grounds that their acts do not constitute prohibited
8  transactions.

9  Defendant TLIC moves to dismiss the IAA claims on the grounds
10  that Plaintiffs were not parties to any investment advisory
11  contracts with TLIC and that there is nothing to rescind.

12  **II. LEGAL STANDARD**

13  A complaint will survive a motion to dismiss when it contains
14  "sufficient factual matter, accepted as true, to state a claim to
15  relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S.
16  662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,
17  570 (2007)).  When considering a Rule 12(b)(6) motion, a court must
18  "accept as true all allegations of material fact and must construe
19  those facts in the light most favorable to the plaintiff." Resnick
20  v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint
21  need not include "detailed factual allegations," it must offer
22  "more than an unadorned, the-defendant-unlawfully-harmed-me
23  accusation." Iqbal, 556 U.S. at 678.  Conclusory allegations or
24  allegations that are no more than a statement of a legal conclusion
25  "are not entitled to the assumption of truth." Id. at 679.  In
26  other words, a pleading that merely offers "labels and
27  conclusions," a "formulaic recitation of the elements," or "naked
28  assertions" will not be sufficient to state a claim upon which

relief can be granted.  <u>Id.</u> at 678 (citations and internal
quotation marks omitted).

"When there are well-pleaded factual allegations, a court
should assume their veracity and then determine whether they
plausibly give rise to an entitlement of relief." <u>Id.</u> at 664.
Plaintiffs must allege "plausible grounds to infer" that their
claims rise "above the speculative level." <u>Twombly</u>, 550 U.S. at
555-56. "Determining whether a complaint states a plausible claim
for relief" is a "context-specific" task, "requiring the reviewing
court to draw on its judicial experience and common sense." <u>Iqbal</u>,
556 U.S. at 663-64.

**III. DISCUSSION**

    **A.   ERISA Claims**

This case presents the question of when a fiduciary duty
attaches to a company such as TLIC that negotiates with an employer
to provide services to a retirement plan.  TLIC argues that it is
not a fiduciary with respect to the terms of its own compensation
because those terms were negotiated before it became a fiduciary.
The court disagrees.  Basic fiduciary principles and ERISA's
functional definition of fiduciary duty require that TLIC be held
accountable for the fees it assesses on employees' retirement
assets.

    **1. Fiduciary Principles**

In assessing TLIC's fiduciary duty, it is essential to bear in
mind that a fiduciary relationship is governed by principles of
trust and confidence, not by contract.  "Many forms of conduct
permissible in a workaday world for those acting at arm's length,
are forbidden to those bound by fiduciary ties.  A trustee is held

1   to something stricter than the morals of the market place.  Not

2   honesty alone, but the punctilio of an honor the most sensitive, is

3   then the standard of behavior." Meinhard v. Salmon, 249 N.Y. 458,

4   464 (1928)(Cardozo, J.).  ERISA fiduciaries are entrusted with

5   protecting "the continued well-being and security of millions of

6   employees and their dependents [which] are directly affected" by

7   employee benefit plans.  John Hancock Mut. Life Ins. Co. v. Harris

8   Trust & Sav. Bank, 510 U.S. 86, 96 n.5 (1993)(quoting the statement

9   of purpose of 29 U.S.C. § 1001(a)).  Congress directed courts to

10  interpret ERISA's fiduciary requirements "bearing in mind the

11  special nature and purpose of employee benefit plans." Varity

12  Corp. v. Howe, 516 U.S. 489, 497 (1996)(quoting H.R. Rep. 93-533,

13  4650).  Indeed, ERISA's fiduciary obligations are the "highest

14  known to the law." Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d

15  Cir. 1982).

16       These broad principles do not answer the question of when TLIC

17  becomes a fiduciary, but they must frame the inquiry into any

18  question concerning fiduciary duty under ERISA.

19            **2.   ERISA's Functional Definition of Fiduciary**

20       "Under traditional trust law . . . only the trustee had

21  fiduciary duties.  ERISA, however, defines 'fiduciary' not in terms

22  of formal trusteeship, but in functional terms of control and

23  authority over the plan, see 29 U.S.C. § 1002(21)(A), thus

24  expanding the universe of persons subject to fiduciary duties—and

25  to damages—under § 409(a)." Mertens v. Hewitt Assoc., 508 U.S.

26  248, 262 (1993)(emphasis in original)(internal citations omitted).

27  See also Arizona State Carpenters Pension Trust Fund v. Citibank,

28  125 F.3d 715, 720 (9th Cir. 1997).  Under ERISA, not only named

1  trustees but those assuming fiduciary functions are deemed to have

2  a fiduciary duty.  The statute describes those functions.  A person

3  is an ERISA fiduciary

4        to the extent (i) he exercises any discretionary

5        authority or discretionary control respecting management

6        of such plan or exercises any authority or control

7        respecting management or disposition of its assets, (ii)

8        he renders investment advice for a fee or other

9        compensation, direct or indirect, with respect to any

10       moneys or other property of such plan, or has any

11       authority or responsibility to do so, or (iii) he has any

12       discretionary authority or discretionary responsibility

13       in the administration of such plan.

14  29 U.S.C.A. § 1002(21)(A).[1]

15       The purpose of a functional standard was to supplement

16  traditional trust law, which was deemed "insufficient to adequately

17  protect the interests of plan participants and beneficiaries." H.R.

