O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JACLYN SANTOMENNO; KAREN POLEY; BARBARA POLEY, | ) ) ) | Case No. CV 12-02782 DDP (MANx) |
| Plaintiff, | ) ) | **ORDER DENYING MOTION FOR CLASS CERTIFICATION** |
| v. | ) ) | [Dkt. No. 277] |
| TRANSAMERICA LIFE INSURANCE COMPANY; TRANSAMERICA INVESTMENT MANAGEMENT, LLC; TRANSAMERICA ASSET MANAGEMENT INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Presently before the Court is Plaintiffs' Motion for Class Certification, (Dkt. No. 277), which is opposed by the Defendants on multiple grounds.  Having considered the parties' submissions and heard oral arguments, the Court adopts the following order.

**I.   BACKGROUND**

The background facts of this case have been described in detail in previous orders and are condensed here, along with new

///

information, from <u>Santomenno v. Transamerica Life Ins. Co.</u>, No. CV 12-02782 DDP MANX, 2013 WL 603901, at *1–3 (C.D. Cal. Feb. 19, 2013).

Transamerica Life Insurance Company ("TLIC") sells a 401(k) plan product targeted at small and mid-size employers. (Compl., ¶¶ 62, 94.) The product consists of a bundle of investment options and administrative services that an employer can purchase. (<u>Id.</u> at ¶ 7.)

Plaintiffs and potential class members the retirement "plans" that used these TLIC products and people who are or were participants in or beneficiaries of the plans. (Mot. Class Cert., § III.) Plaintiffs allege that the fees they were charged for these products were excessive, in violation of the Employee Retirement Income Security Act ("ERISA"). (Compl., ¶ 1.)

Employers who purchase the 401(k) plan product enter into a group annuity contract ("GAC" or "the contract") with TLIC.[1] (See Decl. Darcy Hatton ISO Def.'s Mot. Dismiss, Exs. D-1 and D-2.) Through the GAC, TLIC provides a set of investment options to the employer. Plaintiffs' employers selected the "Partner Series III" retirement package. (Compl., ¶ 243.) This package gives employers 170 investment options, from which the employer may select a smaller number to offer to their employees. (<u>Id.</u> at ¶¶ 241–42.) The 401(k) plan sponsored by the former employer of Plaintiff

---

[1]The employer and TLIC also enter into an "Application and Agreement for Services" ("Services Agreement"), which sets out the various services TLIC agrees to provide for the employer's plan, including recordkeeping services, enrollment services, and website hosting. (<u>See, e.g.</u>, Decl. Darcy Hatton ISO Def.'s Mot. Dismiss, Ex. A.) Plaintiffs do not challenge fees associated with the Services Agreements.

Santomenno, the Gain Capital Group, LLC 401(k) Plan (the "Gain Plan"), selected 46 of 170 investment options. (Id. at ¶¶ 17, 206-08.) The plan sponsored by the employer of Plaintiffs Karen and Barbara Poley, the QualCare Alliance Networks, Inc. Retirement Plan (the "QualCare Plan"), selected 36 of 170 investment options. (Id. at ¶¶ 16, 206-08.)

One of the benefits TLIC provides to client employers is the "Fiduciary Warranty." (Id. at ¶ 155.) Having entered into a GAC, an employer may pick and choose from the investment options à la carte, or it may choose one of TLIC's pre-selected "model" line-ups. (Id. at ¶ 157.) If an employer chooses a model line-up, the employer qualifies for TLIC's Fiduciary Warranty, which "provides specific assurances" that the line-up will satisfy ERISA's "broad range of investments" requirement and its "prudent man standards." (Id.) TLIC warrants that if employees assert a claim for breach of those fiduciary duties against the employer, TLIC will indemnify the employer and make the plan whole. (Id. at ¶ 159.) TLIC's Fiduciary Warranty applies if an employer constructs its own line-up only if the employer selects investments from specified categories. (Id. at ¶ 157.)

TLIC structures its investment product under the GAC such that each investment option is considered a "separate account." (Id. at ¶ 132.)  Each separate account corresponds to an underlying investment: a mutual fund, a collective trust, or a traditional separate account. (Id. at ¶ 130.) In each separate account, TLIC pools together the retirement assets of all employees who choose a certain investment option, regardless of their employer. (Id.) Many of the mutual funds are publicly traded and managed by

investment managers unaffiliated with TLIC such as Fidelity or Vanguard. (See, e.g., id. at ¶ 214.) Some of the mutual funds and collective trusts are managed by Transamerica Investment Management, LLC ("TIM") or Transamerica Asset Management, Inc. ("TAM"), affiliates of TLIC. (Id. at ¶ 340.)

TLIC assesses fees for most accounts. The GAC specifies that there are Investment Management Charges and Administrative Management Charges ("IM/Admin Fee") associated with each separate account, which "may be withdrawn daily and will belong to [TLIC]." (Hatton Decl., Exh. D-1.)  These fees are a percentage of the assets in the separate account, and the rate varies depending on which separate account is in question. (Hatton Decl., Exhs. D-1 and D-2.)  Thus, the IM/Admin Fee is not plan-specific, but investment-specific; it is charged uniformly to each separate account, regardless of plan.  (Decl. Robert Lakind, Ex. P at 21-23 (deposition testimony of Eric King, VP of TLIC's Investment Solutions Group).)  The GAC provides a schedule of fees for each of the separate accounts but reserves the "right to change the Investment Management Charge or the Administrative Charge upon advance written notice to the Contractholder of at least 30 days." (Hatton Decl., Exh. D-1.)

Plaintiff alleges that for separate account investment options invested in mutual funds, TLIC's fees are approximately 75 basis points, or 0.75% of the Plan assets invested in each option. (Id. at ¶ 271.) For at least 28 of the mutual fund options, plan participants pay the fee charged by the mutual fund in addition to a higher fee charged by TLIC. (Id. at ¶¶ 245, 248.) For instance, for the separate account that invests in the Vanguard Total Stock

Market Index Ret Opt, the underlying mutual fund charged a fee of 18 basis points and TLIC charged an additional account fee of 93 basis points, for a total fee of 111 basis points or 1.11% of the separate account assets. (Id. at ¶ 246.) For separate account investment options invested in collective trusts, TLIC charged a fee ranging from 79 basis points to 150 basis points. (Id. at ¶¶ 331, 333-34.)

Plaintiffs allege that Defendants' fees are excessive and are a breach of their fiduciary duty to Plaintiffs under ERISA. More specifically, Plaintiffs allege that TLIC's fees on separate accounts that invest in publicly available mutual funds are excessive because TLIC provides no services on such accounts: the underlying mutual funds' investment management fees covered "all of the necessary investment management/advisory services needed for the mutual fund," and thus "the alleged management services performed by TLIC were unnecessary or simply not performed." (Compl., ¶ 276.) As a result, Plaintiffs argue, the fees they paid to TLIC were "excessive and unnecessary." (Id.) "The charging of any fees by TLIC to Plaintiffs that are in excess of the fees charged by each of the mutual funds that underlie the overlaying separate account is impermissible." (Id. at ¶ 293.)