18  Rep. 93-533 at 4650.  Congress in enacting ERISA made "more

19  exacting the requirements of the common law of trusts relating to

20  employee benefit trust funds."  Donovan v. Mazzola, 716 F.2d 1226,

21

22       [1]Federal regulations elaborate on the fiduciary function of
23  insurers, like TLIC:
            [A]n insurer is subject to ERISA's fiduciary
24       responsibility provisions with respect to the assets of a
       separate account . . . to the extent that the investment
25       performance of such assets is passed directly through to
       the plan policyholders. ERISA requires insurers, in
26       administering separate account assets, to act solely in
       the interest of the plan's participants and
27       beneficiaries; prohibits self-dealing and conflicts of
       interest; and requires insurers to adhere to a prudent
28       standard of care.
  29 CFR § 2550.401c.

1231-32 (9th Cir. 1983).  The functional definition of fiduciary
was central to expanding the protection of employees' retirement
benefits. "To help fulfill ERISA's broadly protective purposes,
Congress commodiously imposed fiduciary standards on persons whose
actions affect the amount of benefits retirement plan participants
will receive." John Hancock Mut. Life Ins. Co., 510 U.S. at 96.

    To say that ERISA defines fiduciary duty in functional terms
is to say that such duty is determined not by a party's status but
by particular actions taken with respect to plan.  The same party
can be both a fiduciary and a non-fiduciary, depending on the
action it is taking.  For instance, "[p]rofessional service
providers such as actuaries become liable for damages when they
cross the line from advisor to fiduciary." Mertens, 508 U.S. at
262.  Likewise, fiduciaries such as employers can take certain non-
fiduciary actions not comprised in their duty.  In other words,
"the trustee under ERISA may wear different hats." Pegram v.
Herdrich, 530 U.S. 211, 225 (2000).  However, ERISA requires

>    that the fiduciary with two hats wear only one at a
>    time, and wear the fiduciary hat when making fiduciary
>    decisions. Thus, the statute does not describe
>    fiduciaries simply as administrators of the plan, or
>    managers or advisers.  Instead it defines an
>    administrator, for example, as a fiduciary only "to the
>    extent" that he acts in such a capacity in relation to a
>    plan.  In every case charging breach of ERISA fiduciary
>    duty, then, the threshold question is not whether the
>    actions of some person employed to provide services
>    under a plan adversely affected a plan beneficiary's

1  interest, but whether that person was acting as a

2  fiduciary (that is, was performing a fiduciary function)

3  when taking the action subject to complaint.

4  Id. at 225-26 (citations omitted).

5      TLIC does not contest that under the GAC it has fiduciary

6  responsibility for the separate accounts.  It concedes that it has

7  "limited fiduciary responsibilities[2] for monitoring the investment

8  performance within its separate account investment products."

9  (TLIC Mot. at 12.)  But TLIC disavows any fiduciary duty with

10  respect to its fees because they were set by contract before TLIC

11  assumed its fiduciary responsibilities as defined in the same

12  contract.  Thus TLIC contends that it wore a non-fiduciary hat when

13  negotiating the contract with the employer, even if the contract

14  allowed it to put on a fiduciary hat once it was in effect.

15      In support of this argument, TLIC cites cases from other

16  Circuits supporting the proposition that "a service provider does

17  not act as a fiduciary with respect to the terms in the service

18  agreement if it does not control the named fiduciary's negotiation

19  and approval of those terms."  Hecker v. Deere & Co., 556 F.3d 575,

20  583 (7th Cir. 2009).  TLIC argues that because it does not have

21  final authority over the contract – only the employer can enter

22  into the contract on behalf of the plan - it also lacks the

23  requisite control over its compensation that would make it a

24  fiduciary with respect to its own fees.

25

26

27          [2] Without addressing the issue further, the court notes that
28  characterizing some fiduciary responsibilities as "limited" seems
    oxymoronic.

1    The court rejects this formalistic line-drawing.  TLIC is

2  negotiating to become a fiduciary and negotiating for the fees

3  that, as a fiduciary, it will assess on the employees' retirement

4  accounts.  The reductio ad absurdum of the principle that a future

5  fiduciary is not responsible for the terms of its own compensation

6  is that the fiduciary could negotiate for a fee of 99% of each

7  separate account and still be considered to be fulfilling its

8  fiduciary duty of managing the separate account simply because it

9  negotiated this fee by contract. The contract can immunize the

10  future fiduciary TLIC from fiduciary breach no more than it can

11  immunize the employer.  To hold otherwise would allow fiduciaries

12  to contract themselves out of their duties, so long as it was done

13  prior to the assumption of those duties.

14    TLIC is entitled to reasonable fees and profits for the

15  services that it provides to the plans, but as a fiduciary TLIC is

16  accountable for the reasonableness of those fees.  This conclusion

17  does no damage to the sanctity of contracts; it simply acknowledges

18  that where fiduciary duties are involved, the fiduciary rules

19  apply.  Because TLIC is negotiating to assume the high duties of an

20  ERISA fiduciary, it must be accountable to the beneficiaries of the

21  plan for the reasonableness of its compensation.

22         **3. Arm's Length Negotiations**

23    TLIC also argues that it has no control over the fees because

24  they were the terms of a contract that was negotiated at arm's

25  length.  TLIC  asserts that where a specific term "is bargained for

26  at arm's length, adherence to that term is not a breach of

27  fiduciary duty."  Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.,

28  805 F.2d 732, 737 (7th Cir. 1986).

1    The court has found no precise definition of an arm's length

2    transaction in the ERISA context.  In other areas of the law, arm's

3    length negotiations or transactions are characterized as

4    adversarial negotiations between parties that are each pursuing

5    independent interests.[3]  The contract negotiations at issue here

6    depart from the typical arm's length negotiation in several

7    respects. First, the subject matter of the contract is fiduciary

8    duty: the duty the employer has and the duty TLIC will assume.