Plaintiffs further allege that TLIC has not used its institutional leverage to invest their money in the lowest price share class of mutual funds. (Id. at ¶ 314.)  This, Plaintiffs allege, was a breach of TLIC's fiduciary duty under ERISA.  (Id. at ¶ 314.)

Plaintiffs also allege that TLIC affiliates TIM and TAM made transactions that are prohibited under ERISA and knowingly

1  participated in TLIC's violations of fiduciary duty. (Id., Count

2  IV.)

3  **II.  LEGAL STANDARD**

4      Class action lawsuits are governed by Rule 23 of the Federal

5  Rules of Civil Procedure.  Rule 23 imposes two sets of requirements

6  on putative class plaintiffs.  First, they must establish four

7  "prerequisites": "(1) the class is so numerous that joinder of all

8  members is impracticable; (2) there are questions of law or fact

9  common to the class; (3) the claims or defenses of the

10  representative parties are typical of the claims or defenses of the

11  class; and (4) the representative parties will fairly and

12  adequately protect the interests of the class."  Fed. R. Civ. P.

13  23(a).

14      Second, they must show that the action is of at least one of

15  several types that lend themselves to resolution on a class basis.

16  Fed. R. Civ. P. 23(b).  For example, the action can be administered

17  on a class basis if adjudication of the rights of the individual

18  plaintiffs "would be dispositive of the interests of the other

19  [class] members not parties" to the litigation, Fed. R. Civ. P.

20  23(b)(1)(b), or if "the questions of law or fact common to class

21  members predominate over any questions affecting only individual

22  members" and "a class action is superior to other available methods

23  for fairly and efficiently adjudicating the controversy."  Fed. R.

24  Civ. P. 23(b)(3).  Which type of action the putative class lawsuit

25  is determined to be affects the rights of the class members to

26  notice of the suit and to non-participation in the judgment.  Fed.

27  R. Civ. P. 23(c)(2)-(3).

28

1    "[T]he court must determine by order whether to certify the

2    action as a class action."  Fed. R. Civ. P. 23(c)(1)(A).

3    **III. DISCUSSION**

4    Plaintiffs seek an order certifying the action as a class

5    action.  They argue that they meet Rule 23's four "prerequisites"

6    (generally known as "numerosity," "commonality," "typicality," and

7    "adequacy of representation").  They also argue that this action

8    may be certified under either Rule 23(b)(1)(b) or Rule 23(b)(3).

9    Defendants argue, primarily, that the "commonality" prerequisite is

10   not met, because the negotiation of fees was "plan-specific" and so

11   requires individualized evidence of unreasonableness.  Defendants

12   also argue that Plaintiffs cannot show proof common to all putative

13   class members of any of the following: TLIC's fiduciary duties; the

14   charging of unreasonable fees for accounts managed by affiliates;

15   failure to use its institutional leverage to invest in low-cost

16   share classes; and the use of transactions prohibited by ERISA.

17   Defendants further argue that the named Plaintiffs are not typical

18   of the class and are not adequate class representatives.  Finally,

19   Defendants argue that the action does not meet the requirements of

20   either Rule 23(b)(1)(b) or Rule 23(b)(3).

21   The Court addresses each of the Rule 23 requirements in turn.

22   **A.   Rule 23(a) Prerequisites**

23   To show that class certification is warranted, Plaintiffs must

24   show that all four prerequisites listed in Rule 23(a) are

25   satisfied.

26   **1.   Numerosity**

27   Numerosity is satisfied if "the class is so numerous that

28   joinder of all members is impracticable."  Fed. R. Civ. P.

7

23(a)(1).  Here, Plaintiffs allege that the affected class is comprised of some "300,000 participants in about 7,400 plans." (Mot. Class Cert. at 17:24-25.)  Defendants do not challenge the proposed class on numerosity grounds or Plaintiffs' figures.  A class in the hundreds of thousands easily satisfies the numerosity requirement.

**2.   Commonality**

Commonality is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Note that this does not mean that *all* questions of law and fact must be identical across the class; "[t]he requirements of Rule 23(a)(2) have been construed permissively, and all questions of fact and law need not be common to satisfy the rule."  <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 981 (9th Cir.2011) (internal quotation marks and brackets omitted).  However, posing common questions of trivial fact is not enough: the "question" must be one that "will generate common answers apt to drive the resolution of the litigation." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551 (2011) (quoting Richard A Nagarenda, <u>Class Certification in the Age of Aggregate Proof</u>, 84 N.Y.U.L.Rev. 97, 132 (2009)).

**a.   Common Proof of Fiduciary Duty**

Plaintiffs and Defendants agree that Defendants' liability under ERISA is predicated on Defendants' fiduciary duty to the members of the proposed class.  In the ERISA context, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."  29 U.S.C. §

1002(21)(A)(I).   A person may also be a fiduciary if "he has any discretionary authority or discretionary responsibility in the administration of such plan."   29 U.S.C. § 1002(21)(A)(iii).   "In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . . whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."   <u>Pegram v. Herdrich</u>, 530 U.S. 211, 226 (2000).

**i.   Duty As To Fees**

ERISA requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying *reasonable expenses* of administering the plan."   29 U.S.C. § 1104(a)(1) (emphasis added).   Plaintiff alleges that TLIC is a fiduciary under ERISA and that its IM/Admin Fees are excessive under ERISA because they do more than defray reasonable expenses.

TLIC enters into two sets of contracts with the retirement plans to which it offers its services. (Lakind Decl., Ex. Q at TRAN-00529150.)   First, it enters into an "Agreement for Services" with each plan. (<u>Id.</u>; Decl. Darcy Hatton ISO Def.'s Mot. Dismiss, Ex. A.)   The terms of this Services Agreement are limited to the particular plan with whom TLIC is negotiating.   Second, it enters into a "Group Annuity Contract" ("GAC") that sets, inter alia, fees for the "separate accounts" – that is, each possible investment option available to participants under the plan.   Plaintiffs' Complaint primarily focuses on the "Investment Management" and "Administrative" fees, referred to collectively by both sides as

the "IM/Admin Fee."  Fees charged under the GAC are uniform across plans and thus, by definition, are not negotiated for by any plan trustee.   Indeed, the GAC is a form contract that does not vary in its basic terms from plan to plan.  (Lakind Decl., Ex. R.)

Plaintiff argues that TLIC was an ERISA fiduciary as to the IM/Admin Fees that it charged to the proposed class plans, and it plans to rely on the powers granted to TLIC under the GAC as class-wide proof that TLIC satisfied the definition of "fiduciary" in § 1002(21)(A).  Plaintiff notes that the GAC gives TLIC "unilateral discretion to raise and lower its 'IM/Admin' fee and to add or delete investment options, along with the physical possesion of the Plans' invested assets from which TLIC pays itself the disputed compensation."  (Mot. Class Cert. at 19:20-23.)  Thus, according to Plaintiff, TLIC exercised discretionary authority or control over the management or administration of the plan, or any sort of authority or control over the assets of the plan, as required by § 1002(21)(A).