9    Importantly, these duties do not extend between the parties who are

10   negotiating the contract.  Instead, the duty is owed to the Plan

11   and its beneficiaries, who are absent and vulnerable.

12

---

13       [3] The typical arm's length transaction involves an adversarial
negotiation in which the parties have independent interests and
each tries to obtain the best deal for itself.  See, e.g., Black's
Law 6th Ed., 109 (defining an arm's length transaction as "a
transaction negotiated by unrelated parties, each acting in his or
her own self interest . . . . A transaction in good faith in the
ordinary course of business by parties with independent
interests");  30 C.F.R. 206.151 (defining arm's length contract in
the minerals context as an agreement between "independent persons
who are not affiliates and who have opposing economic interests
regarding that contract"); A.T. Kearney, Inc. v. Int'l Bus.
Machines Corp., 73 F. 3d 238, 242 (9th Cir. 1995)(contrasting
relationships with a special duty of care to relationships
involving "two adversarial parties negotiating at arm's length to
further their own economic interests," "business adversaries in the
commercial sense"); In re U.S. Med., Inc., 531 F.3d 1272, 1277 n.4
(10th Cir. 2008)(quoting Black's Law Dictionary 109, 6th Ed.
1990)(in the bankruptcy context, "[a]n arm's-length transaction is
'[a] transaction in good faith in the ordinary course of business
by parties with independent interests.... The standard under which
unrelated parties, each acting in his or her own best interest,
would carry out a particular transaction"); Estate of Waters v.
C.I.R., 48 F.3d 838, 849 (in the tax context, a negotiation that
was adversarial in nature constituted a "bona fide arm's length
transaction"); Jeanes Hosp. v. Sec'y of Health and Human Servs.,
448 Fed. Appx. 202, 206 (3rd Cir. 2011)(a party who "negotiated
rigorously, selfishly and with an adequate concern for price," and
"conducted lengthy due diligence" and "extracted concessions" meant
that the "merger bore the hallmark characteristics of arm's-length
bargaining"); and Oxford English Dictionary, Dec. 2012, arm,
n.1("The parties must be put so much at arm's length that they
stand in adverse relations of vendor and purchaser."[1879]).

1    Additionally, the absent party will not only benefit from but will
2    bear a burden under the contract.  It appears to the court that
3    TLIC and the employer are not bargaining for TLIC to provide
4    services and for the employer to pay a fee, but instead for TLIC to
5    provide services and for a fee to be assessed on the employees'
6    retirement accounts.  If this is true, it is not a traditional
7    arm's length negotiation where the parties are adverse and pursuing
8    independent interests; instead, the parties are collaborating to
9    manage the employees' 401(k) plans.

10        One example of the non-adversarial nature of these
11   negotiations is TLIC's Fiduciary Warranty.  (See Compl. ¶¶ 157-59.)
12   Based on the allegations before the court, it appears that the
13   Fiduciary Warranty amounts to insurance provided by TLIC to
14   employers against law suits by employees for breach of fiduciary
15   duty, but this insurance is paid for by the fees assessed on the
16   employees' assets.  The court has found no indication that the
17   employers pay TLIC separately for such insurance.  Thus, instead of
18   an insurance company bargaining with a party seeking to obtain the
19   best rate for itself in its insurance purchase, the insurer is
20   bargaining with a party who is not in fact bearing the financial
21   burden of the insurance, though it will reap the benefits.

22        Because the contract does not appear to have been negotiated
23   at arm's length, TLIC may not shield itself behind the contract
24   from an alleged breach of duty.

25              **4. TLIC's Discretion**

26              **a. Discretion over Fees**

27        As a separate basis for TLIC's fiduciary duty, Plaintiffs
28   allege that TLIC has sufficient discretion over its own

1  compensation to make TLIC a fiduciary on that basis. "When a

2  contract . . . grants an insurer discretionary authority, even

3  though the contract itself is the product of an arm's length

4  bargain, the insurer may be a fiduciary." Ed Miniat, Inc., 805

5  F.2d at 737. Plaintiffs allege that TLIC has discretion over its

6  fees because it retains the right to modify those fees with 30-

7  days' notice to the plan and by assessing termination fees.

8  (Hatton Decl. Exh. D-1, Section B.08; Exh. E, Section B.08) ("We

9  reserve the right to change the Investment Management or the

10  Administrative Charge upon advance written notice to the

11  Contractholder of at least 30 days."). Plaintiffs also point to

12  contract termination and participant level redemption fees. (Opp.

13  at 22; Hatton Decl., Exhs. D-1 & D-2, at Dkt. pp. 3337, 3344, 3393,

14  3408.)[4]

15      TLIC asserts that it has no discretion over the fees because

16  employers have a 30-day period during which they can accept the fee

17  change or reject it by terminating the contract. In making this

18  argument, TLIC conflates an ability to change the fees with the

19  consequences of changing the fees. TLIC could lower its fees at

20  any time, without any approval apparently required from the

21  employer. In such a scenario, TLIC has discretion over its fees

22  because it has the power to modify them without approval; whether

23  the employer chooses to terminate the contract or not is immaterial

24  to determining whether TLIC has the discretion to change the fees.

25      The same logic applies to a scenario in which TLIC raises its

26  fees. TLIC has discretion to modify its fees, and an employer has

27  _____

28      [4] Plaintiffs also note that a "confidential document shows
applicable termination charges." (Opp. at 22 n.13.)