Defendants, on the other hand, argue that the GAC cannot provide class-wide proof that TLIC exercised any of those forms of control or authority, for, primarily, two reasons.  First, the contracts between TLIC and the plans were negotiated at arms' length with the plans' trustees or sponsors, and it was those parties that owed the plans and participants a fiduciary duty to make sure that the fees charged were reasonable.  Defendants recognize, (Opp'n at 17:3-12), that the Court has already held that a party negotiating a contract with an acknowledged fiduciary, in order to assume the powers of a fiduciary, is not immunized from fiduciary responsibility solely because the acknowledged fiduciary

agreed to the contract.  <u>Santomenno v. Transamerica Life Ins. Co.</u>, No. CV 12-02782 DDP MANX, 2013 WL 603901, at *12-13 (C.D. Cal. Feb. 19, 2013) ("The contract can immunize the future fiduciary TLIC from fiduciary breach no more than it can immunize the employer. To hold otherwise would allow fiduciaries to contract themselves out of their duties, so long as it was done prior to the assumption of those duties.").  Defendants nonetheless argue that the contract negotiations were "at arm's length" because "[c]ompetition among service providers is fierce and frequent."  (Opp'n at 17:13.)  This misses the point.  It does not matter what other options the plan sponsors may have had in the market.  What matters is the level of control and authority the GAC granted to TLIC in the management and administration of the plan or the management and disposition of plan assets.  If the contract assigns TLIC ERISA-fiduciary powers, TLIC is an ERISA fiduciary.[2]

Defendants' second argument is that even if it had control and authority, whether it "exercised" that control and authority is a plan-specific, individualized inquiry not susceptible to class-wide proof.  Because the ERISA statute requires that a person "exercise" control and authority, Defendants reason, it can only be considered a fiduciary as to those separate accounts with regard to which it actually took some overt action, such as changing its fees or adding or deleting investment options.  Because every plan selects different separate accounts, Defendants argue, there can be no

---

[2]<u>Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.</u>, 805 F.2d 732, 737 (7th Cir. 1986) ("No discretion is exercised when an insurer merely adheres to a specific contract term. When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.").

class-wide showing that TLIC "exercised" control or authority as to
all plans in the class.

This argument, however, has largely been foreclosed by the
Court's previous order, which held that "in the ERISA context,
having and exercising discretionary authority are so close as to be
identical, and . . . under ERISA, a fiduciary duty attaches not
because a party takes a discretionary action but when that party
acquires the power to take a discretionary action." Santomenno,
2013 WL 603901 at 22.  To support their position that no fiduciary
duty exists until the ERISA fiduciary overtly acts, however,
Defendants cite to Leimkuehler v. Am. United Life Ins. Co., decided
two months after the Court issued its order.  713 F.3d 905 (7th
Cir. 2013).  In that case, a plaintiff alleged that a service
provider was a fiduciary because, like TLIC here, it had a
contractual discretionary right to add or delete investments.  Id.
at 914.  The plaintiff alleged that the service provider had
breached its duty, because it had not used its authority to
purchase less expensive share classes of the investments in
question.  The Seventh Circuit held that

> [The plaintiff's] theory is unworkable. It conflicts with a
> common-sense understanding of the meaning of "exercise," is
> unsupported by precedent, and would expand fiduciary
> responsibilities under Section 1002(21)(A) to entities that
> took no action at all with respect to a plan.  In contrast to
> a named fiduciary, a functional fiduciary under Section
> 1002(21)(A) owes a duty to a plan through its actions,
> regardless of whether it chose to assume fiduciary

1    responsibilities or even anticipated that such

2    responsibilities might arise.

3  <u>Id.</u>  Defendants urge the Court to follow the Seventh Circuit's

4  reasoning.

5       There are several good reasons not to mechanically apply the

6  holding of <u>Leimkuehler</u> to this case, however.  First, <u>Leimkeuhler</u>

7  was not decided at the class certification stage, because the

8  district court had granted summary judgment as to the issue of

9  fiduciary responsibility prior to any motion for class

10 certification.[3]  And the service provider in that case was found

11 not to have "exercised" its authority at all.  <u>Id.</u>  <u>Leimkeuhler</u>

12 therefore never considered the question of whether occasional overt

13 use of control and authority with regard to particular separate

14 accounts could act as class-wide proof of fiduciary status.  The

15 Court doubts, for example, that if TLIC had made unilateral changes

16 to its fee structure in 99% of separate accounts (or affecting 99%

17 of plans) that it would make sense to say there was no class-wide

18 proof of "exercise of control," or fiduciary status, based solely

19 on the 1% of cases in which TLIC chose not to change its fees.

20      Moreover, the Court is not persuaded that <u>Leimkuehler</u>'s

21 reasoning is sound.  If the service provider in that case had

22 bought *no* shares of any kind, then it might make sense to say that

23 it had not "exercised" its authority.  Having taken no action of

24 any kind, it could not have "perform[ed] a fiduciary function"

25 while "taking the action subject to complaint," because it would

26

27      [3]<u>Leimkuehler v. Am. United Life Ins. Co.</u>, 752 F. Supp. 2d 974,
28 976 n.1 (S.D. Ind. 2010) ("[N]o motion for class certification has
   been filed yet.").

have taken no action at all.  Pegram v. Herdrich, 530 U.S. 211, 226 (2000).  But it *did* buy shares, and in doing so it implicitly "exercised" its authority to choose what sorts of share classes to buy.  It *could* have bought less expensive classes of shares for the benefit of plan participants, but *chose* not to use its authority to do so.  This seems to be the very definition of exercising discretionary authority.

Similarly, here it is not the case that TLIC charged *no* fees. It did charge fees, and when it did so, it was within its discretion to adjust the fee to reasonably reflect its expenses and/or market conditions (subject to 30 days' notice).  Thus, every time it charged fees, TLIC was acting with discretionary authority to set the level of those fees.  This satisfies § 1002(21)(A)(i)'s "exercise" requirement.

Moreover, as Plaintiffs point out, Leimkuehler does not consider the effect of § 1002(21)(A)(iii), which makes a fiduciary of any person who *has* "discretionary authority or discretionary responsibility in the administration of" a plan.  If a person falls under clause (iii), the question of "exercise" falls away entirely. Although the statute and the case law provide no clear definition of "administration," as separate from management or disposition of assets, it seems reasonable to say that setting fees is part of the administration of the plan.  As the District of Massachusetts recently held, "to the extent [a service provider] has discretionary control over factors governing its fees after entering into its agreement with GSI for administration of the Plan, subsection (iii) is implicated . . . ."  Golden Star, Inc. v.

1   <u>Mass Mut. Life Ins. Co.</u>, No. CIV. 3:11-30235-PBS, 2014 WL 2117511,

2   at *8 (D. Mass. May 20, 2014).