1   thirty days in which it can terminate the contract or not.  The

2   employer's decision regarding contract termination does not mean

3   that TLIC lacks discretion over the fees.[5]  This is all the more

4   true where, as here, there are financial and logistical hurdles to

5   prevent an employer from cancelling a contract.  Thirty days is a

6   brief period within which to secure a new service provider for an

7   employer's ERISA plan and all it entails, including negotiating

8   such a contract and ensuring that it allows the employer to comply

9   with its obligations under ERISA.[6]  Additionally, there appear to

10  _____

11      [5]TLIC contends that because it must give advance notice to the
    employer of the fee change and because the employer can terminate

12  the contract, all discretion is vested exclusively with the
    employer.  As a fiduciary, any employer would likely have the

13  ability and indeed the duty to terminate the contract at any time
    if an investment administrator were to have the employees' funds in

14  investments with excessive fees or later to transfer the funds to
    investments with excessive fees.  This right exists regardless of

15  any contract provision providing the same.  Therefore, that the
    contract states that there is a "right" of termination is a slight

16  reed from which to build the argument that it is the employer—not
    TLIC-that has discretion over fees.

17      [6] Defendants point to a Department of Labor ("DOL") advisory
    opinion which advised that 60 day notice period followed by a 120-

18  day period following notice within which to reject the change to
    investment options and secure a new service provider meant that the

19  original service provider was not "exercising discretionary
    authority or control over the management of a plan." Dep't of

20  Labor, Advisory Op. 97-16A, 1997 WL 277979 *4 (May 22, 1997).  The
    notice period at issue here is half as long.  The DOL advisory

21  opinion notes that the acceptable notice period is context
    specific, and that a period of fewer than 120 days might be

22  sufficient in some contexts. Id. at *5 n.5("What constitutes a
    'reasonable period' within which to terminate an arrangement and

23  change service providers will depend on the particular facts and
    circumstances of each case. There **may** be situations in which a time

24  period shorter than 120 days **may** constitute a 'reasonable
    period.'")(emphasis in original).  A district court in

25  Massachusetts found that a three months' notice requirement still
    gave an insurance company enough discretion to be considered an

26  ERISA fiduciary.  Charters v. John Hancock Life Ins. Co., 583 F.
    Supp. 2d 189, 198 (D.Mass. 2008).  The court makes no holding on

27  what an adequate notice period would be in this context, but finds
    only that based on the facts alleged, TLIC's contractually explicit

28                                                        (continued...)

1  be termination fees associated with terminating the contract, even

2  if the termination is a consequence of increased fees. (See, e.g.,

3  Hatton Decl., Exh. D-2, Amendment to Contract, Dkt. p. 3392)

4  ("Transamerica reserves the right to: . . . Assess[] a transfer fee

5  or redemption fee for a particular Contract Account.").

6       The court rejects TLIC's claim that the notice period gave

7  final authority over the fees to the employer.  "[I]t is undisputed

8  that [the service provider] retained sole discretion to change the

9  maximum administrative maintenance charge at any time upon

10  three-months prior written notice to [the employer]. That

11  discretion was sufficient to make [the service provider] an ERISA

12  fiduciary with respect to its fees."  Charters v. John Hancock Life

13  Ins. Co., 583 F. Supp. 2d 189, 197-198 (D.Mass. 2008)

14       Based on the facts before it, the court finds that the notice

15  period provided here to employers does not relieve TLIC of

16  discretion over the fees.

17            **b.    Control over investment line-up**

18       Plaintiffs allege that TLIC has discretionary control over

19  its fees for the additional reason that TLIC "retains the authority

20  to unilaterally add and delete investment options at its

21  discretion" and to "unilaterally change the share class [] of the

22  mutual fund, in which Plaintiffs' assets are invested," thereby

23  altering its own compensation. (Compl. ¶¶ 152-54.)  TLIC contends

24  that the ability to add or delete investment options does not give

25  it discretion that would qualify it as an ERISA fiduciary with

26

27       [6](...continued)
    discretion to change fees is not reversed by the brief notice

28  period, all the more so when there also appears to be a termination
    fee.

1  respect to the fees for the same reasons that it asserts it does

2  not have discretion over the Administrative and Investment

3  Management Fees: because Plaintiffs do not allege that TLIC ever

4  exercised its authority to change investment options, and because

5  TLIC must give advance notice of the change.

6      The court finds that TLIC has a fiduciary duty that attaches

7  from its power to add and delete investment options, such that it

8  "exercises authority or control over plan assets by determining and

9  altering which mutual funds are available for the Plans' and the

10 participants' investment."  Haddock v. Nationwide Fin. Servs. Inc.,

11 419 F. Supp. 2d 156, 166 (D.Conn. 2006).  The Department of Labor

12 ("DOL") has taken the position that when the service provider gives

13 an employer advance notice of a deletion or substitution and 120

14 days to reject the change and secure a new service provider, "a

15 person would not be exercising discretionary authority or control

16 over the management of a plan or its assets solely as a result of

17 deleting or substituting a fund from a program of investment

18 options and services offered to plans, provided that the

19 appropriate plan fiduciary in fact makes the decision to accept or

20 reject the change."  Dep't of Labor, Advisory Op. 97-16A, 1997 WL

21 277979 *5.[7]  The crucial feature barring a finding of discretion is

22 thus the approval of such a change by a fiduciary.

23      The facts alleged by Plaintiffs are sufficient to state a

24 claim for TLIC's fiduciary responsibility on this theory.  Unlike

25 _____

26 [7]The DOL has also offered the opinion that reserving the right
   to "add or remove mutual fund families . . . [made] available to
27 Plans" could be considered discretionary authority such that
   receiving fees from those mutual funds would be subject to
28 restrictions on fiduciaries.  Dep't of Labor Advisory Op. 97-15A,
   1997 WL 277980 *3.