3        Because TLIC could be a fiduciary to the plans and

4   participants regardless of whether it actually exercised the option

5   to adjust the IM/Admin Fee, the Court concludes that TLIC's

6   fiduciary status as to the setting of the IM/Admin Fee is a common

7   question, susceptible to common proof.

8   **ii.  Duty as to Other Actions**

9        Defendants do not challenge the possibility of common proof of

10  fiduciary duty as to Plaintiffs' other allegations.  For reasons

11  essentially the same as those cited above with regard to the

12  IM/Admin Fee, as well as the reasons set forth in the Court's

13  previous order, <u>Santomenno</u>, 2013 WL 603901 at 20-23, the Court

14  assumes that common proof can be adduced showing that Defendants

15  had a fiduciary duty as to the other allegations involving

16  collection of fees as well.

17       As to the allegation that TLIC breached its fiduciary duty in

18  not investing in the lowest-cost share classes, the Court also

19  finds that such a claim would be susceptible to common proof as to

20  duty, for the reasons explained above regarding <u>Leimkeuhler</u>, which

21  was about that very question.

22  **b.   Common Proof as to Separate Account/Investment-Level Fees**

23       Fundamentally, this case is about how to view certain

24  "separate account"-level fees – that is, fees charged uniformly to

25  all investors in a particular mutual fund or other investment.

26  Plaintiffs point out that the IM/Admin Fees, in particular, are the

27

28

1   same for all investors in a given separate account.[4]  (Decl. Robert

2   Lakind, Ex. P at 21-23.)  Plaintiffs specifically exclude from the

3   discussion "plan-level" fees that would differ from plan to plan,

4   (Mot. Class Cert. at 4-5), in order to focus on a question of fact

5   common to all plan participants who invested in a given separate

6   account — how much was the IM/Admin Fee for that account? — and a

7   question of law common to the same participants — was that fee

8   reasonable?  (Id. at 20-21.)

9        Defendants see the question differently.  Defendants argue

10   that the reasonableness of a particular fee cannot be measured in

11   isolation; rather, the Court must look at the total fee structure

12   charged to each of the seven thousand plans, compare that fee

13   structure to services rendered each plan, respectively, and judge

14   reasonableness that way.  (Opp'n at 19-20.)

15        The parties do not direct the Court to authority for either

16   position.  The Court also cannot find authority directly on point,

---

24        [4]Because Plaintiffs limit themselves to an examination of
investment-level, relatively uniform fees, the Court need not
25   address whether commonality would be defeated if the plans' "total
fees" were to be considered.  But the Court notes in passing that
26   district courts in the Ninth Circuit have repeatedly rejected the
idea that variations in fee structures defeat commonality in class
27   actions for excessive fees under ERISA.  See In re Northrop Grumman
Corp. ERISA Litig., No. CV 06-06213 MMM JCX, 2011 WL 3505264, at *8
28   (C.D. Cal. Mar. 29, 2011) (listing cases).

although a few cases are at least suggestive.[5]  The Court therefore treats this as a question of first impression.

The Court finds that in this case, it is possible to find common, dispositive questions as to whether the IM/Admin Fees were excessive.  For example, were the investment-level fees charged uniformly across plans?  What was the range of these investment-level fees?  Do other ERISA plan service providers charge similar fees?  What services did TLIC provide at the investment level, distinct from services provided at the plan level?  Were the fees represented to plan purchasers as covering, essentially, fixed administrative expenses related to each investment, *independent of charges related to the administration of the plan?*[6]  All these common questions go to the heart of Plaintiff's claim and are susceptible to common proof.

_____

[5]*Tussey v. ABB, Inc.*, No. 06-04305-CV-NKL, 2007 WL 4289694, at *5 (W.D. Mo. Dec. 3, 2007) (finding commonality in the question of excessive fees, even though the fees were composite in nature and plan participants made individualized decisions in selecting investments based on disclosed expense ratios); Spano v. The Boeing Co., 633 F.3d 574, 588 (7th Cir. 2011) (common question as to "[w]hether the fees charged by the plans were excessive (either on their own, or as a result of the fee structures the plans used)").  But *Tussey* was about a single plan, while the consolidated case considered in Spano involved just two plans administered by a single employer.  Thus, neither directly answers the question whether it is possible to find a common question based on an investment-level fee charged to many thousands of plans.

[6]Plaintiff presents some initial evidence that they were.  A document that TLIC provided to plan fiduciaries explains that "[y]ou will generally encounter two types of fees and expenses with respect to your 401(k) plan" and describes those two types as "Recordkeeping and Administrative Fees" and "Investment and Product Fees."  (Lakind Decl., Ex. QQQ at TRAN-00533083.)  The IM/Admin Fees are included in the latter category.  (Id.)  The same document states that the IM/Admin Charges cover "[e]xpenses for managing and administering the assets in the separate accounts offered under the group annuity contract."  (Id. at TRAN-00533094.)

1      Defendants can (and do) present a defense on the basis of

2 total fees. See Part III.B.2.a., infra. Defendants also argue

3 that there are plan-specific issues as to the effect of disclosures

4 stating that the IM/Admin Fees might be used to "subsidize other

5 services." (Opp'n at 21:3.) Additionally, Defendants cite to

6 deposition testimony which they claim shows that plan sponsors

7 looked at the total package of fees, not just the IM/Admin Fees, to

8 determine whether they were reasonable. (Id. at 21:19-27.)

9      But these arguments, which essentially go to individualzed

10 defenses that can be mounted against certain plans, are more

11 properly addressed in the predominance analysis under Rule

12 23(b)(3). See Part III.B.2., infra. Plaintiffs have adequately

13 framed a set of common questions on the issue of fees.

14      The Court finds that common proof can be adduced as to the

15 reasonableness of the IM/Admin Fees.

16 **c.   Common Proof as to Fees Charged by Separate Accounts Managed**

17       **by Affiliates**

18      Plaintiffs assert that TLIC allowed its affiliates, TIM and

19 TAM, to charge excessive fees for the separate accounts that they

20 managed.

21      Defendants assert that there is no common proof possible

22 because "[a]s with Plaintiffs' challenge to TLIC's IM/Admin fees,

23 the relevant question is whether total fees are reasonable."

24 (Opp'n at 26:14-15.) This argument, however, mistakes the type of

25 fiduciary duty at issue in this claim. In the claim as to the

26 IM/Admin fees, the question was whether TLIC's compensation as

27 fiduciary was reasonable. There, under the language of the ERISA

28 statute, only total compensation is at issue.

1   As to its dealings with TIM and TAM, however the fiduciary

2   duty has nothing to do with TLIC's *own* compensation.  Rather, the

3   alleged breach has to do with whether TLIC properly acted at arm's

4   length with its affiliates to "secure[] . . . lower fees on

5   [participants'] behalf."  (Reply at 18.)  The relevant source of

6   fiduciary duty, then, is not 29 U.S.C. § 1104(a)(1)(A)(ii)

7   (fiduciary may only "defray[] reasonable expenses of administering

8   the plan"), but 29 U.S.C. § 1104(a)(1)(A)(i) ("[A] fiduciary shall

9   discharge his duties with respect to a plan solely in the interest

10  of the participants and beneficiaries and for the exclusive purpose

11  of providing benefits to participants and their beneficiaries . . .