1  in Hecker, where the complaint alleged that the service provider

2  "played a role" in the choice of funds rather than exercising

3  "final authority," Hecker, 556 F.3d at 584, here there is no

4  indication that an employer has final authority over such changes

5  beyond its ability to terminate the contract.[8]  As discussed above,

6  an employer's ability to terminate a contract if it does not

7  approve of a unilateral decision to substitute or delete options

8  does not somehow transform TLIC's decision into the employer's

9  decision.[9]

10                 **c. Exercise or possession of discretion**

11       TLIC argues that even if it is found to have discretionary

12  authority over its fees and the investment line-up, it has not

13  exercised such discretion and is therefore not a fiduciary.  TLIC

14  points out that under the ERISA statute, an entity is a fiduciary

15  if it "exercises any discretionary authority or discretionary

16  control respecting management of such plan or exercises any

17  authority or control respecting management or disposition of its

18  _____

19       [8] Again, TLIC conflates its discretion to do an act, i.e., its
     election to switch to investment options with allegedly excessive
20   fees, with the employer's possible remedy in terminating the
     contract. It also appears to assume again that the employer has the
21   right to terminate the contract only because the contract so
     specified.  But the employer may have both the right and the
22   obligation to terminate the contract if employees' investments were
     placed in or moved into investment accounts with excessive fees,
23   regardless of the terms of the contract with TLIC.

24       [9] TLIC contends that "Negotiated termination fees are just a
     mechanism for service providers to ensure reasonable compensation,
25   including the recovery of initial costs in the event of an early
     termination.  The mere fact that termination would entail costs or
26   inconvenience does not give a service provider control over the
     sponsor's decisions."  (TLIC Reply at 8-9.)  The service provider
27   need not have "control" over a sponsor's decision to make
     termination an unrealistic option for the sponsor.  A termination
28   fee may be so burdensome that it alone could stop a sponsor from
     terminating a plan.

assets," or to the extent it "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(emphasis added). TLIC asserts that Plaintiffs have alleged that TLIC possesses, but not that it has exercised, discretionary authority with respect to the management or disposition of assets.  Merely having such authority, TLIC argues, is insufficient to create fiduciary duty under the relevant clause of the statute.

Plaintiffs respond that while they did not allege in the Complaint that TLIC exercised its authority,[9] TLIC's conduct "should be measured by what it did or failed to do.  A fiduciary has affirmative obligations to conduct itself prudently. . . . [Fiduciary duties] entail obligations to end conduct that may be self dealing or imprudent."  (Opp. at 24, emphasis omitted.) Plaintiffs appear to be saying that TLIC is "exercising" its discretionary authority by not altering its fees when it should, as required by its fiduciary duty.

There is a fine line between "having" and "exercising" discretionary authority.  Discretionary authority is premised on a power or a capacity.  See Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 668 (2007)(quoting Random House Dictionary of the English Language 411 (unabridged ed. 1967) ("'discretion' defined as 'the power or right to decide or act according to one's own judgment; freedom of judgment or choice'")). Discretion is the touchstone of fiduciary duty under ERISA because

_____

[9]Plaintiffs assert that they have "uncovered evidence that TLIC altered its fees" and that "[d]iscovery will likely reveal other similar instances," but they do not claim to have pled altered fees.  (Opp. at 24.)

it is precisely this power of free decision that is transferred in trust to a fiduciary.  The power of free decision comprises not only the power to act but the power not to act.  A person without discretionary authority has no choice with respect to acting or not acting; she is required either to act or to refrain from acting, depending on the circumstances.  A person with discretionary authority, in contrast, may act or not act, as she deems best.  But she exercises her discretion no less in choosing not to act than in choosing to act.

TLIC's assertion that "a party is only a fiduciary with respect to the management of a plan or the disposition of its assets when it *exercises* authority or control over the plan," in contrast to "plan administration, as to which a party only needs to *have* discretionary authority" makes little sense.  (TLIC Reply at 10, emphasis in brief.)  TLIC does not explain how a party can exercise authority over the plan without having such authority, the rationale behind such a distinction, or its implications, nor does it cite any authority for such an interpretation.  Such an interpretation contravenes Congress's directive to construe fiduciary duty broadly in order to effect the remedial purposes of ERISA. See Varity, 516 U.S. at 497.  The court therefore finds that in the ERISA context, having and exercising discretionary authority are so close as to be identical, and that under ERISA, a fiduciary duty attaches not because a party takes a discretionary action but when that party acquires the power to take a discretionary action.

### 5. Plaintiffs' Fiduciary Duty Claims

Because the court finds that Plaintiffs have stated a claim for TLIC's fiduciary status, all of Plaintiffs' allegations that

TLIC violated its fiduciary duty under ERISA must survive TLIC's Motion to Dismiss.[10]

Mutual Fund Excessive Fee Claims (Counts I and II):Plaintiffs allege that because TLIC has a fiduciary duty with respect to its fees, the fees it charges in excess of the fees charged by an underlying mutual fund are excessive. Likewise, they allege that TLIC's investment management fees on separate accounts are also excessive.  Since Plaintiffs have stated a claim for TLIC's fiduciary status with respect to its fees, these claims survive.

Revenue Sharing Claim (Count III): Plaintiffs allege that TLIC receives "fee income" or "Revenue Sharing Payments" from Plaintiffs' investments, ranging from 15 to 25 bps.  (Compl. ¶¶ 281, 283-84.)  They allege that even if TLIC uses those Revenue Sharing Payments to offset the Investment Management and Administrative Charges, as TLIC claims it does, those payments are still impermissible because they are only offsetting TLIC's excessive fees, themselves impermissible.  (Id. ¶¶ 288-91.)