12  .").  The question of TLIC's total fees does not enter into it.

13  Defendants also argue that Plaintiffs use the wrong basis of

14  comparison, and that market rates for such fees vary considerably

15  "by asset class."  (<u>Id.</u> at 27:2.)  But those objections seem to be

16  factual matters implicating the merits of the claim; it is

17  inappropriate to resolve such questions at this stage unless

18  necessary to resolve the Rule 23 questions.  <u>Connecticut Ret. Plans</u>

19  <u>& Trust Funds v. Amgen Inc.</u>, 660 F.3d 1170, 1175 (9th Cir. 2011).

20  But there is a different problem with certifying this class as

21  to the fees charged by TIM and TAM for the "Affiliated Advised

22  Separate Accounts," which is that it is not clear that every plan

23  and participant in the class actually invested in these accounts.

24  Plaintiffs only allege that "[a] few of the Ret Opt separate

25  account investment choices invested in an underlying mutual fund"

26  advised by TIM or TAM.  (Mot. at 11.)  This does not suggest that

27  every plan and participant – i.e., every plaintiff – invested in

28  the investment choices advised by the affiliates.  The Court

therefore cannot conclude that there is common proof available as
to the fees charged by the affiliate-managed accounts.

**d.   Common Proof as to Failure to Invest in Lowest-Cost Share
       Classes**

Plaintiff alleges that TLIC breached its fiduciary duty when
it did not invest in the lowest-cost classes of shares available to
it.  Defendants counter that the evidence shows that it did, in
fact, "generally" invest in the lowest-cost share class.  (Opp'n at
27:16-17.)  Again, this may be true, but it is a question best
reserved for an evaluation on the merits.

Defendants also argue that plan-by-plan analysis is necessary
to determine whether the plans and participants invested in the
relevant separate accounts at a time when a lower-cost class was
available.  (Opp'n at 1-3.)  There may be some merit to this
contention.  Unlike the fees discussed above, which were both
within TLIC's discretion to change and fairly similar from account
to account, the existence of an opportunity to buy lower-cost share
classes might well have varied significantly from account to
account and time to time.  However, the commonality requirement of
Rule 23(a)(2) is construed liberally.  "All questions of fact and
law need not be common to satisfy the rule." Hanlon v. Chrysler
Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).  Here, the question of
law – was TLIC obligated to attempt to buy the lowest-cost share
class where possible? – is common to all investors.  And a question
of fact can be framed as a common question as well – did TLIC
consistently buy lowest-cost shares *when it was possible to do so*?
It may be that TLIC will have an individualized defense as to
damages for some investors, because no opportunity to buy lower-

1  cost shares will have arisen.  But commonality is not defeated by

2  the possibility that this claim requires a more individualized

3  inquiry to consider defenses against certain class members.

4  **e.    Common Proof as to Prohibited Transactions**

5       Defendants similarly argue that there are individualized

6  issues of proof as to the prohibited transactions claims, because

7  fiduciary responsibility for the transactions will depend on who

8  "caused" the transactions.  Defendants argue that because other

9  fiduciaries (the plan sponsors) had notice of potential conflicts

10 or other issues making the transactions prohibited, and either

11 those other fiduciaries or the plan participants made the decision

12 to invest in the relevant separate accounts, they are not

13 "prohibited transactions."  (Opp'n at 28-30.)  Essentially,

14 Defendants argue that if plan sponsors or participants selected the

15 separate accounts with full knowledge of the relevant details, the

16 transactions are not prohibited.

17      Whether Defendants are correct about that is, of course, a

18 common question of law.  Moreover, there appear to be common

19 questions of fact, such as what fees TIM and TAM may have charged,

20 the degree of control and affiliation TLIC had with the affiliate

21 accounts, the amount and nature of the alleged revenue-sharing

22 payments, whether TLIC gave investment advice, whether the IM/Admin

23 fees were used to pay for investment advice, and so on.  Defendants

24 do not argue that these questions do not have common answers.  They

25 have, again, raised a question that may (or may not) serve as a

26 defense as to some proposed class members, and that may affect

27 predominance, but that is not enough to defeat commonality.

28 **f.    Conclusion**

1    The Court finds that Plaintiffs raise sufficient dispositive

2    questions, common to all proposed class members, that the

3    requirement of commonality is satisfied.

4    **3.   Typicality**

5    Typicality is satisfied if "the claims or defenses of the

6    representative parties are typical of the claims or defenses of the

7    class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality

8    requirement is to assure that the interest of the named

9    representative aligns with the interests of the class.  Typicality

10   refers to *the nature of the claim or defense* of the class

11   representative, and *not to the specific facts from which it arose*

12   or the relief sought.  The test of typicality is whether other

13   members have the same *or similar* injury . . . ."  <u>Hanon v.</u>

14   <u>Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992) (internal

15   quotation marks omitted) (citations omitted) (emphasis added).

16   Defendants argue that the Plaintiffs' claims are not typical

17   of class for two reasons.  First, Plaintiffs' plans were "among the

18   largest," and fees vary by plan size.  (Opp'n at 31:10-15.)

19   Second, about 1,600 plans of the alleged 7,400 started using TLIC's

20   services after December 9, 2011, at which point received "express

21   DOL-prescribed disclosures underscoring that the bulk of TLIC's

22   IM/Admin charges would be used to subsidize plan-level

23   administrative services."  (<u>Id.</u> at 31:16-21.)

24   The Court does not find these arguments convincing with regard

25   to typicality.  Defendant makes no effort to explain how the fact

26   that the fees varied somewhat with the size of the plan changes the

27   *nature* of the injury suffered.  Plaintiffs assert that all

28   potential class members were charged unreasonable fees under the

1  GAC; to the degree that the total fees charged to the plans may

2  have varied in absolute magnitude, that does not make alleged

3  injuries of a different kind.

4      As to the second point, it is not clear what effect the

5  alleged disclosures would have on the claims.  Perhaps Defendants

6  mean to argue that receipt of the disclosures might be a defense as

7  to those members.  But even using Defendants' numbers, the vast

8  majority of plans would not have received the disclosure, so that

9  Plaintiffs are, in fact "typical" of the average case here.  To the

10  extent that defenses that apply only to certain members of the

11  class are a concern in the typicality analysis, it is generally

12  because those defenses are *unique to the class representatives*.

13  Hanon, 976 F.2d at 508.  The concern is that the class

14  representatives would be forced to spend an inordinate amount of

15  time "prepar[ing] to meet defenses that are not typical of the

16  defenses which may be raised against other members."  Id.  For

17  example, in Ellis v. Costco Wholesale Corp., the defendant employer

18  in a promotion discrimination case had unique defenses against some

19  of the proposed class representatives: one had refused a promotion,

20  while another had "misrepresented her way into" the job and "was

21  disciplined for abusing subordinates."  657 F.3d 970, 984 (9th Cir.