Because the court has already found that Plaintiffs have stated a claim that TLIC is a fiduciary with respect to its fees, Plaintiffs have also stated a claim with respect to the Revenue Sharing Payments.  Offsetting impermissible fees may not be a permissible use of Revenue Sharing Payments.  Plaintiffs have thus stated a claim for breach of fiduciary duty and the commission of prohibited transactions with respect to these Payments.

Mutual Fund Share Class Claim (Count V) and Collective Trust/Separate Account Excessive Fee Claim (Count VI):  In Count V,

---

[10]Plaintiffs's claims against TIM and TAM are discussed below.

1   Plaintiffs allege that TLIC breached its ERISA fiduciary duties by
2   failing to invest in the lowest cost share class of the mutual
3   funds underlying separate account investment options, even though
4   TLIC had the leverage to do so.  (Compl. ¶¶ 302-19.)  In Count VI,
5   Plaintiffs allege that TLIC failed to use its economic leverage to
6   negotiate lower fees for collective trusts and traditional separate
7   accounts.  (Id. ¶¶ 320-337.)  Because Plaintiffs have stated a
8   claim that TLIC is a fiduciary with respect to its fees, the fact
9   that the employer has approved the inclusion of a particular mutual
10  fund or the expenses of a collective trust or separate account will
11  not get TLIC off the hook if, as a fiduciary, TLIC should have
12  selected the cheapest share class or negotiated lower fees.
13  Plaintiffs have thus stated a claim on these two counts.

14          **6. Prohibited Transaction and Affiliate Claims (Counts IV and VII)**
15               **a. Claims against TLIC**

16      ERISA's prohibited transactions rule provides that "[a]
17  fiduciary with respect to a plan shall not – (1) deal with assets
18  of the plan in his own interest or for his own account, . . . or
19  (3) receive any consideration for his own personal account from any
20  party dealing with such plan in connection with a transaction
21  involving the assets of the plan."  29 U.S.C. § 1106(b). The
22  legislative history of ERISA demonstrates that "the crucible of
23  congressional concern was misuse and mismanagement of plan assets
24  by plan administrators and that ERISA was designed to prevent these
25  abuses in the future." Mass. Mut. Life Ins. Co. v. Russell, 473
26  U.S. 134, 140 n.8 (1985).

27      Plaintiffs allege that TLIC committed prohibited transactions
28  under ERISA § 406(b), 29 U.S.C. § 1132(a)(3), by paying advisory

1  fees from employees' accounts to affiliates TIM and TAM for

2  advising or subadvising certain mutual funds, collective investment

3  trusts, or traditional separate accounts.  (Compl., Counts IV and

4  VII.)  These fees, allege Plaintiffs, were an instance of TLIC

5  dealing with assets of the Plaintiff Plans for its own interest,

6  because TIM and TAM were its affiliates.  (Compl., Count IV, ¶ 4.)

7  Additionally, Plaintiffs allege that TIM and TAM violated ERISA §

8  502(a)(3), 29 U.S.C. § 1132(a)(3), for knowingly participating in

9  those prohibited transactions.  (Compl., Count IV, ¶ 8.)

10      TLIC asserts that these claims fail because Plaintiffs do not

11  identify any specific "transaction" that would trigger liability

12  under ERISA § 406.  TLIC points to Wright v. Oregon Metallurgical

13  Corp., where the Ninth Circuit found that the Corporation's

14  decision to continue to hold a certain percentage of plan assets in

15  employer stock was not a transaction because it was not "akin to a

16  'sale, exchange, or leasing of property, or the lending of money or

17  extension of credit,' all commercial bargains defined by the

18  Supreme Court in Lockheed as falling under § 1106."  360 F.3d 1090,

19  1101 (9th Cir. 2004), quoting Lockheed Corp. v. Spink, 517 U.S.

20  882, 893 (1996)(alterations omitted).  Here, TLIC argues, the only

21  "transaction" involving Plan assets identified in the Complaint is

22  the selection of the original Plan investment lineup.  TLIC also

23  argues that even if collecting fees from separate accounts can be

24  considered a transaction, doing so is not a prohibited transaction,

25  since TLIC was "merely collecting fees from transactions that a

26  different, independent fiduciary caused the plan to undertake."

27  (TLIC Reply at 15.)

28

25

1    The court finds that Plaintiffs have stated a claim for
2    prohibited transactions in the form of collecting fees from
3    separate accounts and selecting the investment lineup.  As
4    discussed above, TLIC may not insulate itself from its fiduciary
5    obligations by invoking the terms of its contract with the
6    employers; TLIC cannot by contract permit itself transactions that
7    would otherwise be prohibited to it as a fiduciary.  Here, the
8    employer-fiduciaries did approve the selection of TIM- and TAM-
9    managed accounts by selecting them for the line-ups offered to the
10   employees.  Nonetheless, mere approval by another fiduciary does
11   not relieve TLIC of potential responsibility for fees being paid to
12   TLIC affiliates.  For instance, Plaintiffs may be able to show that
13   TLIC used the promise of the fiduciary warranty to direct employers
14   to select TIM- and TAM-managed accounts.  "[B]ecause the authority,
15   control or responsibility which makes a person a fiduciary may be
16   exercised 'in effect' as well as in form, mere approval of the
17   transaction by a second fiduciary does not mean that the first
18   fiduciary has not used any of the authority, control or
19   responsibility which makes such person a fiduciary to cause the
20   plan to pay the first fiduciary an additional fee for a service."
21   29 CFR § 2550.408b-2(e)(2).
22       The court finds that Plaintiffs have stated a claim for
23   prohibited transactions by TLIC.