22  2011).  There was thus a very real danger that litigation about the

23  worthiness of those plaintiffs as managerial candidates would have

24  overshadowed the grievances of other class members.  Here, however,

25  there is no such danger: the named plaintiffs are *not* subject to

26  the defense Defendants raise.

27      The Court finds that typicality is satisfied.

28  **4.   Adequacy of Representation**

23

1   Adequacy of representation is satisfied if "the representative

2   parties will fairly and adequately protect the interests of the

3   class." Fed. R. Civ. P. 23(a)(4).  Inasmuch as it is conceptually

4   distinct from commonality and typicality, this prerequisite is

5   primarily concerned with "the competency of class counsel and

6   conflicts of interest."  Gen. Tel. Co. of Southwest v. Falcon, 457

7   U.S. 147, 158 n.13 (1982).  Thus, "courts must resolve two

8   questions: (1) do the named plaintiffs and their counsel have any

9   conflicts of interest with other class members and (2) will the

10  named plaintiffs and their counsel prosecute the action vigorously

11  on behalf of the class?"  Ellis, 657 F.3d at 985.

12   Defendants point to no conflict of interest between Plaintiffs

13  and other members of the proposed class, and there is no apparent

14  reason to think that Plaintiffs will not vigorously prosecute the

15  action on behalf of all class members.  Nonetheless, Defendants

16  argue that Plaintiffs cannot adequately represent other class

17  members because they were not all participants in the same plans.

18  Defendants do not explain, however, how this fact would create a

19  conflict of interest or otherwise impact Plaintiffs' vigorous

20  prosecution of the case.[7]

21  _____

22   [7]To the extent that this is an argument about standing, the
    Court agrees with the analysis in Fallick v. Nationwide Mut. Ins.
23  Co.:

24   Threshold individual standing is a prerequisite for all
        actions, including class actions . . . . [H]owever, once an
25      individual has alleged a distinct and palpable injury to
        himself he has standing to challenge a practice even if the
26      injury is of a sort shared by a large class of possible
        litigants . . . . [O]nce a potential ERISA class
27      representative establishes his individual standing to sue his
        own ERISA-governed plan, there is no additional constitutional
28      standing requirement related to his suitability to represent
                                                     (continued...)

24

1    The Court finds that adequacy of representation is satisfied.

2  **B.    Existence of a Class Action Under Rule 23(b)**

3  **1.    Action Under Rule 23(b)(1)(B)**

4    Plaintiffs suggest the class could be certified under Rule

5  23(b)(1)(B), which allows for class actions if separate actions

6  "would create a risk of . . . adjudications with respect to

7  individual class members that, as a practical matter, would be

8  dispositive of the interests of the other members not parties to

9  the individual adjudications or would substantially impair or

10  impede their ability to protect their interests."  The paradigmatic

11  case is a "limited fund" case, in which the rights to some limited

12  quantity of money are being adjudicated, and the adjudication of

13  the rights of one individual necessarily decreases the pool of

14  money available for other claimants.  "For much the same reason

15  actions by shareholders to compel the declaration of a dividend . .

16  . should ordinarily be conducted as class actions . . . ."

17  Advisory Committee's Notes on Fed. R. Civ. P. 23.

18    Thus it is unsurprising that a class action may be certified

19  under 23(b)(1)(B) where there has been "a breach of trust by an

20  indenture trustee or other fiduciary similarly affecting the

21  members of a large class of security holders or other

22  beneficiaries, and which requires an accounting or like measures to

23  restore the subject of the trust."  Id.  See also Ortiz v.

24  Fibreboard Corp., 527 U.S. 815, 834 (1999) (quoting same).  At

25

---

26    [7](...continued)

27    the putative class of members of other plans to which he does
    not belong.

28  162 F.3d 410, 423 (6th Cir. 1998).

1   least one judge in this district has found class certification

2   appropriate under 23(b)(1)(b) where the claims involve large-scale

3   violations of fiduciary duty under ERISA.  In re Syncor Erisa

4   Litig., 227 F.R.D. 338, 347 (C.D. Cal. 2005).

5       But in Syncor, only one plan was involved, the class was made

6   up of participants in the plan, and the fiduciaries being sued were

7   the employer and its board, as well as the committee that was in

8   charge of the plan.  Id. at 339-40.  The plaintiffs in that case

9   sought "an order compelling Defendants to make good to the Plan all

10  losses to the Plan resulting from Defendants' alleged breaches of

11  their fiduciary duties."  Id. at 340.  Thus, of necessity,

12  adjudication of the claim of any plaintiff would have affected all

13  the class members.

14      In this case, however, it is perfectly possible for

15  participants in Plan A who invested in Investment X to be made

16  whole without that remedy in any way being dispositive of the

17  interests of participants in Plan B who invested in Investment Y.

18  The common nexus of interests is simply not present.  The Court

19  finds that certification under Rule 23(b)(1)(b) is not appropriate.

20  **2.   Action Under Rule 23(b)(3)**

21      A class action may be certified under Rule 23(b)(3) if "the

22  questions of law or fact common to class members predominate over

23  any questions affecting only individual members, and that a class

24  action is superior to other available methods for fairly and

25  efficiently adjudicating the controversy."  Fed. R. Civ. P.

26  23(b)(3).  In making its findings on these two issues, courts may

27  consider "the class members' interests in individually controlling

28  the prosecution or defense of separate actions," "the extent and

1  nature of any litigation concerning the controversy already begun

2  by or against class members," "the desirability or undesirability

3  of concentrating the litigation of the claims in the particular

4  forum," and "the likely difficulties in managing a class action."

5  Id.

6  **a. Predominance**

7      "The Rule 23(b)(3) predominance inquiry tests whether proposed

8  classes are sufficiently cohesive to warrant adjudication by

9  representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591,

10  623 (1997).  "Even if Rule 23(a)'s commonality requirement may be

11  satisfied by [a] shared experience, the predominance criterion is

12  far more demanding." Id. at 623-24.  Predominance cannot be

13  satisfied if there is a much "greater number" of "significant

14  questions peculiar to the several categories of class members, and

15  to individuals within each category." Id. at 624.

16      The major common questions in this case revolve around whether

17  a single party, TLIC, met its fiduciary duties to the investors and

18  plans to whom it provided investment management services.  And

19  TLIC's status as a fiduciary helps to narrow the questions that

20  must be answered – the Court need not, for example, conduct a free-

21  ranging inquiry into truth in advertising regarding the IM/Admin

22  Fee and other fees charged; the common questions here are grounded

23  in a single statute and its definition of fiduciary duty.

24      Nonetheless, individual inquiries potentially loom large.  As

25  a starting matter, Plaintiffs seek to certify a class of "about

26  300,000 participants in about 7,400 plans." (Mot. Class Cert. at

27  17:24-25.)  The sheer number of participants and plans dwarfs

28  anything the Court has been able to find in the case law:

typically, it seems, ERISA cases deal with just one plan or a handful of related plans.  See note 5, supra.  Thus, any difference in facts or legal posture among plans is potentially multiplied a thousandfold – a problem not presented in other ERISA class actions.