24                   **b. Claims against TIM and TAM**

25       "Section 502(a)(3) authorizes a civil action: 'by a
26   participant, beneficiary, or fiduciary (A) to enjoin any act or
27   practice which violates . . . the terms of the plan, or (B) to
28   obtain other appropriate equitable relief (i) to redress such

1  violations or (ii) to enforce any such provisions of . . . the

2  terms of the plan.'"  <u>Great-West Life & Annuity Ins. Co. v.</u>

3  <u>Knudson</u>, 534 U.S. 204, 209 (2002)(quoting 29 U.S.C. § 1132(a)(3)).

4  "'[E]quitable relief' in § 502(a)(3) must refer to those categories

5  of relief that were <u>typically</u> available in equity."  <u>Id.</u> at 210

6  (citation and internal quotation marks omitted).  Here, the relief

7  requested from TIM and TAM is restitution.  Restitution may be

8  either a legal or an equitable remedy, depending on the

9  circumstances.  "[R]estitution is a legal remedy when ordered in a

10  case at law and an equitable remedy when ordered in an equity case,

11  and whether it is legal or equitable depends on the basis for the

12  plaintiff's claim and the nature of the underlying remedies

13  sought."  <u>Id.</u> at 213 (alterations, citation, and internal quotation

14  marks omitted).  "[F]or restitution to lie in equity, the action

15  generally must seek not to impose personal liability on the

16  defendant, but to restore to the plaintiff particular funds or

17  property in the defendant's possession."  <u>Id.</u> at 214 (footnote

18  omitted).[11]  More specifically, restitution in equity is possible

19  "where money or property identified as belonging in good conscience

20  to the plaintiff could clearly be traced to particular funds or

21  property in the defendant's possession."  <u>Id.</u> at 213.

22      TIM and TAM argue that Plaintiffs are "not seeking recovery of

23  specific funds in Defendants' possession that properly belong to

24  the Plan" but "are instead seeking broad recovery of the fees"

25

26      [11]A remedy was considered to be restitution at law when a

27  plaintiff "sought to obtain a judgment imposing a merely personal
   liability upon the defendant to pay a sum of money," in what was

28  essentially a breach of contract claim.  <u>Great-West Life</u>, 534 U.S.
   at 213 (citation and internal quotation marks omitted).

1  received by TIM and Tam.  (TIM/TAM Mot. at 4.)  These fees are not

2  traceable, assert TIM and TAM, because the fees TIM and TAM

3  received were paid out of the mutual funds, which are not

4  considered plan assets under ERISA § 401(b)(1), 29 U.S.C. §

5  1101(b)(1).  Under ERISA § 401(b)(1), "[i]n the case of a plan

6  which invests in any security issued by an investment company

7  registered under the Investment Company Act of 1940 [15 U.S.C.A. §

8  80a-1 et seq.][indicating a mutual fund], the assets of such plan

9  shall be deemed to include such security but shall not, solely by

10 reason of such investment, be deemed to include any assets of such

11 investment company."  29 U.S.C.A. § 1101.  According to the Seventh

12 Circuit, "[o]nce the fees are collected from the mutual fund's

13 assets and transferred to one of the Fidelity entities, they become

14 Fidelity's assets – again, not the assets of the Plans."  <u>Hecker</u>,

15 556 F.3d at 584.

16      Even if this is correct, it is not clear how it defeats the

17 traceability of the fees.  Plaintiffs allege that TIM and TAM

18 knowingly participated in TLIC's alleged self-dealing by

19 withdrawing fees from the mutual fund or collective trust accounts

20 into which TLIC's separate accounts invested Plaintiffs' retirement

21 funds.  The fees are allegedly in the current possession of TIM,

22 TAM, or their successors.  The fees assessed appear to be a

23 percentage of the mutual fund's value.  It does not appear to be

24 difficult to determine the fees assessed by and in the possession

25 of TIM and TAM with respect to each Plaintiff's account.[11]

26 _____

27      [11] In <u>Hecker</u>, the court found that assessing fees on mutual
   funds could not be the source of fiduciary status because the
28 mutual fund is not itself a plan asset.  556 F.3d at 584.  Without
                                              (continued...)

**B. Investment Advisers Act Claims**

In Counts VIII and IX, Plaintiffs make claims against TLIC for violation of the Investment Advisers Act ("IAA"), which requires investment advisers to register with the Securities and Exchange Commission ("SEC").  IAA § 215(b), 15 U.S.C. § 80b-15(b), voids investment advisory contracts entered into by unregistered investment advisors and permits investors to bring actions for equitable relief.  <u>Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis</u>, 444 U.S. 11, 18-19 (1979).  "[T]here exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but . . . the Act confers no other private causes of action, legal or equitable."  <u>Id.</u> at 24. Plaintiffs allege that TLIC entered into contracts with them pursuant to which TLIC rendered investment advice to them without registering with the SEC.  (Compl. ¶ 38 and Count VIII, ¶ 10.) Plaintiffs seek to void the advisory contracts and recover the "Investment Management Fees" paid by Plaintiffs.

TLIC argues that Plaintiffs were not party to the contract. The contract was with the Plan, and "[n]o new, individual contracts between TLIC and the participants were required or can be reasonably inferred."  (TLIC Reply at 18.)  Furthermore, they claim that the Investment Management Fees were paid not by Plaintiffs, as Plaintiffs allege, but instead by the Plan.