**i.   IM/Admin Fees**

Nor is this concern abstract or conjectural.  Defendants raise potentially serious "defenses of liability . . . affecting the individuals in different ways."  Fed. R. Civ. P. 23, Adv. Comm. Notes.  For example, as to the IM/Admin Fee issue (which, itself, predominates the lawsuit), Defendants argue that whether TLIC met its fiduciary duty to a given plan when charging the fee depends on: (a) what the total fees charged were; (b) the actual services TLIC rendered to each plan (and, presumably, TLIC's actual cost in providing them); (c) what disclosures TLIC may have made about how the fee would be used; and (d) what services the plan administrators or other plan fiduciaries would have understood the fee to cover.  These questions, if relevant, would be manageable in a suit involving one or two or even a few dozen plans.  In a suit involving thousands of plans, such inquiries could quickly become intractable.

The Court has therefore asked for additional briefing to assist it with the question of predominance.  (Dkt. No. 319.)  That order suggested that because Plaintiffs do not allege that Defendants' total packages of fees are excessive, it was unclear what Plaintiffs' theory of liability was.  A fiduciary is allowed to "defray[] reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1).  Thus, at first blush, it would seem that as

long as a fiduciary's fees match its reasonable expenses, ERISA is not violated.  The Court hoped that by gaining clarity as to Plaintiff's precise theory of ERISA liability, it could better determine whether Defendants' potential individualized defenses would be likely to overwhelm the common questions at issue.

**i.a. Fiduciary Duty Under ERISA to Defray Only "Reasonable Expenses"**

In response to the Court's order, Plaintiffs appear to state that their theory of liability is that "the .75% Separate Account IM/Admin fee paid at the Separate Account level on assets invested in RetOpts and Menu 10 investment options is grossly excessive." (Pls.' Suppl. Brief at 2.)  The problem with this statement is that it does not clearly explain what fiduciary duty is being violated by the charging of this "grossly excessive" fee.  The Court concludes that it cannot be the duty to act solely to "defray[] reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A)(ii).

To see why this is so, consider an example set out by one of Plaintiff's experts:

Suppose a provider tells investors they are paying a certain amount for investment services ($40) and another amount for an ancillary service, such as preparation of statements or mailing ($5). Suppose the investors, in fact, are paying $20 for investment services and $25 for the ancillary services because the advice is sent by express mail. The investors, who have not been properly informed, are not equally well off in both circumstances. More money spent on investment advice should pay for better investment advice (which in this case

29

1    would have resulted in Transamerica realizing it should reduce

2    its IM&A Charge).  With the bundled fee, the investors are not

3    equally well off irrespective of how their money is used,

4    because they lack the ability to monitor the propriety of

5    their total fees and the ability to insure the total price

6    they pay their provider is being allocated efficiently to buy

7    the services and quality of service that they value most.

8  (Pls.' Suppl. Brief at 5-6.)

9        While it may be true that investors in this hypothetical are

10  not equally well off – at least in the sense that they are deprived

11  of the opportunity to monitor the provider's decision-making – that

12  is not (necessarily) because the provider is not using the money to

13  defray reasonable expenses.  There might be a range of reasonable

14  prices for investment services and for mailing.  Looking at the

15  available options, the provider might conclude that the additional

16  value to investors in investment services priced at $40 rather than

17  $20 was minimal, and it might also conclude that express mail was

18  faster, more secure, and more reliable than regular mail, and that

19  it therefore justified the cost.  These conclusions might or might

20  not be reasonable – and, importantly, a different service provider

21  might make different choices – but if they are reasonable, §

22  1104(a)(1)(A)(ii) is satisfied.

23        In other words, the plain language of § 1104(a)(1)(A)(ii) only

24  requires a fiduciary to show that its expenses are reasonable – not

25  that its naming and accounting of fees accurately reflects the

26  breakdown of expenses.

27        The Court therefore finds that if Plaintiffs wish to assert a

28  claim under TLIC's fiduciary duty to defray only reasonable

expenses, they must do so by considering TLIC's fees as a whole compared to TLIC's total reasonable expenses in providing its services.

Plaintiffs argue in their supplemental brief that they *are* challenging the total fee package, in addition to challenging the IM/Admin Fee, because the size of the IM/Admin Fee makes the total fee package unreasonable. (Pls.' Suppl. Brief at 6-7.)  This is unconvincing; it simply assumes the premise Plaintiffs want to prove: that the fees must be considered separately, rather than as a total package, without considering cost-sharing or subsidization between categories of fees.  If Plaintiffs do not consider the plan level fees excessive for plan-level expenses, (Pls.' Suppl. Brief at 7), perhaps that is only because they are being subsidized by the investment-level fees.

All of this leads to the conclusion that fees charged to individual plans must be compared to the expense of providing services to those plans.  These individualized inquiries would be significantly more complex than Plaintiff's proposed inquiry into a single fee whose reasonableness (Plaintiffs argue) could be straightforwardly determined as to all plans equally.

Because Plaintiffs have not briefed the Court on how such a plan-by-plan inquiry into total expenses and fees could be conducted, even after the Court requested supplemental briefing, the Court cannot determine that the common questions identified above would necessarily predominate.

**i.b. Fiduciary Duty Under ERISA to Provide Accurate Accounting of Fees for the Benefit of Participants**

1    Of course, as Plaintiff's expert points out in the above
2  hypothetical, a careful naming and accounting of fees might benefit
3  the investors in other ways – for instance, by enabling them to
4  judge for themselves whether the fiduciary is making the best
5  decisions as to how to allocate resources.  Thus, an investor can
6  sue a fiduciary who misrepresents the allocation of expenses to
7  fees for breach of the duty to act for the purpose of "providing
8  benefits to participants and their beneficiaries."  §
9  1104(a)(1)(A)(i).  Implicit in § 1104(a)(1)(A)(I) is a fiduciary
10 duty of honesty.  Pegram v. Herdrich, 530 U.S. 211, 224-25 (2000).
11 ERISA "fiduciaries breach their duties if they mislead plan
12 participants or misrepresent the terms or administration of a
13 plan."  Quan v. Computer Sciences Corp., 623 F.3d 870, 886 (9th
14 Cir. 2010) abrogated on other grounds by Fifth Third Bancorp v.
15 Dudenhoeffer, 134 S. Ct. 2459 (2014).

16    But these kinds of allegations, though actionable, get away
17 from a relatively simple mathematical question of whether a
18 provider's fees exceed its reasonable expenses and into the more
19 complex evidence needed to prove misrepresentation.

20    "To allege and prove a breach of [ERISA] fiduciary duty for
21 misrepresentations, a plaintiff must establish each of the
22 following elements: (1) the defendant's status as an ERISA
23 fiduciary acting as a fiduciary; (2) a misrepresentation on the
24 part of the defendant; (3) the materiality of that
25 misrepresentation; and (4) detrimental reliance by the plaintiff on
26 the misrepresentation."  In re Computer Sciences Corp. ERISA
27 Litig., 635 F. Supp. 2d 1128, 1140 (C.D. Cal. 2009).  Element (1)
28

1  can be proven on a classwide basis; it seems highly unlikely that

2  elements (2), (3) and (4) can be.