---

[11](...continued)
such a rule, all mutual fund administrators (such as Fidelity) would automatically be fiduciaries when any retirement funds are invested into the mutual funds.  Here, in contrast, the issue is whether the fees assessed by TIM and TAM are traceable, and the technical distinction between plan assets and mutual fund assets has no bearing on this inquiry.

1    The parties disagree on what, if anything, should be
2 considered the investment advisory contract.  TLIC maintains that
3 the contract is the GAC, while Plaintiffs point to a functional
4 contract that developed out of the economic relationship between
5 Plaintiffs and TLIC.  Plaintiffs argue that there was a functional
6 contract between Plaintiffs and TLIC by analogy to the Securities
7 Act.  In that context, the Supreme Court construed the term
8 "investment contract" broadly based on its use in state laws prior
9 to the adoption of the statute: "Form was disregarded for substance
10 and emphasis was placed upon economic reality.  An investment
11 contract thus came to mean a contract or scheme for the placing of
12 capital or laying out of money in a way intended to secure income
13 or profit from its employment."  S.E.C. v. W.J. Howey Co., 328 U.S.
14 293, 298 (1946)(internal quotation marks omitted).

15    Using a similar functional analysis, Plaintiffs argue, there
16 was a contract between TLIC and each Plaintiff when that Plaintiff
17 purchased units in the separate account, paid an Investment
18 Management Fee, and received investment advice from TLIC in the
19 form of advisory fact sheets.  (Opp. at 46.) Plaintiffs contend
20 that the requirements of offer, acceptance, and consideration are
21 all met in this case.  The "offer" is made by TLIC "by providing
22 each Plaintiff with a personal electronic account and a menu of
23 pre-selected investment options which a Plaintiff may accept," the
24 "acceptance" by Plaintiff selecting an investment online or by
25 mail, and "consideration" from Plaintiffs in the form of investment
26 and management fees, and from TLIC by its "culling and analysis of
27 available investments."  (Opp. at 48.)

28

1     The court does not disagree that there could be a functional

2  investment advice contract between Plaintiffs and TLIC even if the

3  fees paid technically came from Plan assets rather than from a

4  check written by each Plaintiff to TLIC; the temporary placement of

5  the money into a Plan account does not alter the economic reality

6  that the fees are coming out of each Plaintiff's retirement fund.

7  However, here there is already a contract in place – the GAC –

8  which governs the same relationship.  TLIC points out that the

9  website, which Plaintiffs construe as part of the "offer," is part

10  of a prior separate services agreement between TLIC and the Plan

11  which requires TLIC to provide a website allowing employees to

12  manage their accounts.  (Hatton Decl., Exh. C, Dkt. p. 3297; TLIC

13  Reply at 18 n.11.) There is no indication that the consideration in

14  the GAC is different from the consideration in the purported

15  functional contract (the fees assessed by TLIC on the separate

16  accounts and the investment services and advice provided by TLIC).

17  Plaintiffs appear to suggest that the Investment Management Fee was

18  not consideration for the GAC, but in that case, it is unclear what

19  the consideration for the GAC was.  Plaintiffs do not appear to be

20  arguing that the GAC is invalid, but instead that it exists

21  alongside a functional contract between Plaintiffs and TLIC.

22  However, all the relevant components of a functional contract

23  appear already to be governed by the GAC.

24     It is a principle of contract law that "[t]here cannot be a

25  valid, express contract and an implied contract, each embracing the

26  same subject matter, existing at the same time." Berkla v. Corel

27  Corp., 302 F.3d 909, 918 (9th Cir. 2002) (internal quotation marks

28  and citation omitted).  See also Rogers v. American President

1  Lines, Limited, 291 F.2d 740, 742 (9th Cir. 1961)("An action does
2  not lie on an implied contract where there exists between the
3  parties a valid express contract which covers the same subject
4  matter.") The same principle applies in this context.  This is for
5  both conceptual and practical reasons.  Conceptually, if a party is
6  already contractually obliged to perform a certain action, that
7  action cannot be consideration for a separate contract.
8  Practically, rescinding an implied (or functional) contract will
9  have no effect on the express contract.  Here, Plaintiffs wish to
10  rescind the functional contract for investment advice between
11  themselves and TLIC.  Even if they were successful in doing so, the
12  GAC would still exist and put them back in the same position.
13  Plaintiffs do not appear to argue that they are parties to the GAC,
14  which is the express contract that could be rescinded, nor do they
15  argue that as beneficiaries they may rescind that contract.

16      Plaintiffs argue that even if they are not a party to an
17  investment management contract with TLIC they are still entitled to
18  restitution under a theory of unjust enrichment, which does not
19  require an actual contract.  The court does not disagree with this,
20  but finds that the GAC is once again a barrier to recovery under
21  the IAA.  "[U]njust enrichment is an action in quasi-contract,
22  which does not lie when an enforceable, binding agreement exists
23  defining the rights of the parties."  Paracor Finance, Inc. v.
24  General Elec. Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996).
25  Since the content of the GAC and the content of the quasi-contract
26  claimed by Plaintiffs appear to be identical, Plaintiffs can have
27  no claim for unjust enrichment.

28

1        Plaintiffs have failed to state a claim for violation of the

2    IAA.

3    **IV. CONCLUSION**

4        For these reasons, Defendant TLIC's Motion to Dismiss is

5    DENIED with respect to the ERISA claims (Counts I, II, III, IV, V,

6    VI, VII) and GRANTED with respect to the IAA claims (Counts VIII

7    and IX).  Defendants TIM and TAM's Motion to Dismiss is DENIED.

8

9    IT IS SO ORDERED.

10

11

12   Dated: February 19, 2013

13                                 DEAN D. PREGERSON
                                   United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28