3      Whether there was actually a misrepresentation may not be

4  susceptible to classwide proof, because many class members appear

5  to have received disclosures, starting in 2012, that explained the

6  subsidization of plan-level costs and provided estimates of the

7  amount spent on such subsidization. (E.g., Defs.' Exs. Q at TRAN-

8  02287686 & R at TRAN-02679054.)

9      As to materiality, "a misrepresentation is 'material' if there

10  was a substantial likelihood that it would have misled a reasonable

11  participant in making an adequately informed decision about whether

12  to place or maintain monies in a particular fund." Quan, 623 F.3d

13  at 886 (internal quotation marks omitted).  Whether the

14  misrepresentation is material, in other words, depends on whether

15  it would change a reasonable participant's behavior.  But the

16  question of whether charging an "IM/Admin Fee" at the investment

17  level, rather than charging it or something like it at the plan

18  level, would change participants' investment behavior is likely a

19  context-specific question.  It would probably depend, at a minimum,

20  on what other investment options were available to the participant,

21  which would likely vary from plan to plan.

22      But even if there were classwide proof of prongs (2) and (3),

23  the last prong, detrimental reliance, would necessarily require

24  individualized inquiries.  The Court would be forced inquire into

25  what plan sponsors or participants knew and when they knew it, what

26  steps participants took in reliance on the misrepresentations, and

27  whether those steps were detrimental to the participants' financial

28  positions.  In a class the size of the one Plaintiffs propose, this

1   would require thousands of separate inquiries.  These inquiries

2   would far outweigh the common questions at issue.  "[A]lthough

3   having some common core, a fraud case may be unsuited for treatment

4   as a class action if there was material variation . . . in the

5   kinds or degrees of reliance by the persons to whom they were

6   addressed."  Adv. Comm. Notes on Fed. R. Civ. P. 23.

7       Thus, although Plaintiffs have plausibly alleged that

8   Defendants have violated the fiduciary duty of honesty, and

9   specifically the duty to honestly describe its fee structure for

10  the benefit of participants, any proceeding under that theory would

11  require individualized inquiries that would quickly come to

12  predominate over the common questions.

13  **ii.   Failure to Invest in Lower-Cost Share Classes**

14      The Court finds that individualized inquiries would

15  predominate over common questions as to the claim that TLIC should

16  have invested in lower-cost share classes.  As noted above, plan-

17  by-plan analysis would be necessary to determine whether the plans

18  and participants invested in the relevant separate accounts at a

19  time when a lower-cost class was available.  It seems likely that

20  there could have been significant variation in such availability

21  from account to account and time to time.  Individualized inquiries

22  would thus tend to predominate as to this claim as well.

23  **iii. Conclusion**

24      The Court concludes, for the reasons given above, that

25  individual questions as to the IM/Admin fee and lower-cost share

26

27

28

34

1  classes would predominate over the common questions in this case.

2  Thus predominance is not satisfied.[8]

3  **b.   Superiority**

4      Because Plaintiffs' motion fails on predominance, the Court

5  need not fully analyze the superiority prong.  The Court notes in

6  passing that at least one key factor could weigh in favor of

7  granting class certification: the amount that any individual

8  plaintiff could get from Defendants might well be dwarfed by

9  litigation costs.  Thus, class litigation might be superior in that

10  sense.  But to the degree that individualized inquiries would

11  blossom and expand the scope of the litigation, the benefits of

12  cost-sharing among the class would correspondingly diminish.  In

13  any event, the same issues of trial manageability discussed above

14  would likely tip the superiority inquiry toward denying the motion.

---

16      [8]Of course, there are other claims as well.  The Court has the
17  authority to isolate certain issues for class treatment under Rule
   23(c)(4).  Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234
18  (9th Cir. 1996).  But the Court has already concluded, above at
   Part III.A.2.c., that the claim regarding fees charged by TIM and
19  TAM as to the affiliate-advised accounts does not contain questions
   common to the whole class.  As to the prohibited transactions
20  claims, the parties have not briefed whether certification of those
   claims in isolation would be appropriate.  The legal authority for
21  these claims is, in any event, underdeveloped in the motion.
   Plaintiffs allege that TLIC engaged in three types of prohibited
22  transactions: a portion of the IM/Admin fee was used to pay for
   "investment advice"; revenue-sharing payments that TLIC received
23  from the underlying mutual funds; and TLIC's investment of plan
   funds in "Affiliate Advised Separate Accounts" – that is, accounts
24  managed by TIM and TAM.  (Mot. at 23.)  Defendants point out that
   no claim was raised in the complaint as to the first type of
25  transaction.  (Opp'n at 30 n.25.)  More generally as to all three
   types of transactions, Plaintiffs' motion alleges violations of
26  "ERISA § 406(b)" – that is, 29 U.S.C. § 1106(b) – but does not
   explain whether Plaintiffs' theory of liability is under subsection
27  (1), (2), or (3).  As Plaintiffs have not requested partial
   certification, and as the legal basis for the claims is
28  underdeveloped on the present motion, the Court will not attempt to
   construct an issue for partial certification *sua sponte*.

**c.    Limited Holding**

The Court emphasizes that its decision to deny the motion for
class certification is limited to the particular facts of this
motion and this proposed class.  The Court is mindful of the
problem of hidden or unappreciated fees charged to retirement
investors.  The Government Accountability Office ("GAO"), for
example, has presented research to the Senate showing that 83% of
401(k) participants do not know how much they pay in fees and
expenses.  Government Accountability Office, *401(k) Plan
Participants and Plan Sponsors Need Better Information on Fees* 3-4
(2007).  Some 65% of those interviewed thought they paid no fees.
Id. at 5.  This order is not intended to approve of ERISA plan
service providers playing "hide the ball" with their fees.  Nor is
it the case, as has occasionally been argued by Defendants in this
litigation, that the reasonableness of fees is measured against
what other providers are charging.  A fiduciary's fees can be
unreasonable under ERISA even if other fiduciaries are also
charging unreasonable fees.

But the Court is constrained by the statute, which calls for
an evaluation of a service provider's reasonable expenses as to a
given plan compared to the fees charged.  This means that the
primary question to be answered is not, as Plaintiffs suggest, a
single question about a single fee whose reasonableness is the same
as to all plans.

If the question of evaluation of total plan expenses against
total plan fees were more directly presented, or if the class were
more narrowly drawn (so that individualized inquiries, even if
present, would not overwhelm common questions), the holding might

1   well be different.   But on these pleadings and this motion, the

2   Court finds that it cannot certify the class.

3   **IV.   CONCLUSION**

4        The Motion for Class Certification is DENIED.

5

6   IT IS SO ORDERED.

7

8   Dated: August 28, 2015

                                            DEAN D. PREGERSON
9                                           United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28